UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA

DEMOCRATIC EXECUTIVE
COMMITTEE OF FLORIDA,
and BILL NELSON FOR U.S.
SENATE,

                Plaintiffs,

     v.

KEN DETZNER, in his official
capacity as Secretary of State of
the State of Florida,

                Defendant.

Case No. _____

## MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY INJUNCTION, TEMPORARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION

Plaintiffs Democratic Executive Committee of Florida and Bill Nelson for U.S. Senate, by and through their undersigned counsel, respectfully move for the entry of a Temporary Injunction, Temporary Restraining Order, and Preliminary Injunction under Rule 65 of the Federal Rules of Civil Procedure enjoining Defendant, including all supervisors of elections and canvassing boards statewide, from rejecting provisional and absentee ballots of voters who are otherwise qualified to vote based on a canvassing board's, poll worker's, or other election official's subjective determination that the voter's signature on the ballot did not

match the signature in the precinct register. Plaintiffs further request that the Court toll the deadline to file unofficial results of the general election with the Department of State until this matter can be heard to ensure that all otherwise valid absentee and provisional ballots are duly counted in accordance with Florida and federal law. As detailed below and in the Complaint Plaintiffs file simultaneously with this Memorandum and Motion, such relief is warranted and necessary to prevent immediate, irreparable injury to Plaintiffs and to Florida voters, and to guarantee Florida citizens seeking to cast provisional and absentee ballots the fundamental right to vote in the 2018 General Election.

## PRELIMINARY STATEMENT

This lawsuit seeks to protect the constitutional right to vote of the hundreds of thousands of citizens of Florida who vote by mail or provisionally, in accordance with state and federal law, yet whose access to the franchise may be denied based solely on an election officials subjective determination that the signature on the voter's ballot does not match the voter's signature in the precinct register. The election officials entrusted with the fate of a provisional or absentee voter's ballot are not trained in signature verification, nor do they follow any pre-determined standards or other regulations that ensure accurate, uniform processes when comparing signatures. Rather, they "employ a litany of procedures . . . using their collective best judgment as to what constitutes a signature match," *Fla.*

2

*Democratic Party v. Detzner*, No. 4:16-cv-607, 2016 WL 6090943, at *7 (N.D. Fla. Oct. 16, 2016), and in the process impose severe burdens on the right to vote. Furthermore, the result of this patchwork of procedures—to the extent any procedure exists—is that provisional and absentee ballots in different counties are subjected to differing standards, in violation of the equal protection clause, and ballots submitted by African-American and young voters are rejected at a disproportionately higher rate. As a result, Plaintiffs request that this Court issue an Order enjoining Defendant, including canvassing boards and supervisors of election from rejecting provisional and vote-by-mail ballots on the grounds of signature-mismatch.

## STATEMENT OF FACTS

In the 2018 general election, 3,497,012 Florida voters requested to vote by mail. As of November 8, 2018 at 7:17 a.m., 2,622,194 of the vote by mail ("VBM") ballots have been returned and accounted for, and 874,818 had not yet been counted as returned. *Id.* And despite that turnout has historically been lower in midterm elections than in presidential elections, the number of returned VBM ballots in the 2018 midterm election (2,622,194) are already nearly identical to the number of VBM ballots cast in the 2016 presidential election (2,758,617).

VBM ballots, however, will only be counted if: (1) "[t]he signature on the voter's [VBM] certificate . . . matches the elector's signature in the registration

3

books or precinct register," Fla. Stat. § 101.68(2)(c); or (2) upon notification that there is a signature mismatch, the voter submits a "cure affidavit" before "5 p.m. on the day before the election," *and* the affidavit's signature "matches the elector's signature in the registration books or precinct register" *and* the canvassing board is able to "confirm the identity of the elector" with certain forms of accepted identification. Fla. Stat. § 101.68(2)(c), Fla. Stat. § 101.68(4).[1]

In the 2012 and 2016 general elections, approximately 1% of all VBM ballots were rejected as "illegal." "In 2016, more than 27,700 VBM ballots were rejected; in 2012, nearly 24,000 VBM ballots were rejected. The deadline to cure a VBM ballot that is rejected is 5:00 p.m. on the day before the election, Fla. Stat. § 101.68(4), scores of voters who are unable to meet this deadline will be denied the right to vote. A recent study of the VBM process in Florida has found that "younger voters as well as racial and ethnic minorities are disproportionately more likely *not* to have their VBM ballot counted as valid," and that due to "issues with their signature, eligible registrants in Florida who are younger—particularly first-time voters—and who are racial or ethnic minorities are much more likely to have

