# EXHIBIT A



# Vote-By-Mail Ballots Cast in Florida

Report by

**ACLU** Florida

Written by

Dr. Daniel A. Smith

Professor and Chair
Department of Political Science
University of Florida

President
ElectionSmith, Inc.

September 19, 2018
Revised

For Florida to
have free and
fair elections, all
eligible voters
must have equal
opportunity to
vote, including
those casting
(and curing)
VBM ballots.

## Summary

This report contrasts the rates of rejected vote-by-mail (VBM) ballots in the 2012 and 2016 general elections—statewide broken down by age cohorts and racial and ethnic groups, and across counties. In addition, drawing on available county-level records, it highlights variations in cure rates of VBM ballots received by Supervisors of Elections (SOE) in the 2016 general election that initially were deemed invalid because they were contained in return envelopes with mismatched signatures. It finds that younger voters, as well as voters from racial and ethnic minorities, are much more likely to cast VBM ballots that are rejected, and are less likely to cure their VBM ballots if SOE staff flag them for having signature problems.

## Principal Findings

➢ Mail ballots (commonly referred to as "Vote by Mail" or VBM) have had a higher rejection rate than votes cast at assigned precincts on Election Day and at Early Voting sites;

➢ There is a lack of uniformity in the vote-by-mail process as well as procedures to cure invalid ballots across Florida's 67 counties, leading to considerable variation in rejection rates and cure rates by counties;

➢ Younger and racial and ethnic minority voters were much more likely to have their VBM ballots rejected and less likely to have their VBM ballots cured when they are flagged for a signature problem;

➢ Younger and racial and ethnic minority voters casting VBM ballots were at least twice as likely as older and white voters to have their VBM ballot rejected in the presidential elections of 2012 and 2016;

➢ The likelihood of younger and minority voters casting a mail ballot that was rejected increased in 2016 compared to 2012 while the rejection rate of VBM ballots cast by white voters decreased;

➢ Florida voters were more likely to have their vote tabulated and validated if they cast their ballot in person at an Early Voting site or at their assigned Election Day polling location.

## Policy Recommendations

To ensure that all eligible voters have an equal access to the voting process and to have their vote processed, tabulated, and accepted as valid:

➢ There should be greater statewide uniformity in the design of mail ballots and the return VBM envelope;

➢ There should be greater uniformity in the procedures employed by Supervisors of Elections, their staff, and canvassing boards to process, validate and, if necessary, cure VBM ballots;

➢ The Florida statewide voter history file (the FVRS database) should include information about why a voter's mail ballot was rejected, including whether it was rejected because it lacked a signature or the voter's signature was mismatched, and if the voter attempted to cure the VBM ballot if it was flagged as invalid;

➢ The October 17, 2016 Memorandum to Supervisors of Elections (SOEs) from Secretary of State Ken Detzner should be revised to include specific procedures that county election officials should follow when notifying voters of a rejected VBM ballot and the cure process for missing and mismatched signatures;

➢ The Florida Division of Elections should study procedures for processing VBM ballots as well as procedures in place for voters to cure an invalid mailed ballot, promoting "best practices" from those counties with the lowest rejection and highest cure rates;

➢ The legislature should create guidelines for how SOEs shall notify voters of their rejected ballot status and how voters can cure their VBM ballot prior to Election Day.

## Voting by Mail in the Sunshine State

One of the fundamental requirements of a free and fair election is the equal access, processing, and validation of ballots cast by eligible electors. In Florida, compared to ballots cast by voters early in-person at early voting locations or on Election Day at assigned local precincts, there is a much higher rate of rejected mail ballots, known technically as vote-by-mail (VBM) ballots. There is also considerable variation from county to county in the process of allowing voters to correct rejected VBM ballots with a "Vote-by-Mail Ballot Cure" Affidavit.

When variation exists in the rate of valid ballots cast across groups of individuals and especially following the adoption of a process to cure invalid ballots due to a problem with the voter's signature, both the voter casting an invalid ballot and  election officials charged with processing and validating them share responsibility. To be sure, eligible voters are responsible to make sure they cast a valid ballot, taking care to update their signature on file with local election officials and to follow instructions on how to complete the voter's certificate on the return envelope to avoid mistakes that might spoil their ballot. At the same time, given their considerable discretion in processing and validating VBM ballots, local election officials, too, are responsible for ensuring that all voters have equal access to cast a ballot,  have that ballot tabulated and that the process and validation of ballots is fairly administered for all eligible voters.

## Florida's 2012 and 2016 General Elections

This report examines rejected vote-by-mail (VBM) ballots in Florida in the 2012 and 2016 General elections.  After documenting the rates of valid and invalid VBM ballots for the two elections, it further breaks down the statewide and county rejection rates across six age cohorts and racial and ethnic groups, documenting the differential rates of rejected VBM ballots for individuals in these demographics.[1]

Given the newfound opportunity in the 2016 general election for voters to cure their initially rejected VBM ballot due to a missing or mismatched signature, the report then draws on available county-level records to highlight statewide and county variation in cure rates of VBM ballots for different demographic groups.

Following a Preliminary Injunction issued by U.S. District Judge Mark Walker prior to the 2016 general election (later codified into state law in 2017), there is an expectation that rejection rates of VBM ballots should be lower in 2016 relative to those in 2012.  In the most recent presidential election, eligible voters who cast an absentee mail ballot had the opportunity to cure ballots not only if they had a missing signature, but also if their signature on the voter's certificate was mismatched with the signature in the voter registration file.[2]

Because of the disparate rejection rates of VBM ballots across age cohorts and racial and ethnic groups, it is critical to understand which voters in the 2016 election were able to cure their rejected VBM ballot, and which voters failed to cure their rejected VBM ballot. Are some voters more likely to cast VBM ballots that have a missing signature or a signature that does not match the voter's signature on file? Are voters in some counties more successful in curing their invalid ballots than those in other counties? Do differences in the rates of rejected VBM ballots vary by age cohorts or race/ethnic groups, across or within counties?

This report draws on publicly available data sources, including statewide voter files and vote history files.[3] It also draws on data obtained through public record requests[4] with SOEs to determine whether voters who cast VBM ballots that were initially rejected were able to successfully cure their invalid ballots so that those ballots could be counted in the election.