---

[1] *See also* Fla. Stat. § 101.6923 ("A vote-by-mail ballot will be considered illegal and will not be counted if the signature on the Voter's Certificate does not match the signature on record. The signature on file at the start of the canvass of the vote-by-mail ballots is the signature that will be used to verify your signature on the Voter's Certificate. If you need to update your signature for this election, send your signature update on a voter registration application to your supervisor of elections so that it is received no later than the start of canvassing of vote-by-mail ballots, which occurs no earlier than the 15th day before election day.").

their ballot rejected by a county canvassing board." *See* Dr. Daniel A. Smith, ACLU Florida, Vote-By-Mail Ballots Cast in Florida (2018) ("Smith Report"), Ex. A.

Similar to VBM ballots, signatures on provisional ballots are also subject to inspection under Florida law. As a threshold matter, the county canvassing board will first examine a provisional ballot's voter certificate and affirmation to determine if the voter was entitled to vote in the precinct where the vote was cast. Fla. Stat. § 101.048(2). If a provisional ballot passes the threshold inquiry, the provisional ballot will only be counted if the canvassing board concludes that "the signature on the Provisional Ballot Voter's Certificate and Affirmation" matches "the signature on the voter's registration." Fla. Stat. § 101.048(2)(b)(1).

Notably, rejection rates for vote-by-mail and provisional ballots vary significantly across Florida's counties. As Judge Walker found in *Florida Democratic Party v. Detzner* ("FDP"), "the State of Florida has no formalized statewide procedure for canvassing boards to evaluate whether the signature on a vote-by-mail ballot matches the signature on file with the elections office. And the procedures in place vary widely by county." No. 4:16-cv-607, 2016 WL 6090943, at *3 (N.D. Fla. Oct. 16, 2016). In underscoring the arbitrary and standard-less nature of the statewide process for evaluating a voter's signature on VBM and provisional ballots, Judge Walker further recognized that "the number of

mismatched-signature ballots that are rejected *also* varies widely by county," *id* (emphasis in original) and that the lack of uniform standards has resulted in "a crazy quilt of conflicting and diverging procedures." *Id*. at *7. As a result, whether a voter's VBM or provisional ballot is counted will depend largely on where the voter lives.

## ARGUMENT

### I.   Legal Standard

In order to obtain a temporary restraining order or preliminary injunction, a plaintiff must establish a substantial likelihood of success on the merits, that it will suffer irreparable injury unless the injunction issues, that the threatened injury outweighs whatever damage the proposed injunction may cause a defendant, and that the injunction will not be adverse to the public interest. *U.S. v. Florida*, 870 F. Supp. 2d 1346, 1348 (N.D. Fla. 2012) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). None of these factors is controlling however. The Court "must instead consider these elements and the strength of the showing made as to each of them together, and a strong showing of (for instance) likelihood of success on the merits may compensate for a relatively weak showing of public interest." *See Fla. Med. Ass'n, Inc*. v. *U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

### II.   Plaintiffs are Likely to Succeed on their Claims.

### A. The signature-matching process imposes a hodge-podge of arbitrary, non-uniform standards upon voters in violation of the equal protection clause.

As recent elections (and the early vote totals of the 2018 general election) have demonstrated, it is all but certain that millions of Florida citizens will vote by mail, and that thousands of those ballots will be improperly rejected because a voter's signature on her ballot envelope does not match the signature on file for the voter. Fla. Stat. § 101.68(4)(a). It is also all but certain that thousands of provisional ballots will be rejected for the same reason. Fla. Stat. § 101.048(2)(b)(1) (requiring the canvassing board to compare the signature on the provisional ballot voter's certificate and affirmation with the signature on the voter's registration and to count the ballot if the signatures match). But there are no uniform standards that election officials follow, nor is there any known state-wide training, for signature-matching processes. That means under sections 101.68(4)(a) and 101.048(2)(b)(1), provisional voters are subject to arbitrary signature-matching standards that vary depending on the county in which the voter resides. And even among voters within the same county, different standards may apply depending on which election official reviews their signatures.