**To preview of the findings:**

➢ **The rejection rate of VBM ballots cast in Florida in the 2012 and 2016 presidential elections was nearly identical—1.01 percent of all VBM ballots cast were rejected;**

➢ **Nearly 24,000 VBM ballots cast in the 2012 general election were rejected, and nearly 28,000 were rejected in the 2016 general election;**

➢ **The rejection rate of mail ballots differs considerably across age cohorts and racial and ethnic groups, as well as across the state's 67 counties; younger voters as well as racial and ethnic minorities in Florida are disproportionately more likely to cast VBM ballots that are "rejected as illegal" by county Canvassing Boards.[5]**

➢ **These age and racial/ethnic disparities further widened in the 2016 general election compared to the 2012 November election, despite the expanded opportunity for voters to cure ballots initially flagged as invalid by Supervisors of Elections (SOEs).[6]**

➢ **Furthermore, the report documents the considerable variation in VBM ballot rejection rates across the state's 67 counties.**

## The Popularity of Vote-by-Mail Ballots

In Florida, voting by mail remains very popular. Both the overall number of VBM ballots, as well as the percentage of VBM ballots of all votes cast, have steadily ticked up over the past three presidential elections in the Sunshine State. In the 2016 general election, more than 2.7 million registered voters, some 28.7 percent of the 9.6 million Floridians who turned out to vote, cast their ballot by mail,[7] up from the nearly 2.4 million registrants (or 27.8 percent of the electorate) who voted VBM in 2012.[8] Four years earlier, in the 2008 general election, more than 1.8 million Florida voters, or 22.2 percent of the electorate, cast a VBM ballot prior to Election Day.[9] Even with the growing popularity of early in-person voting, absentee mail ballots account for a sizeable share of the total votes cast in Florida.

## Why Might Validation Rates of VBM Ballots Differ?

Why might validation rates of VBM ballots differ across age cohorts and racial/ethnic groups? It is a given that some voters fail to follow instructions when filling out their ballot and return VBM envelope. When returning their VBM ballots, some voters may fail to sign their name as it appears in the official voter registry on the back of the official mailing envelope. They may disregard an affidavit or date, or simply sign the return envelope incorrectly. Or, perhaps, these VBM voters may neglect to sign the vote by mail ballot envelope at all.[10] Alternatively,

5

the differential rates of VBM ballots cast across demographic groups may be related to how SOEs process these mail ballots, or how the state's 67 county canvassing boards interpret the voter's certificate signature and other information on VBM return envelopes.

Regardless of whether the cause of rejected VBM ballots is voter error or less than adequate procedures established by local election administrators, in theory, the rate of rejected VBM ballots across demographic groups (age cohorts and racial/ethnic minorities) should not differ substantially. Even if there are correlations with age and race and ethnicity (such as education) that might lead to higher rates of rejected VBM ballots for some demographic groups, VBM rejection rates across demographic groups should not differ substantially across counties, if equal standards are being applied by SOEs and their staff. Furthermore, we should see comparable VBM cure rates across counties of ballots cast across age cohorts and racial and ethnic groups that were initially rejected prior to an election by SOEs. In the 2016 general election, voters who neglected to sign the voter's certificate on the VBM envelope, or who signed the voter's certificate on the envelope but their signature did not match their signature in the registration books, had an opportunity to cure their invalid ballot.

## "Curing" Rejected VBM Ballots in Florida

On Monday, October 3, 2016, a month and five days prior to the November 8, 2016 election, the Florida Democratic Party and the Democratic National Committee jointly filed suit in federal district court, suing Governor Rick Scott and Secretary Ken Detzner to allow voters to cure their VBM ballot if it was initially rejected by their county canvassing board. The plaintiffs requested a preliminary injunction from U.S. District Court Judge Mark Walker to allow VBM voters the opportunity to cure their ballot if their signature did not match the voter's signature on file with their county SOE. At the time the lawsuit was filed, hundreds of thousands of absentee ballots were already in the mail to voters, and thousands of VBM ballots had already been returned by voters to their SOE.

Citing the Equal Protection Clause of the 14th Amendment, the Democratic Party plaintiffs argued that voters who mailed back their absentee ballots with mismatched signatures should have an opportunity to cure a signature deemed to be invalid by county canvassing boards. There was precedent for such a holding. In 2013, the state legislature passed a law allowing VBM voters who neglected to sign the voter's certificate on the back of the envelope housing their absentee mail ballot to sign an affidavit and provide their signature by 5:00 p.m. on the day before the election. In order to cure their missing

In order to cure their missing signature on their VBM envelope, voters were permitted to mail, fax, email, or hand-deliver to their SOE their signed affidavit, along with a copy of a permissible form of identification.

# VOTING BY MAIL IN THE SUNSHINE STATE

One of the fundamental requirements of a free and fair election is the equal access, processing, and validation of ballots cast by eligible electors. In Florida, compared to ballots cast by voters early in-person at early voting locations or on Election Day at assigned local precincts, there is a much higher rate of rejected mail ballots, known technically as vote-by-mail (VBM) ballots.

signature on their VBM envelope, voters were permitted to mail, fax, email, or hand-deliver to their SOE their signed affidavit, along with a copy of a permissible form of identification.

Calling Florida's VBM statutory scheme "a crazy quilt of conflicting and diverging procedures" and a "hodgepodge of procedures" marked by a "complete lack of uniformity," Judge Walker dismissed Secretary Detzner's opposition for a cure period allowing voters to update their mismatched signatures. Judge Walker ruled that not allowing voters to correct their signatures on rejected mail ballots constituted "a severe burden on the right to vote." "The state of Florida has categorically disenfranchised thousands of voters," Judge Walker concluded, "arguably for no reason other than they have poor handwriting or their handwriting has changed over time."[11]

Judge Walker's ruling recognized the discrepancy in treatment of VBM return envelopes devoid of a signature and those that were returned with a voter's certificate signature that did not match the voter registration form on file with the SOEs. Deeming this difference in treatment unconstitutional, Judge Walker cited League of Women Voters of Ohio v. Brunner (2008), writing that "[t]he right to vote includes the right to have one's votes counted on equal terms with others."[12] He ordered Secretary of State Detzner to issue a directive to all Florida SOEs, advising them that Florida's scheme regarding the treatment of ballots with mismatched signatures was unconstitutional. SOEs would be required to allow voters to cure their mismatched signatures on their VBM envelopes in the same fashion as VBM ballots returned with no signature by the voter.

Immediately following Judge Walker's ruling, Secretary Detzner issued a directive to all SOEs requiring them to "allow mismatched signature ballots to be cured in precisely the same fashion provided for no-signature ballots."[13] The directive also pointed out that the curing of mismatched signatures and no-signature ballots must use two different forms, indicating which type of invalid VBM envelope voters wished to cure. As with VBM ballot envelopes returned with no signature, voters wishing to cure their VBM ballot with a mismatched signature had until 5:00 p.m. the day before the election to do so.

However, Secretary Detzner's directive was as noteworthy for what it did not state, as much as for what it did state. His directive did not include any instructions for SOEs on how they should document the VBM cure process; SOEs were not informed (or required) to record which voters cast rejected VBM ballots, if or how these voters were to be contacted, or whether those VBM ballots that were initially rejected were ever cured or not. This makes the oversight and accountability of rejected VBM ballots and the cure process nearly impossible. The lack of detail in Secretary Detzner's directive is perhaps indicative of his argument during the hearing that, as Secretary of State, he did not have the authority to mandate to SOEs to follow a certain protocol to assist voters who cast VBM ballots initially flagged as invalid by SOEs.  In his Preliminary Injunction requiring the directive, Judge Walker rebuked Secretary Detzner for being "disingenuous," but he did not direct the Secretary of State to charge SOEs to implement specific procedures on how to evaluate the signature on the voter's certificate on the envelopes of returned VBM ballots.