The hodgepodge of standards for signatures in Florida's current, arbitrary system is clearly violative of the Equal Protection Clause. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate

treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000); *OFA v. Husted*, 888 F. Supp. 2d 897, 905 (E.D. Ohio 2012) ("The . . . Supreme Court has reiterated time and again the particular importance of treating voters equally . . . .") (citing cases). Moreover, "'[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.'" *Obama For America v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Bush*, 531 U.S. at 104 (2000)) (citation omitted) (emphasis added). "A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Id.* (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).

Judge Walker's ruling in *FDP* highlighted the dangers of the lack of uniformity among counties in comparing signatures on provisional and VBM ballots. There, Judge Walker explained that canvassing boards across the state "employ a litany of procedures when comparing signatures" and that the "complete lack of uniformity" was "deeply troubl[ing]." *FDP*, 2016 WL 6090943, at *7. Following *FDP*, Secretary Detzner issued a directive requiring SOES to "allow mismatched signature ballots to be cured in precisely the same fashion provided for no-signature ballots." Secretary of State Ken Detzner, Memorandum to Supervisors of Elections, "Court Order, Fla. Democratic Party v. Secretary of State," October 17, 2016, available at: http://dos.myflorida.com/elections/for-

voter/voting/vote-by-mail/. The directive provided for no specific procedures on how to evaluate the signature on the voter's certificate on the envelope of returned VBM ballots, leading to inexplicable ranges in the percentage of rejected VBM ballots across Florida's 67 counties in 2016: "[t]wo counties (Bay and Glades) reported no rejected VBM ballots; Calhoun County reported that it rejected more than 2 percent of all VBM ballots cast, and Orange County reported rejecting nearly 4 percent of all VBM ballots cast." Smith Report at 14.

The explanation for these numbers becomes clear, however, with even a cursory review of the standards across counties:

> The lack of statewide protocols left counties in 2016 to create their own, varying, methods of contacting voters who had VBM ballots with a mismatched signature on the return envelope. In rural, Gadsden County, for example, SOE staff contacted affected mail voters by either phone or email to inform them of their rejected ballot status, and that they had an opportunity to cure their VBM ballot. In Pinellas County, which has by far the highest percentage in the state of voters who utilize VBM ballots (50.7 percent of all ballots cast in the 2016 general election were VBM ballots), registered voters have access to a "Track Your Ballot" feature on the SOE's website. The website also provides detailed information on the steps a voter needs to follow to cure a rejected VBM ballot.[17] Nassau County encourages voters whose VBM ballot is rejected due to a mismatched signature to simultaneously update their signature on file by also mailing a voter registration form with the VBM cure affidavit.

> Other county SOEs were creative in developing their
> own, individualized protocol to contact affected VBM
> voters in the 2016 general election. For example, if the
> Wakulla County SOE was unable to reach, by phone or
> email, those with a mismatched signature, the staff tried
> to contact affected voters via their Facebook profiles.

Smith report at 24.

These differing standards are plainly inappropriate under any reasonable review under the Equal Protection Clause. A voter in Florida should not have their opportunity to vote vary by the county they live in, or the vigilance of their local canvassing board. Without any uniform state protocols in place, the current individualized and standard-less procedures for evaluating signatures violates the Equal Protection Clause.

B.   **The categorical disqualification of signature-mismatch ballots imposes a severe burden on Florida citizens' right to vote.**

The canvassing board's rejection of signature-mismatch ballots unquestionably burdens the right to vote, which "is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) ("a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction") (quoting Dunn v. Blumstein, 405 U.S. 330, 336 (1972)), as "[o]bviously included" within the right to vote "is the right of qualified voters within a state to cast their

ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941); *Stewart v. Blackwell*, 444 F.3d 843, 856-57 (6th Cir. 2006) (same); see also 52 U.S.C. § 10310(c)(1) (defining right to vote as including "casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast").

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi,* 504 U.S. 428 (1992) the Supreme Court laid out a "flexible standard" to resolve constitutional challenges to state election laws. *Anderson*, 460 U.S. at 789. "A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 433-34 (citation and internal quotations omitted). Under this sliding scale, when a regulation subjects the right to vote to a "severe" restriction, the restriction "must be narrowly drawn to advance a state interest of compelling importance" to pass constitutional muster. *Norman v. Reed*, 502 U.S. 279, 280 (1992). Less severe burdens remain subject to balancing, but "[h]owever slight" the burden on the right to vote "may appear," "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election*

*Bd.*, 128 S. Ct. 1610, 1616 (2008) (plurality) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).