IN 2016, VOTERS UNDER THE AGE OF 30 MADE UP JUST 9.2 PERCENT OF ALL VBM VOTERS, BUT THEY ACCOUNTED FOR 30.8 PERCENT OF ALL THE REJECTED MAIL BALLOTS.

**Rates of Rejecte VBM Ballots Cast in the 2012 and 2016 General Elections by Age Cohorts and Racial/Ethnic Groups**

All voters—regardless of race and ethnicity or age face considerable hurdles when casting a mail ballot.[14] But in Florida, younger voters as well as racial and ethnic minorities  are disproportionately more likely not to have their VBM ballot counted as valid. Because of issues with their signature, eligible registrants in Florida who are younger—particularly first-time voters—and who are racial or ethnic minorities are much more likely to have their ballot rejected by a county canvassing board.

*Rejected VBM Ballots by Age Cohorts*

In the 2016 general election, a total of nearly 2.8 million voters cast valid and invalid ballots.  Some 375,000 more VBM ballots were cast than in the presidential election four years earlier.  As Table 1 shows, based on calculations derived from snapshots of the statewide voter files, in both the 2012 and 2016 general elections approximately 1 percent of all VBM ballots were rejected as illegal.  In 2016, more than 27,700 VBM ballots were rejected; in 2012, nearly 24,000 VBM ballots were rejected.

The rejection rates of VBM ballots in both elections, however, vary considerably across the six age cohorts (18-21, 22-25, 26-29, 30-44, 45-64, 65-105).  In the 2012 general election, the rate of rejected VBM ballots cast by the youngest cohort, 18-21 year-olds, was 4.2 percent, more than eight-times greater than that of the oldest cohort.  Although 18-29 year-olds comprised only 9.6 percent of all voters who cast a VBM ballot in Florida in 2012, they accounted for exactly one-third of all rejected VBM ballots in the presidential election.

In the 2016 general election, voters had the opportunity to cure their invalid VBM ballot by 5:00 p.m. the day before Election Day.  As such, one might expect that the overall rate of rejected VBMs might be considerably lower in the 2016 election compared the presidential election held four years earlier.  This was not the case.  In 2016, the gulf between younger and older voters casting rejected VBM ballots remained nearly as wide.  A voter 18 to 21 years old in 2016 was again eight-times more likely to have her VBM ballot rejected than an absentee mail voter 65 years old or older.  County canvassing boards rejected more than 4 percent of all VBM ballots cast by this youngest cohort. Similar patterns exist for the other two age cohorts under 30 years old, as 22-25 year-olds and 26-29 year-olds were several times more likely than the oldest voting cohort to have their VBM ballots rejected in 2016, just like in 2012.

➢ **In 2016, voters under the age of 30 made up just 9.2 percent of all VBM voters, but they accounted for 30.8 percent of all the rejected mail ballots.**

These figures clearly indicate that young Floridians who vote by mail have a substantially higher likelihood of having their VBM ballots rejected than older registered voters, and that the rate did not depreciate in 2016, even though voters had the ability to cure their VBM ballots with a missing or mismatched signature on their VBM envelope prior to Election Day.

**TABLE 1**

**2012 AND 2016 FLORIDA GENERAL ELECTIONS:**
**NUMBER AND PERCENTAGE OF ACCEPTED AND REJECTED VOTE BY MAIL BALLOTS, BY AGE**

| Age | 2012 General Election | | | 2016 General Election | | |
|---|---|---|---|---|---|---|
| | Accepted Vote by Mail | Rejected Vote by Mail | Total | Accepted Vote by Mail | Rejected Vote by Mail | Total |
| **18-21** | 67,491 | 2,941 | 70,432 | 71,374 | 2,984 | 74,358 |
| | 95.8 | 4.2 | 100.0 | 96.0 | 4.0 | 100.0 |
| **22-25** | 57,903 | 2,094 | 59,997 | 82,667 | 2,980 | 85,647 |
| | 96.5 | 3.5 | 100.0 | 96.5 | 3.5 | 100.0 |
| **26-29** | 93,736 | 2,883 | 96,619 | 89,368 | 2,558 | 91,926 |
| | 97.0 | 3.0 | 100.0 | 97.2 | 2.8 | 100.0 |
| **30-44** | 312,904 | 5,030 | 317,934 | 362,017 | 6,405 | 368,422 |
| | 98.4 | 1.6 | 100.0 | 98.3 | 1.7 | 100.0 |
| **45-64** | 793,996 | 5,897 | 799,893 | 887,348 | 6,984 | 894,332 |
| | 99.3 | 0.7 | 100.0 | 99.2 | 0.8 | 100.0 |
| **65-104** | 1,015,405 | 5,088 | 1,020,493 | 1,220,279 | 5,796 | 1,226,075 |
| | 99.5 | 0.5 | 100.0 | 99.5 | 0.5 | 100.0 |
| **Total** | 2,341,435 | 23,933 | 2,365,368 | 2,713,053 | 27,707 | 2,740,760 |
| | 99.0 | 1.0 | 100.0 | 99.0 | 1.0 | 100.0 |

In the 2012 general election, racial and ethnic minorities who cast VBM ballots in the 2012 general election were disproportionately more likely to have their VBM ballot not count in the election results.

### *Rejected VBM Ballots by Racial and Ethnic Groups*

The differential patterns of rejected VBM ballots are even more glaring when it comes to mail votes cast by racial and ethnic minorities. Despite Judge Walker's ruling, the rate of rejected VBM ballots for racial and ethnic minorities worsened from the 2012 to the 2016 presidential election.  As Table 2 documents, in both elections, the VBM rejection rates for Black and Hispanic voters, as well as individuals who identified themselves with other racial and ethnic categories, were substantially higher than the VBM rejection rate of white voters. That gap widened in 2016 general election.

In the 2012 general election, only 0.9 percent of all VBM ballots cast by white voters were "rejected as illegal" by local canvassing boards. In contrast, 1.2 percent of VBM ballots cast by Black voters not counted; 1.3 percent of VBM ballots cast by Hispanics were rejected; and 1.9 percent of VBM ballots cast by voters of other racial/ethnic identities were rejected.

 In the 2012 election, the more than 222,000 Black voters who voted  with mail ballots accounted for 9.4 percent of all VBM ballots cast, but they made up 14.0 percent of all the VBM ballots that were rejected.  Over 254,000 Hispanics cast absentee mail ballots in the election, roughly 10.7 percent of all VBM ballots cast statewide, but they amounted to 13.8 percent of all the VBM ballots that were not counted.  Voters of other races and ethnicities accounted for only 4.8 percent of all absentee mail ballots cast in the election, but they cast 8.6 percent of all the rejected ballots. In contrast, in the 2012 general election, white voters cast nearly 1.8 million VBM ballots, 75.1 percent of all absentee mail ballots; yet, they were responsible for only 63.5 percent of those that were rejected by county canvassing boards.