The outright rejections of the votes of thousands of qualified voters, based on a subjective, standard-less comparison of signatures by untrained lay persons, unquestionably imposes a severe burden on the constitutional right to vote. *See Florida Democratic Party*, 2016 WL 6090943, at *6 ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does."). Courts have further found that the burden on the right to vote is more severe when it is a result of government error or is otherwise out of the voter's control. *See NEOCH,* 696 F.3d at 593-94 (relying on fact that majority of provisional ballot right-place/wrong precinct votes—which are not counted—are attributable to poll-worker error to establish that burden on voters is substantial); *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 238 (6th Cir. 2011) (granting preliminary injunction on equal protection grounds where "voters who may bear no responsibility for the rejection of their ballots"); *Stewart*, 444 F.3d at 860-61 (fact that technological burden exacted by voting machines "not within the control of the voters" makes burden more substantial).

In the context of voting rights cases, "even one disenfranchised voter—let alone several thousand—is too many[.]" *League of Women Voters of N.C. v. N.*

Carolina ("*LOWV*"), 769 F.3d 224, 244 (4th Cir. 2014), *cert. denied*, 135 S. Ct.
1735 (2015). In *Stewart v. Blackwell*, 444 F.3d 843 (6th Cir. 2006), for instance,
the Sixth Circuit found a "severe" burden where unreliable punch card ballots and
optical scan systems resulted in thousands of votes not being counted. *Id.* at 661-
62. And, in *Ne. Ohio Coal. for the Homeless v. Husted* ("*NEOCH*"), 696 F.3d 580
(6th Cir. 2012), the court held that disqualification of thousands of Ohio
provisional ballots because they were cast in the right polling location but wrong
precinct in multiple precinct polling locations constituted a "substantial" burden on
provisional voters. *Id.* at 597. The court reached this conclusion even though such
ballots historically constituted less than 0.248% of all votes cast. *Id. at 593.* Most
recently, in *One Wisconsin Inst., Inc. v. Thomsen,* 2016 U.S. Dist. LEXIS 100178
(W.D. Wis. July 29, 2016), the court found a severe burden where about 100
otherwise qualified voters were disenfranchised because of Wisconsin's voter ID
law. *Id.* at *137-38.

Here, it is all but certain that thousands of voters will be disenfranchised
because their ballots are rejected due to a determination that the signature on their
ballot envelope does not "match" the signature on file. In the 2012 General
Election, in just 11 Florida counties, at least 2,608 vote-by-mail ballots were
rejected because of signature-mismatch. *See* Smith Report at 8. Those counties
account for "nearly half of all absentee ballots cast" in that election, *id*. at 7-8,

indicating that it is likely that well over 5,000 ballots were rejected across Florida for signature mismatch in the 2012 General Election. With vote-by-mail voting on the rise, *see discussion supra*, that number is most likely to increase in the 2018 General Election.

Moreover, studies have also shown that the burden of canvassing boards' improper rejection of signature-mismatch falls disproportionately on African American voters and young voters. *See* Smith Report. And the disproportionate rejection of provisional and absentee ballots on account of signature mismatch impermissibly burdens the constitutional right to vote. Indeed, in *Ohio Organizing Collaborative v. Husted*, the District Court, applying the *Anderson-Burdick* framework, found that Ohio's reduction of early voting days had a disproportionate burden on African American voters. *See Ohio Organizing Collaborative v. Husted*, 189 F. Supp. 3d 708, 739 (S.D. Ohio 2016), *rev'd*, 834 F.3d 620 (6th Cir. 2016). While the Sixth Circuit disagreed as to the extent of the burden imposed on African Americans, both courts were consistent in evaluating and weighing the extent of the "disparate burden [of the Ohio law] on African American voters" as part of that balancing test. *See Husted*, 834 F.3d at 627. As explained above, the extent of the burden here—the outright denial of the right to vote—is well-established. *See Fla. Democratic Party*, 2016 WL 6090943, at *6. Thus, evidence of the law's disproportionate burden—in this case, the disproportionate rejection of