➢ **In the 2012 general election, racial and ethnic minorities who cast VBM ballots in the 2012 general election were disproportionately more likely to have their VBM ballot not count in  the election results.**

Given that in the 2016 presidential election, eligible voters casting a VBM ballot that were initially deemed invalid had the opportunity to cure a flawed  mail ballot, the expectation is that the rate of rejected VBM ballots should drop evenly across all racial and ethnic groups from the 2012 tallies.  Yet, as Table 2 shows, across all racial and ethnic groups, minority voters had an even greater likelihood of having their VBM ballot rejected in the 2016 general election, but white voters saw the rejection rate drop over the two elections.

➢ In 2016, VBM ballots cast by Black, Hispanic, and other racial and ethnic minorities were more than two-and-a-half times as likely to be rejected as VBM ballots cast by white absentee mail voters.

**TABLE 2**

**2012 AND 2016 FLORIDA GENERAL ELECTIONS:**
**NUMBER AND PERCENTAGE OF ACCEPTED AND REJECTED VBM BALLOTS, BY**

|  | 2012 General Election | | | 2016 General Election | | |
|---|---|---|---|---|---|---|
| **Age** | **Accepted Vote by Mail** | **Rejected Vote by Mail** | **Total** | **Accepted Vote by Mail** | **Rejected Vote by Mail** | **Total** |
| **Black** | 219,325 | 3,358 | 222,683 | 240,094 | 4,683 | 244,777 |
|  | 98.5 | 1.5 | 100.0 | 98.1 | 1.9 | 100.0 |
| **Hispanic** | 250,750 | 3,310 | 254,060 | 375,345 | 6,696 | 382,041 |
|  | 98.7 | 1.3 | 100.0 | 98.2 | 1.8 | 100.0 |
| **White** | 1,761,034 | 15,204 | 1,776,238 | 1,950,770 | 13,558 | 1,964,328 |
|  | 99.1 | 0.9 | 100.0 | 99.3 | 0.7 | 100.0 |
| **Other** | 110,326 | 2,061 | 112,387 | 146,844 | 2,770 | 149,614 |
|  | 98.2 | 1.8 | 100.0 | 98.2 | 1.8 | 100.0 |
| **Total** | 2,341,435 | 23,933 | 2,365,368 | 2,713,053 | 27,707 | 2,740,760 |
|  | 99.0 | 1.0 | 100.0 | 98.9 | 1.0 | 100.0 |

VBM remains popular in Florida for voters of all races and ethnicities. A greater share of voters across all racial and ethnic groups cast VBM ballots in 2016 compared to 2012, although the increase was only marginal for white voters. In both the 2012 and 2016 elections, a higher percentage of white voters cast VBM ballots (compared to Early In-Person or Election Day ballots) than their racial and ethnic minority counterparts. However, the number and share of racial and ethnic minorities casting VBM ballots in the 2016 general election increased at a greater rate than for white voters, making the disparate rejection rates of mail ballots for racial and ethnic minorities an even greater concern.

In 2012, of the more than 5.8 million ballots cast statewide by white voters, 30.6 percent of them were mail ballots. In 2016, of the nearly 6.4 million whites who voted, 30.9 percent cast a VBM ballot, a bump of only 0.3 percentage points. In the 2012 general election, only 18.8 percent of the nearly 1.2 million Black voters cast VBM ballots that election, as did 24.0 percent of the 1.1 million Hispanics who voted in 2012 election.

> In 2016, VBM ballots cast by Black, Hispanic, and other racial and ethnic minorities were more than two-and-a-half times as likely to be rejected as VBM ballots cast by white absentee mail voters.

In contrast, of the nearly 1.2 million Blacks who voted in 2016, 20.4 percent voted VBM, a jump of 1.6 percentage points. Over 26.3 percent of votes cast by the more than 567,000 racial and ethnic minorities who voted in 2016 were VBM ballots, a 1.3 percentage point increase up from 2012.

Hispanic voters are not only most vulnerable to having their VBM ballot rejected, they continue to utilize absentee mail ballots more than other racial and ethnic minority voters. Of the 1.4 million Hispanics who cast a ballot in 2016, 27.0 percent cast a VBM ballot, a 3 percentage point jump from 2012.

When assessing the relative rejection rates of VBM ballots, although the nearly 245,000 Black voters comprised only 8.9 percent of all voters casting a VBM ballot in the 2016 general election, they accounted for 16.9 percent of all voters who had their VBM ballot rejected. Nearly one-in-four rejected VBM ballots in 2016 were cast by Hispanics, although they accounted for only 13.9 percent of all VBM ballots cast that election.  Ten percent of the nearly 28,000 rejected VBM ballots in 2016 were cast by members of other racial or ethnic groups, although they accounted for only 5.5 percent of all VBM ballots cast. White voters cast nearly 72 percent of all VBM ballots in 2016, but they accounted for less than half of all rejected VBM ballots in 2016.

➢ **These figures indicate that not only have racial and ethnic minorities voting a VBM ballot in Florida had a substantially higher likelihood of having their VBM ballots rejected than white voters casting  mail ballots, the likelihood of minority voters casting a rejected  mail ballot increased in 2016 compared to four years earlier.**

These findings are troubling, given that all voters in 2016 had the opportunity to cure their invalid ballot prior to Election Day.

13

## Rejected VBM Ballots in the 2012 and 2016 General Elections, by County

The rejection rates of VBM ballots cast in the 2012 and 2016 general elections varied considerably across the state's 67 counties.  There are several possibilities for variable rejection rates of mail ballots across election administration jurisdictions. First, the design of the mail ballots themselves, or their return envelopes (including their physical layout and instructions) may differ across counties. Second, Supervisors of Elections, their staff, and county  canvassing boards may have different processes in place when processing and validating VBM ballots they receive.  Third, it is possible that voters across counties differ in their capacity to properly fill out and return their VBM ballots.

As  noted above, in the 2012 general election, a fraction more than 1 percent of the more than 2.3 million VBM ballots cast—the votes of nearly 24,000 Floridians—were rejected as illegal. However, the percentage of rejected VBM ballots across the 67 counties ranges from four counties with no rejected VBM ballots (Baker, Glades, Hamilton, and Lafayette), to six counties that rejected more than 2 percent of all VBM ballots (Madison, Okaloosa, Bay, Taylor, Seminole, and Alachua). Figure 1 displays the percent rejected VBMs in the 2012 general election across counties.

Similarly, in the 2016 general election, slightly more than 1 percent of the 2.7 million plus VBM ballots cast statewide—more than 27,700 votes—were rejected by county canvassing boards. Again, there is a considerable range in the rejection rates across the 67 counties. Two counties (Bay and Glades) reported no rejected VBM ballots; Calhoun County reported that it rejected more than 2 percent of all VBM ballots cast, and Orange County reported rejecting nearly 4 percent of all VBM ballots cast.