14

the ballots of certain classes of voters—is more than sufficient to demonstrate a severe burden on the right to vote under the Anderson-Burdick framework. *See id.*

To be clear, the canvassing board's signature-match determinations are inherently error-prone and highly unreliable. As Dr. Linton Mohammed has explained, laypersons with little to minimal training are highly likely to mistakenly classify a valid signature as invalid (i.e., a mismatch). Ex. B ¶¶ 10-12, 18, 21(Mohammed Decl.) (studies found laypersons find false mismatch 26% of the time, even when they have more samples than elections administrators have in determining whether a Florida voter's signature "matches" the signature on file). And, as discussed *infra*, there are ample reasons a canvassing board might conclude no signature match, even though the person signing the ballot envelope is the same as the person who originally signed the registration. In other words, there are numerous factors outside a voter's control that may cause their ballot to be rejected for signature-mismatch.

For one, a person's signature varies each time she signs based on unremarkable factors such as the person's body position when signing, writing surface and material, physical and psychological state of the person, and environmental factors, such as noise and luminance. *See* Ex. B ¶¶ 15, 17 (Mohammed Decl.). Indeed, a presentation given by a Forensic Document Examiner at the 2015 annual conference for the Florida State Association of

Supervisors of Elections noted that eyesight, illness, pen type, surface, paper quality, distress, depression, and nervousness are among the many factors that affect handwriting. Ex. B ¶¶ 14, 17-18 (Mohammed Decl.).

Furthermore, signatures systematically change with age for even healthy individuals. *See, e.g.*, Ex. B ¶ 14, 17-18 (Mohammed Decl.). Given that voters need not regularly update their registrations once registered to vote, it is likely that many vote-by-mail voters' signatures are being compared to their signatures from many years earlier, further increasing the likelihood of an erroneous finding of mismatch. Ex. B ¶¶ 18 (Mohammed Decl.). Additionally, maintaining a consistent signature can be a struggle for voters who suffer from arthritis, strokes and other ailments that affect their handwriting. And, most troubling, it is these voters who are most likely to need to cast a vote-by-mail ballot because of the physical difficulties presented by voting in person.

Lastly, and most importantly, in light of the lack of standards provided to canvassing boards for assessing signatures' authenticity, the risk of canvassing board error—deeming authentic signature inauthentic or non-matching—is incredibly high. Ex. B ¶¶ 3-4, 18, 21-22 (Mohammed Decl.). As demonstrated by the studies cited above, detecting forgery is a challenging task since a person's signature can vary over time due to a number of factors, many outside the person's control. Ex. B ¶ 17-19 (Mohammed Decl.). Yet amateurs without expertise in

handwriting analysis—canvassing board members—are statutorily obligated to take up the task without any guiding standards, making it all-but-certain that they will conduct such signature comparison using inconsistent metrics and disparate guesswork. Ex. B ¶¶ 3-4, 18, 21-22 (Mohammed Decl.). As the Florida Division of Elections has explained, the Florida legislature: did not incorporate in the Florida Election Code a scientific standard of handwriting comparison when charging canvassing boards with their duty to compare signatures . . . Instead, the Legislature in essence created a standard of reasonableness and left it to the canvassing boards to make such determinations using their collective best judgment as to what constitutes a signature match. In other words, the statutory scheme affords canvassing boards complete discretion over signature comparison with no statewide oversight or standards. Even if a Supervisor of Elections for a particular county were to elect to use signature verification technology to aid in the signature matching decision process, the Florida Division of Elections has made clear both that (a) even if such technology is used, "the ultimate decision regarding the authenticity of a signature must be made by the canvassing board using their collective best judgment" and (b) the Division of Elections lacks the statutory test to certify the use of signature verification technology. *Id.* at 3-4. The statutory scheme accordingly *ensures* that the metrics used for comparing signatures will not and cannot be standardized across county canvassing boards. Nor can the Division

of Elections ameliorate the problem by ensuring that the particular standard or scheme used by each canvassing board is sufficiently reliable—it lacks the statutory authority to do so. It should come as no surprise, then, that the rejection rates for signature- mismatch vary "considerabl[y]" across counties. *See supra*. Such variance further amplifies the severity of the burden—and the Equal Protection Clause violation—because vote-by-mail voters in some counties are "less likely to cast effective votes" than vote-by-mail voters in others. *Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006). The facts here are very much akin to those in *Stewart*, cited favorably by the Eleventh Circuit in *Wexler*, where the Sixth Circuit applied strict scrutiny to particular counties' use of voting technologies where use of them "result[ed] in a greater likelihood that one's vote w[ould] not be counted on the same terms as the vote of someone in" another county that employed a different, more reliable technology. *Stewart*, 444 F.3d at 871; *Wexler*, 452 F.3d at 1233 n.10. Similarly, here, through no fault of the voter, vote-by-mail voters in some counties face a significantly greater likelihood their votes will not be counted than voters in other counties.