When comparing rates of rejected VBM ballots over the two presidential election years, 47 of the state's 67 counties had lower VBM rejection rates in 2016 than they did in 2012. This could be taken as evidence that the opportunities to cure rejected VBM ballots—provided first by the legislature (VBM ballots with no signatures), and then by Judge Walker (VBM ballots with a mismatched signature)had their intended consequence, reducing the rate of invalid ballots.

However, in 18 counties (Orange, Miami-Dade, Gulf, Madison, Lake, Duval, St. Lucie, Union, Hardee, Dixie, Levy, Calhoun, Monroe, Okeechobee, Gadsden, Citrus, Liberty, and Marion), the rate of rejected VBM ballots cast in 2016 general election was greater than the rejection rate four years earlier. (Baker reported no rejected VBM ballots in either general election, and Polk County's VBM rejection rate did not change from 2012 to 2016).



# FIGURE 1:

Percent of VBM Ballots Rejected, by County, 2012 General Election



# FIGURE 2:

Percent of VBM Ballots Rejected, by County, 2016 General Election

■ Percent Rejected

**2016 Rejected VBM Rates by Racial and Ethnic Groups, by County**

Breaking down VBM rejection rates across the 67 counties by the race and ethnicity of those who cast absentee mail ballots in the 2016 general election provides insight into the considerable variance that exists across the state in the rejection rates of VBM ballots.  For counties that had at least 10 rejected VBM ballots for each racial and ethnic group, Figure 3 reports the percentage of VBM ballots cast by Black voters that were rejected in the 2016 general election, and Figure 4 reports the same for rejected VBM ballots cast by Hispanics.

➢ **The considerable variance in the rate of rejected absentee mail ballots across Florida's 67 counties suggests at a minimum that the evaluation standards used by county SOEs and their respective county canvassing boards likely are not uniform.**

Recall that in 2016, only 0.7 percent of all VBM ballots cast by white voters were rejected, 1.9 percent of VBM ballots cast by Black voters were rejected, and 1.8 percent of VBM ballots cast by Hispanic voters were rejected.  Across that state's 67 counties, however, the VBM rejection rates for Black voters range from highs of 5.3 percent in Orange County, to 2.7 percent in Miami-Dade and Collier counties, to 2.1 percent in Duval and Volusia counties, to a low of 0.2 percent in Pinellas County (which is not labeled in Figure 3 due to size constraints). There was a similar wide range across the counties of rejected VBM rates for Hispanic mail voters, as shown in Figure 4.  In Alachua County, 4.8 percent of VBM ballots cast by Hispanic voters were rejected, followed by Orange County at 4.2 percent. Among the other counties that had at least 20 rejected VBM ballots cast by Hispanic voters, Pinellas again had the lowest rejection VBM ballot rate, just 0.3 percent.

These figures indicate that not only have racial and ethnic minorities voting a VBM ballot in Florida had a substantially higher likelihood of having their VBM ballots rejected than white voters casting  mail ballots, the likelihood of minority voters casting a rejected  mail ballot increased in 2016 compared to four years earlier.

17



FIGURE 3:

Percent of VBM Ballots Cast by Black Voters that were Rejected, by County, 2016 General Election

Note: Excludes counties with fewer than 10 rejected VBM ballots cast by Black voters.



**FIGURE 4:**

Percent of VBM Ballots Cast by Hispanic Voters that were Rejected, by County, 2016 General Election

Note: Excludes counties with fewer than 10 rejected VBM ballots cast by Hispanic voters.

19

The disparate rejection rates of VBM ballots across the state's 67 counties and across racial and ethnic groups raise some questions about the uniformity of the processing and validation of mail ballots by SOEs, their staff, and county canvassing boards.  In the 2012 general election, for example, more than 6 percent of the VBM ballots cast by roughly 580 Black voters in Collier County were "rejected as illegal" by the County Canvassing Board, a rejection rate nearly five times greater than that for white voters casting VBM ballots that same year in the county.  But in the 2016 election, the rejection rate of VBM ballots cast by the more than 800 Black voters in Collier County fell to 2.7 percent—to be sure, a substantially lower rate than four years earlier in the county, but still higher than the statewide rejection rate of absentee ballots cast by Black voters.

Why did the VBM rejection rate in Collier County drop? Did Black voters casting VBM ballots that were initially flagged as invalid by the SOE staff cure their missing or mismatched signatures? Was their more extensive civic engagement and voter education that helped reduce the VBM error rate in the Black community? Was there a change in the design and delivery of Collier County's VBM envelope? Or, did the SOE staff and county canvassing board use a different standard to interpret the validity of signatures on the back of returned mail ballots? Although this report does not provide answers to these questions, such swings in the rejection rates of a county over time raises the issue more generally of whether individual voters or county election administrators bear the greater responsibility of ensuring that VBM ballots will be counted as valid.

### *2016 Rejected VBM Rates by Age Cohort, by County*

Similar patterns exist across counties in the rejection rates of VBM ballots cast by voters in age cohorts.  Although the statewide VBM rejection rate among 18-21 year-olds was over 4 percent in the 2016 general election—four times the statewide rate of all rejected mail ballots cast—in 11 mainly smaller counties (Baker, Bradford, Desoto, Franklin, Glades, Hamilton, Hardee, Jefferson, Liberty Martin, and Union), every VBM ballot cast by a voter in this youngest age cohort was accepted as valid.

Equally impressive, of the more than 4,600 registered voters 18-21 year-olds who cast VBM ballots in Pinellas County, less than 0.2 percent of the more than 4,600 voters casting their first ballot in a presidential election had their mail ballot rejected by the County Canvassing Board. No other county with a sizeable number of young voters who cast VBM ballots comes close to this low rejection rate.

In contrast, over 5 percent of VBM ballots cast by this youngest cohort of voters in 2016 were rejected in Miami-Dade County, amounting to more than 500 mail ballots that did not count in the election. Both Alachua County and Orange County—homes to two of the largest state universities in the state, the University of Florida and the University of Central Florida— had VBM rejection rates over 7 percent for the 18-21 age cohort.  In Alachua County, the 9.4 percent VBM ballot rejection rate in 2016 for the youngest age cohort was more than 4 times higher than the county's overall rejection rate of 1.6 percent. Orange County's rejection rate of VBM ballots cast by 18-21 year-olds was 9.0 percent, more than twice the county's 3.7 percent rejection rate for all VBM ballots -- the highest county VBM rejection rate in the state. However, 31 other counties had even higher ratios of the youngest cohort rejection rate to the overall VBM rejection rate, including Charlotte, Collier, Hillsborough, Lee, Leon, Manatee, Pasco, Polk, Sarasota, St. Lucie, and Volusia counties.