C.    **The arbitrary rejection of ballots for signature-mismatch does not advance any sufficiently weighty government interest.**

The burden on Florida voters' fundamental right to vote is severe, and there is no corresponding government interest that is "sufficiently weighty" to justify the

burden imposed by the signature matching process, nor is this process narrowly tailored to meet any such interest. *Normand*, 502 U.S. at 288-89. To the extent that Defendants advance an interest in preventing voter fraud, that interest is not furthered by comparing signatures under an arbitrary, error-prone process that results in the categorical disqualification of thousands of ballots. In light of the natural variation of individual's signatures, *see discussion supra*, the signature-match requirement does little to further the government's interest in preventing voter fraud because its high rate of error—when conducted by lay persons all but ensures the improper rejection of legitimate ballots, which directly impairs the integrity of the political process.

## III.    The Balance of Hardships Weighs in Favor of Issuing a Temporary Restraining Order and Preliminary Injunction.

The threatened injury of voter disenfranchisement outweighs any damage that an injunction might cause Defendants. A ruling enjoining the canvassing board and election officials from rejecting ballots on the basis of signature mismatch imposes no administrative burden on Defendants, nor does it impair any purported efforts to protect against voter fraud. As Judge Walker recognized in *FDP*, "there is simply no evidence that . . . mis-matched signature ballots were submitted fraudulently. Rather, the record shows that innocent factors—such as body position, writing surface, and noise—affect the accuracy of one's signature." 2016

19

WL 6090943, at *7. Any hardship created by an injunction would thus be minimal to nonexistent and is certainly outweighed by the hardship imposed by the unconstitutional deprivation of the equal right to vote. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975) (stating "administrative convenience" cannot justify the deprivation of a constitutional right).

## IV.    An Injunction is in the Public Interest.

The public has a paramount interest in elections where every eligible resident may cast an effective vote. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *see also LOWV*, 769 F.3d at 248 ("[t]he public has a 'strong interest in exercising the fundamental political right to vote.'" (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)); *OFA*, 697 F.3d at 437 ("The public interest . . . favors permitting as many qualified voters to vote as possible.'"). Fla. Stat. §§ 101.68(2)(c)(1) and 101.048(2)(b)(1) subject absentee and provisional voters to an unjustified risk that their ballots will be rejected. It serves no public purpose to retain an error-prone and arbitrary process for verifying signatures that will surely result in the improper rejection of valid ballots. Under the circumstances, an injunction barring the State from disenfranchising voters would only promote the public interest.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court enter a temporary restraining order and preliminary injunction enjoining Defendant, his officers, employees, and agents; all persons acting in active concert or participation with the Defendant, or under any Defendant's supervision, direction, or control, including the county canvassing boards; and all other persons within the scope of Federal Rule of Civil Procedure 65, from enforcing Fla. Stat. §§ 101.68(2)(c)(1) and 101.048(2)(b)(1). Plaintiffs further request that the Court toll, until this matter can be heard, the deadline for the county canvassing board to submit "unofficial" results to the Department of State in order to ensure that all signed absentee and provisional ballots are counted and included in all submitted results.

Dated: November 8, 2018

Respectfully submitted,

_____/s/_____
RONALD G. MEYER
Florida Bar No. 0148248
Email:  rmeyer@meyerbrookslaw.com
JENNIFER S. BLOHM
Florida Bar No. 0106290
Email:  jblohm@meyerbrookslaw.com
Meyer, Brooks, Demma and Blohm, P.A.
131 North Gadsden Street
Post Office Box 1547
Tallahassee, FL 32302-1547
(850) 878-5212

Uzoma N. Nkwonta*
Email:  UNkwonta@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

Counsel for Plaintiffs

*Pro Hac Vice Motion forthcoming