# FIGURE 5:

Total VBM Ballots Rejected,
by Age Cohort,
by County,
2016 General Election

➢ **8,522 VBM ballots cast by voters between the ages of 18 and 29, including 2,984 VBM ballots cast by first-time voters, did not count in the 2016 Presidential Election.**

Figure 5 provides a breakdown of rejected VBM ballots across the five age cohorts.  Again, it is important to put the raw number of rejected VBM ballots across the 67 counties in perspective. Overall in 2016, voters in the three youngest age cohorts accounted for vastly fewer of all the absentee ballots cast in Florida.  Of the 2.7 million VBM ballots cast statewide, voters in the three youngest age cohorts cast only 9.2 percent of all VBM ballots; yet, they accounted for 30.8 percent of all rejected VBM ballots cast statewide. In several counties, the proportion of all rejected VBM ballots was even higher for these youngest voters.

## Double Jeopardy: Voters Casting Rejected VBM Ballots in 2012 and 2016

Under Florida law (enacted in 2017 in response to the ruling of U.S. District Court Judge Mark Walker), voters who cast a rejected VBM ballot are to be notified by their SOE that their absentee ballot was not counted. According to Florida state statutes, "After all election results on the ballot have been certified, the supervisor shall, on behalf of the county canvassing board, notify each elector whose ballot has been rejected as illegal and provide the specific reason the ballot was rejected."[15] In addition to being notified about the reason why their VBM ballot was rejected, these voters are to be given an opportunity to update their current signature if either the voter's certificate or cure affidavit did not match the elector's signature on record.  Given that voters have an opportunity to update their official signature after having their VBM ballot rejected, one might expect those casting a rejected VBM ballot in a future election not to suffer the same result.

In the 2016 general election, there were nearly 14,000 voters in Florida, who in the presidential election four years earlier, cast a VBM ballot that was rejected.  Over half of these 2012 rejected VBM voters successfully cast a VBM ballot in the 2016 election, evidently resolving the issues that led to their ballot being invalidated four years earlier. Another quarter of those who had their VBM ballot rejected in 2012 successfully cast an early in-person ballot or successfully cast a ballot on Election Day in the November 2016 general election.

➢ **321 voters, or 4 percent of those who cast a VBM ballot that was rejected in 2012, cast a VBM ballot in 2016 that again was rejected.**

Younger and racial and ethnic minority voters casting VBM ballots were at least twice as likely as older as well as white voters to have their VBM ballot rejected in the successive presidential elections. Roughly 6 percent of voters aged 22-25, 26-29, and 30-44 had their VBM ballot rejected in 2012 and then again in 2016. This is to be contrasted with less than 2.6 percent of voters 45-64 and 65-105 who cast an invalid VBM ballot in 2016, and who voted a VBM ballot again in 2016 and had their ballot rejected a second time.

Less than 3 percent of white voters who had their VBM ballot rejected in 2012 and had the same fate when voting again in 2016.  In contrast, over 5 percent of Black and Hispanic voters had their VBM ballot rejected a second straight presidential election, and nearly 8 percent of voters reporting other racial and ethnic categories had their VBM ballot rejected in both 2012 and 2016.

## Curing Rejected "Mismatched" VBM Ballots in the 2016 General Election

Although they offer information on voters casting VBM ballots deemed by county canvassing boards to be illegal, Florida's statewide voter file and vote history files do not detail why a VBM ballot is rejected. The data provided to the public from the FVRS does not provide any information about whether a VBM ballot was returned with no signature or a mismatched signature, or whether a voter casting a problematic VBM ballot tried—and was successfully able to cure—a VBM ballot that was initially flagged as invalid.



## VOTING BY MAIL IN THE SUNSHINE STATE

321 voters, or 4 percent of those who cast a VBM ballot that was rejected in 2012, cast a VBM ballot in 2016 that again was rejected.

Photo by Chris Phan/Flickr

In order to get a sense of how well the VBM cure process worked, it is important to examine the procedures SOEs put in place in the 2016 general election to handle VBM ballots with mismatched signatures. Unfortunately, Secretary Detzner's October 17, 2016 directive to the SOEs did not detail any specific procedures that county election officials should follow when processing rejected VBM cure process because of a mismatched signature. Rather, the directive instructed the SOEs that they had to inform "each elector whose ballot was rejected as illegal and provide the specific reason the ballot was rejected," as was already required by state law when alerting voters who cast VBM ballots that were rejected because they lacked a signature on the voter's certificate.[16] Even the 2017 legislation codifying Judge Walker's order only requires supervisors to "immediately notify" voters who they flag as casting a VBM ballot with a signature problem. Florida law, however, provides no method or guidelines for how SOEs are to notify voters of their rejected ballot status. As such, there is no standalone record on how the 67 SOEs each attempted to contact voters who cast VBM ballots that were initially flagged as having a signature that did not match the official signature on record. There is no statewide database on how many VBM voters who had issues with their signature were actually contacted by SOEs or how many of these mail voters replied with an affidavit and proof of identification. There is also no database on the number of voters who had their VBM ballots flagged due to a signature mismatch were actually able to cure their ballot.

The lack of statewide protocols left counties in 2016 to create their own, varying, methods of contacting voters who had VBM ballots with a mismatched signature on the return envelope. In rural, Gadsden County, for example, SOE staff contacted affected mail voters by either phone or email to inform them of their rejected ballot status, and that they had an opportunity to cure their VBM ballot. In Pinellas County, which has by far the highest percentage in the state of voters who utilize VBM ballots (50.7 percent of all ballots cast in the 2016 general election were VBM ballots), registered voters have access to a "Track Your Ballot" feature on the SOE's website. The website also provides detailed information on the steps a voter needs to follow to cure a rejected VBM ballot.[17] Nassau County encourages voters whose VBM ballot is rejected due to a mismatched signature to simultaneously update their signature on file by also mailing a voter registration form with the VBM cure affidavit.

8,522 VBM ballots cast by voters between the ages of 18 and 29, including 2,984 VBM ballots cast by first-time voters, did not count in the 2016 Presidential Election.

Other county SOEs were creative in developing their own, individualized protocol to contact affected VBM voters in the 2016 general election. For example, if the Wakulla County SOE was unable to reach, by phone or email, those voters who cast a VBM ballot initially flagged with a mismatched signature, the staff tried to contact affected voters via their Facebook profiles.

Due to the lack of a statewide protocols for cataloguing the processing of rejected VBM ballots in Florida, it is extremely difficult to obtain, much less systematically assess, how many voters cast VBM ballots that were initially flagged as having a mismatched signature, much

less how many VBM voters were able to cure their initially rejected VBM ballot.[18] Only 41 of the state's 67 SOEs responded to public records requests for data on rejected and cured VBM ballots cast in the 2016 general election, although with varying details.

➢ **Florida's counties do not use standardized coding when documenting the reasons for VBM ballots to be initially rejected, processed, or cured.**

Among the various codes used to document a possible VBM signature mismatch are "signature mismatch" (used by 30 counties), "signature doesn't match voter name" (used by four counties), "signed wrong ballot" (used by five counties), and "voted wrong ballot" (used by one county). It is unclear substantively how these codes differ; even more perplexing, some counties use two or more of these similar terms when coding VBM ballots that their staff has flagged.

The analysis that follows examines the cure rates of VBM ballots initially rejected due to mismatched signatures in Pinellas County. Pinellas County, under Supervisor of Elections Deborah Clark, has led the way on VBM ballots. The detailed records that her office provided on the VBM ballots it received in the 2016 general election, including VBM ballots her staff initially flagged as having a mismatched voter's certificate on the envelope, as well as mismatched VBM ballots that were successfully cured by voters, offers some "best practices" that could be followed by other SOEs to help remedy problematic VBM ballots.

Florida's counties do not use standardized coding when documenting the reasons for VBM ballots to be initially rejected, processed, or cured.

### *Curing Vote-by-Mail Ballots: Best Practices of Pinellas County*

Pinellas County, led by SOE Deborah Clark, is the state's undisputed leader in voting-by-mail.[19] According to the January 2017 statewide vote history file, of the Pinellas County voters whose age on Election Day (according to the statewide voter file) was between 18 and 105 years old, a total of 254,036 voters cast VBM ballots. The county's three-member | Canvassing Board rejected only 285 of all VBM ballots cast as illegally cast, just 0.11 percent of the total, by far the lowest rejection rate of counties with medium or large populations.[20] One of the reasons for this low rejection rate was the high cure rate of VBM ballots with signatures that were initially flagged as mismatched. The Pinellas elections office initially flagged 730 VBM ballots as having signatures that appeared not to match. Of those, 173 voters (23.7 percent) cured their signatures by submitting proper ID and a signed affidavit. In addition, the canvassing board accepted 463 VBM ballots (62.0 percent) that had initially questionable signatures without requiring the voter to submit an affidavit; the Canvassing Board rejected 104 of the VBM ballots initially screened by staff to have a mismatched signature (14.3 percent).

Younger voters in Pinellas County who had their VBM ballot flagged as having an invalid signature were just as likely to cure their signature with an affidavit as older voters, and the three-member Canvassing Board also accepted nearly identical rates across age cohorts for voters who did not cure their ballots. Older voters who returned their VBM ballots that the staff identified as having a mismatched signature on their return envelope were slightly more likely to have their cured VBM ballot rejected by the canvassing board, but the overall 14.3 percent rejection rate is far less than that of other counties. There are also only minor differences across racial and ethnic groups in the final rejection of VBM ballots that were identified as having mismatched signatures and that voters had the opportunity to cure though the affidavit process. Of the 104 VBM voters who ultimately had their VBM ballot rejected (out of 730 who initially were tagged as having a mismatched signature), the Pinellas SOE staff personally contacted most of them by phoning and emailing voters to alert them to the problem with their VBM ballot, going above and beyond Secretary Detzner's directive of mailing each affected voter.

## Conclusion

In his October 16, 2016 Preliminary Injunction, Judge Walker concluded, "Once again, at the end of the day, this case is about the precious and fundamental right to vote and to have one's vote counted. In our democracy, those who vote decide everything; those who count the vote decide nothing."[21] Florida Secretary of State Detzner of course complied with the federal judge's order – but minimally, issuing a directive to the state's 67 SOEs advising them that the state's existing statutory scheme relating to mismatched signatures on VBM voter's certificates was unconstitutional. Secretary Detzner instructed the SOEs to permit VBM ballots with mismatched signatures "to be cured in precisely the same fashion as currently provided for non-signature ballots."[22] Yet, the rejection rates of VBM ballots in the 2016 election sheds light on problems with the current administration of VBM ballots, and more specifically, the process in place to allow voters to cure VBM ballots with a mismatched signature on the return envelope.

Florida, like most states, has a much higher rejection rate of mail ballots compared to ballots cast in person during the early voting period or on Election Day. It is easy to chalk the higher rejection rate of VBM ballots up to the failure of some voters—they neglect to sign the back of the VBM mail envelope, or sign in a way that does not match their signature on file with the election supervisor's office.

➢ **Vote by Mail ballots in Florida are processed and verified using different standards than ballots cast in person; as such, VBM ballots are rejected at a much higher rate by county canvassing boards than ballots cast during the early voting period or on Election Day.**

But the possible variation in the greater or lesser ability of some voters to fill out a VBM ballot and return envelope does not fully account for the considerable inter-county variation in rejection rates, particularly when broken down by age cohorts or by racial or ethnic groups. Are younger registered voters, or those of minority racial or ethnic groups, in some counties intuitively more civically engaged or more educated—leading to a lower rejection rate of VBM ballots—than those who live in other counties that have higher rejection rates? Or, should some of the responsibility for differential VBM rejection rates and lower VBM cure rates rest with

election administrators and the canvassing boards who are charged not only with determining whether an ballot signature should be flagged or ultimately counted as valid or not, but with protecting the right to vote for all eligible Florida voters? What explains the sizeable gaps in rejected VBM ballots across age cohorts and racial and ethnic groups in some of Florida's 67 counties, but not in others?

> **Uniform standards in processing and validating mail ballots are severely lacking across Florida's 67 counties.**

Despite Judge Walker's order in October 2016, and Secretary Detzner's directive soon thereafter, not all vote-by-mail ballots in the November election were treated equally with regard to the ability of an elector to cure his or her absentee ballot.[23] In 2016, there was considerable non-uniformity in the rate of rejected mail ballots cast across Florida's 67 counties, as well as by age cohorts and racial and ethnic groups. Some county canvassing boards rejected VBM ballots at a much higher rate than other counties, suggesting that the standards to "reject as illegal" are still not uniform.

> **Not all Florida voters who voted by mail in 2016 had the same opportunity to return a signed affidavit to cure their VBM that had a missing or mismatched signature on the voter's certificate on the back of their return envelope.**

Moving forward, in lieu of legislative action, it is incumbent upon the Secretary of State to issue a more detailed directive of how the VBM ballot cure process, for both unsigned and mismatched ballots, should be handled.

> **Uniform standards in processing and validating mail ballots are severely lacking across Florida's 67 counties.**

Supervisors of Elections use very different designs for their VBM return envelopes. They employ different procedures to handle VBM ballots that are initially flagged as having issues with the signature on the return envelope. Supervisors of Elections differ in their outreach to VBM voters who have problematic ballots during the cure period and not all registered voters are given an opportunity to update their official signature when filling out a VBM cure affidavit. Finally, county canvassing boards employ different standards when adjudicating the validity or illegality of VBM ballots with signature problems.

To be sure, responsibility for the variation of invalid VBM ballots in Florida rests with individual voters who have the responsibility to follow instructions and have an up-to-date signature on file. But responsibility to protect the right to vote also rests with election officials who process and validate VBM ballots.

For Florida to have free and fair elections, all eligible voters must have equal opportunity to vote, including those casting (and curing) VBM ballots.

## About the Author

Daniel A. Smith is Professor and Chair of Political Science at the University of Florida. He is the President of ElectionSmith, Inc., and a former Senior Fulbright Scholar in Ghana, West Africa.  He has served as an expert witness in numerous voting rights lawsuits in Florida and across the country, working closely with the ACLU, the NAACP, Demos, the Campaign Legal Center, Mi Familia, SEIU, and numerous other voting rights groups.  Dr. Smith holds a M.A. and a Ph.D. from the University of Wisconsin-Madison; he went to Penn State for his under-graduate degrees in Political Science and History. Dr. Smith's research broadly examines how political institutions affect political behavior across and within the American states. In addition to publishing over 100 peer-reviewed articles, book chapters, and research reports on voting and elections in the American states, his authored and coauthored books include Tax Crusaders and the Politics of Direct Democracy (Routledge, 1998), Educated by Initiative (University of Michigan Press, 2004), and State and Local Politics: Institutions and Reform (4th edition, Cengage, 2015). He is widely quoted in the Florida and national media.

# Endnotes

1   Research assistance by Kendrick Meek, Jr., Caitlin Ostroff, Laura Uribe, and Dillon Boatner.

2   Prior to 2004 when the Florida Legislature banned the practice, voters were able to cure returned VBM ballots that had either voter's certificate signature that was missing or that was mismatched. In 2013, the Florida Legislature allowed VBM ballots with no-signature on the voter's certificate to be cured by signing an affidavit. See the legislative history of F.S. 101.68.

3   All registered voters in Florida receive a unique 9-digit voter ID number recorded in the state's official database, the Florida Voter Registration System (FVRS). The FVRS is a statewide, centralized, computerized voter registration list maintained by the Florida Department of State, Division of Elections. The database is updated in real time by local and state election officials, with snapshots made available to the public every month by the Division of Elections. The statewide voter extract and vote history files are colloquially, and collectively, known as the statewide voter file. See, http://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-extract-disk-request/.  Voter files in Florida are public records. The statewide data in this report are drawn from individual-level FVRS records (voter extract and vote history) from snapshots dated January 10, 2017 and December 31, 2012, as well as a corrected statewide vote history file from March 31, 2013 for a handful of affected counties.  (For a detailed discussion of Florida's statewide voter files, see Michael C. Herron and Daniel A. Smith, "Race, Party, and the Consequences of Restricting Early Voting in Florida in the 2012 General Election," Political Research Quarterly 67 (2014): 646-65.)

4   Public records requests for VBM cure process and data were made to all 67 SOEs. A dozen counties never responded to our requests; others quoted charges of up to $1,910 to provide the data on cured vote by mail ballots. In addition to the statewide coverage of VBM ballots accepted and rejected, this report highlights data obtained from Pinellas counties regarding cured VBM ballots.

5   F.S. 101.68 (2)(c)5. "If the canvassing board determines that a ballot is illegal, a member of the board must, without opening the envelope, mark across the face of the envelope: 'rejected as illegal.'"

6   In 2017, the state legislature amended F.S. 101.68 (4)(a) to state, "The supervisor shall, on behalf of the county canvassing board, immediately notify an elector who has returned a vote-by-mail ballot that does not include the elector's signature or contains a signature that does not match the elector's signature in the registration books or precinct register. The supervisor shall allow such an elector to complete and submit an affidavit in order to cure the vote-by-mail ballot until 5 p.m. on the day before the election."

7   Florida Department of State, Division of Elections. 2017. "Voting Activity by Ballot Type for 2016 General Election." URL: http://dos.myflorida.com/media/697842/2016-ge-summaries-ballots-by-type-activity.pdf.

8   Florida Department of State, Division of Elections. 2013. "Ballots-by-Type Activity for the 2012 General Election." URL: http://dos.myflorida.com/media/693340/2012ballotscast.pdf.

9   Florida Department of State, Division of Elections. "November 2008 General Election Ballots Cast." 2009. URL: http://dos.myflorida.com/media/693351/2008ballotscast.pdf.

10   Domestic VBM ballots received after the official deadline of 7:00 p.m. on Election Day are not processed by SOEs and are thus not counted by the county canvassing board.

11   See Florida Democratic Party v. Detzner, Case 4:16-cv-00607 (U.S. District Court for the Northern District of Florida, Tallahassee Division), pp. 19-23.

12   Ibid., p. 26.

13    Secretary of State Ken Detzner, Memorandum to Supervisors of Elections, "Court Order, Fla. Democratic Party v. Secretary of State," October 17, 2016.  The "Vote-by-Mail Ballot Cure" Affidavit is Form DS-DE 139, available here: http://dos.myflorida.com/elections/for-voters/voting/vote-by-mail/.

14    Charles Stewart III, "Losing Votes by Mail," NYU Journal of Legislation and Public Policy 13 (2010): 573-602.

15    See F.S. 101.68 (4)(f).

16    Secretary of State Ken Detzner, Memorandum to Supervisors of Elections, "Court Order, Fla. Democratic Party v. Secretary of State," October 17, 2016.

17    In Pinellas County, according to correspondence with SOE staff, "letters are mailed to voters if their signature on their ballot return envelope does not match their signature on file or their ballot is received without a signature on their ballot return envelope. The letter is accompanied by the pertinent affidavit to 'cure' their ballot as well as a pre-paid return envelope. Voters may also receive a call or email if this contact information is available in the voter's file and/or the ballot return envelope is received too close to the deadline of 7:00 pm Election Day. Through the "Track Your Ballot" feature on our website, voters are also able to track their mail ballot status.  Information is posted through this feature notifying voters that their mail ballots have been returned without a signature or with a signature mismatch on the ballot return envelope, and the

steps needed to complete the affidavit process. "

18    In the 2012 general election, data obtained from 11 counties through public records requests revealed that thousands of electors had their VBM ballots rejected because their VBM ballot signature did not match, and of course, they had no recourse to cure their "rejected as illegal" ballots. Across the 11 counties, (Alachua, Broward, Collier, Miami-Dade, Hillsborough, Leon, Osceola, Palm Beach, Pinellas, Sarasota, and Seminole), there were more than 1.22 million  ballots cast by mail, nearly half of all VBM ballots cast in the 2012 election. Of these, county canvassing boards "rejected as illegal" 2,608 VBM ballots because the voter's certificate signature did not match the official signature on record." See Daniel A. Smith, "Analysis of Absentee ('Vote-by-Mail') Ballots Cast in Florida," Expert Report, Florida Democratic Party v. Detzner, September 30, 2016.

19    Steve Bousquet, "Are Voting Centers a Good Idea for Florida? Some Election Officials say Yes," Miami Herald, June 4, 2018. Available: https://www.miamiherald.com/news/politics-government/state-politics/article212525949.html.

20    Email correspondence with Pinellas County Supervisor of Elections, March 31, 2017.

21    Florida Democratic Party v. Detzner, pp. 27-28.

22    Secretary of State Ken Detzner, Memorandum to Supervisors of Elections, "Court Order, Fla. Democratic Party v. Secretary of State," October 17, 2016.

23    According to Florida Statutes 101.68 (4)(a), after an election, county SOEs must notify each elector whose ballot was "rejected as illegal" by a canvassing board, including the reason why the VBM ballot was rejected. There is no reason why a statewide database of these letters could not be made available.



www.aclufl.org