UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DEMOCRATIC EXECUTIVE
COMMITTEE OF FLORIDA, and BILL
NELSON FOR U.S. SENATE,

    Plaintiffs,

v.

KENNETH DETZNER, in his official
capacity as the Florida Secretary of State,

    Defendant.

Case No. 4:18-cv-00520-RH-MJF

**RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.    <u>Introduction</u>

The Plaintiffs ask for too much too late.[1]  They ask to enjoin all state

elections officials from complying with sections 101.68(2)(c)(1) and

101.048(2)(b)(1) of the Florida Statutes—provisions that balance the State's

interest in ensuring fair and efficient elections with a voter's ability to cure any

defects in ballots cast through the mail or cast provisionally at polling places. *See,

e.g.,* DE 3 at 2; DE 4 at 20.  Not just that, the Plaintiffs seek to toll the statutory

deadline for submitting the first set of unofficial results under section 102.141(5)

of the Florida Statutes.  DE 3 at 3 ¶ 2.  Because the first set of unofficial results is

---

[1] This response refers to Kenneth Detzner as "Secretary," the Plaintiffs collectively
as "the Plaintiffs," and docket entries before this Court as "DE" followed by the
appropriate citation.

the statutory trigger for recounts, this tolling request or any related extension of deadlines could significantly delay the conclusion of the 2018 General Election.  It could delay not only the recounts but the submission of a second set of unofficial results, the submission of official results and the State's ultimate certification of official election results.  *See* §§ 102.141(7), 102.112, 101.591, 102.111, Fla. Stat.  And, as a practical matter, the time to toll the deadline has already come and gone in 62 of the State's 67 counties as of 10 a.m. on November 10, 2018.  These counties have submitted their first unofficial results.  At least two recounts (for House District 26 and Senate District 18) have been triggered and one is already underway.  More recounts are likely after 12 p.m. on Saturday, November 10, 2018.  Granting the Plaintiffs any of the relief they seek would force county canvassing boards throughout the State to undo and then redo their work—to undo the current count and stop ongoing recount efforts only to start the process again.  Significant delays, confusion, and a higher probability of errors would result.

Aside from the cascading delays in counting votes and certifying the election, the extraordinary relief the Plaintiffs seek is also unjustified.  The Plaintiffs challenge the constitutionality of sections 101.68(2)(c)(1) and 101.048(2)(b)(1) in the middle of an election.  While the statutes at issue are facially neutral and the Plaintiffs offer no direct evidence and scant circumstantial evidence of discriminatory intent for their equal protection claim, the Plaintiffs

have also simply waited too long to file their lawsuit.  The relevant statutes have been unaltered since 2005 and 2017 respectively.   Indeed, the 2017 Florida Legislature amended the vote-by-mail statute—section 101.68—to address concerns that this Court, resolved in *Florida Democratic Party v. Detzner,* Case No. 4:16-cv-00607, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016).  *See* Fla. H.R. Final Bill Analysis, *Canvassing of Vote-by-Mail Ballots (CS/HB 105)* at 1, 3 (Jun. 7, 2017).[2]

If dicta from this Court's 2016 Order provides the substantive basis for relief here as the Plaintiffs wrongly suggest, *see* DE 4 at 5-8, the Plaintiffs still had over 2 years to seek additional relief before this Court in that case or a subsequent case. The Florida Democratic Party filed nothing before this Court in the earlier signature-matching case, allowing this Court to close that earlier case after the 2017 Florida Legislature made relevant amendments to the vote-by-mail statute. There was also no new lawsuit to challenge the State's vote-by-mail or provisional ballot signature requirements until two days *after* ballots had been cast.

Relying on the September 19, 2018 publication date for the revised Smith study on vote-by-mail ballots provides no reprieve either.  While an election was imminent on September 19, 2018, not a single ballot had yet been cast or counted.

---

[2]https://www.myfloridahouse.gov/Sections/Documents/loaddoc.aspx?FileName=h0105z1.OTA.DOCX&DocumentType=Analysis&BillNumber=0105&Session=2017.

In addition, much of the data and conclusions from Smith's study—and Smith himself—were available to the Plaintiffs' counsel well before September 2018. The Secretary knows this because earlier this year, the Plaintiffs' counsel filed a expert report authored by Smith and dated June 2018 in a pending elections case. *See League of Women Voters of Florida, et al. v. Detzner,* 4:18-cv-00251-MW-CAS. This report specifically addressed Florida vote-by-mail statistics.[3] Smith remains a purported expert in that case. Smith's study, however, relies entirely on data from the 2012 and 2016 general elections. *See* DE 4, Exhibit A, at 2. Put another way, Smith and his data predate the cure this Court mandated and the Florida Legislature codified in 2016 and 2017, respectively. Florida's supervisors of elections have also raised concerns regarding Smith's dataset.[4] This data was also available to the Plaintiffs well before November 8, 2018—when the Plaintiffs decided to file their lawsuit.

At bottom, changing the rules—rules in place for some time—in the middle of an election is fundamentally wrong and undermines significant State interests in the "smooth and effective administration of the voting laws" under "legitimate

---

[3] For instance, Smith's September 2018 study contains an identical breakdown of vote-by-mail data from the 2016 General Election as that found in his expert report from June. DE 4 at Exhibit A, Table 1; *cf.* DE 24-2, at Table 2, *League of Women Voters of Florida, et al. v. Detzner,* 4:18-cv-00251-MW-CAS.

[4] The Supervisor of Elections for Orange County has pointed out that Smith's methodology and dataset are inherently flawed. *See* http://floridapolitics.com/archives/275277-bill-cowles-contends-aclu-rejected-votes-study-used-incorrect-data.

statutory processes." *Summit Cnty. Dem. Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004).  This is especially so where the Plaintiffs had every opportunity to make their arguments in the run-up to the election, but chose to sue only *after* all ballots had been cast and many counted.  The Plaintiffs waited too long to seek relief.  *See, e.g., Benisek v. Lamone,* 138 S. Ct. 1942, 1944 (2018).

## II.      Relevant Legal Standards

The Plaintiffs state that the substantive standards for a temporary restraining order and a preliminary injunction are the same.  DE 4 at 6.  The Secretary agrees. The relief the Plaintiffs seek "is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Keister v. Bell,* 879 F.3d 1282, 1287 (11th Cir. 2018) (collecting citations).  The four requisites the Plaintiffs "must clearly establish" are:  "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the [P]laintiff[s] outweighs the potential harm to the [D]efendant; and (4) that the injunction will not disserve the public interest."  *Id.* (citations omitted).   The rule governing preliminary injunctions "does not place upon the non-moving party the burden of coming forward and presenting its case against a preliminary injunction." *Ala. v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1136 (11th Cir. 2005) (citations omitted). It bears emphasizing that "[a] party requesting a preliminary injunction must

generally show reasonable diligence." *Benisek,* 138 S. Ct. at 1944.   The requirement "is as true in election law cases as elsewhere." *Id.*

### III.   Argument

This Court should deny the Plaintiffs' request for extraordinary relief because the Plaintiffs fail to satisfy any one of the four requisites that they must "clearly establish." *Keister,* 879 F.3d at 1287.   The Plaintiffs cannot show a substantial likelihood for success on the merits or irreparable harm.   Nor can the Plaintiffs show that the equities and public interest favor them.

#### A.   *The Plaintiffs cannot clearly establish substantial likelihood of success on the merits.*

The *Anderson-Burdick* standard, as it is called, ordinarily governs when parties raise comingled, election-related claims under the First and Fourteenth Amendments.   This standard seeks to balance the burdens that election laws impose on the right to vote with the justification for those burdens.   *See Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983); *Burdick v. Takushi,* 504 U.S. 428, 433 (1992).[5]   Signature-matching requirements—even in the absence of notice and

---

[5] In considering the level of scrutiny to apply when considering a challenge to an election law, the *Anderson-Burdick* standard states that this Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"   *Burdick,* 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789).   "This standard is sufficiently flexible to

opportunity to cure—impose only a "minimal burden" under the *Anderson-Burdick* standard. *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008). This minimal burden is more than justified by the legitimate state interest in preventing fraud. *See generally Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205, 128 S. Ct. 1610, 1624-25 (2008) ("Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe."); *see also* Matt Vasilogambros, *What Stops Political Campaigns from Forging Signatures?  Not Much.*, Pew Charitable Trust Stateline Publication (May 3, 2018) (discussing and providing examples of signature-related fraud).[6]

Regardless, even in an election-related context, a party raising equal protection claims concerning minorities and young people must still prove discriminatory intent. *See Lee v. Va. Bd. of Elections*, 843 F.3d 592, 601-05 and 607 (4th Cir. 2016) (citing *Village of Arlington Heights v. Metro. Housing Dev.*

---

accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012). When voting rights are subjected to "severe" restrictions, the regulation at issue must be "'narrowly drawn to advance a state interest of compelling importance.'" *Norman v. Reed*, 502 U.S. 279, 289 (1992). The test is accommodating enough to subsume the rational basis test that would ordinarily apply in an Equal Protection context. *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012).

[6] https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/05/03/what-stops-political-campaigns-from-forging-signatures-not-much

*Corp.,* 429 U.S. 252 (1977)).  Direct or circumstantial evidence of intent is needed. *Id.* at 603 (citing *Arlington Heights,* 429 U.S. at 266).  Neither exists here.

There is clearly no direct evidence of discriminatory intent.  The signature-matching provisions in sections 101.68(2)(c)(1) and 101.048(2)(b)(1) are facially neutral.  They make no distinctions between voters based on their race, ethnicity, religion, age, or party-affiliation.   All voters face the same inconveniences— inconveniences necessary to ensure the identity of the voter, legality of the ballot, maintain the integrity of elections for all Floridians.

The scant circumstantial evidence now before this Court does not establish an equal protection violation either.  Unlike *North Carolina State Conference of NAACP v. McCrory,* 831 F.3d 204, 214 (4th Cir. 2016), where the legislative record provided substantial evidence of a state's attempt to suppress African-American voters with "almost surgical precision," the Plaintiffs offer no similar circumstantial evidence of discriminatory intent.  A vague reference to "studies that have also shown" support for some proposition, or dicta from a case referring to a proposition as "well-established," is orders of magnitude different from a record that establishes surgical targeting of a minority group.  DE 4 at 14; *see also Lee,* 843 F.3d at 601-07.

The U.S. Supreme Court's decision in *Bush v. Gore,* 531 U.S. 98 (2000) neither alters the applicable equal protection framework nor requires a contrary

result.  In *Bush,* the U.S. Supreme Court issued a ruling "limited to the present circumstances."  *Id.* at 106-07.  The U.S. Supreme Court held that Florida's court-ordered statewide recount denied equal protection because the recount lacked "specific standards to ensure its equal application" from ballot to ballot, precinct to precinct, or recount team to recount team when determining a voter's intent.  *Id.* at 106.   This resulted in a process without "sufficient guarantees of equal treatment"—a recount without "minimal procedural safeguards" to ameliorate unequal treatment.  *Id.* at 109.  Because the U.S. Supreme Court limited *Bush* to the circumstances of that case, it does not apply here.  Even if it did, sections 101.68(2)(c)(1) and 101.048(2)(b)(1) satisfy *Bush*'s requirements.

First, the State has a single uniform standard for matching signatures for vote-by-mail and provisional ballot purposes.  This standard requires a comparison of the voter's signature with the signature on file with the county.  §§ 101.048(2)(b)(1), 101.68(2)(c)(1)(a), Fla. Stat.  The Ninth Circuit upheld a similar state standard in *Lemons*.  There, after considering whether *Bush* applied and assuming for the sake of argument that it did, the Ninth Circuit found the state standard to be "sufficiently uniform and specific to ensure equal treatment of voters" because the relevant state official "uniformly instruct[ed] county elections officials to verify … signatures by determining whether each matches the signature

9

on the signer's voter registration card." *Lemons,* 538 F.3d at 1106. The statutory provisions at issue here serve the same function as the state official in *Lemons*.

Thus, Florida has standards that prevent variation from ballot to ballot, precinct to precinct, or recount team to recount. This uniformity is sufficient. *See Bush,* 531 U.S. at 106-07.

Second, the State's uniform standard for signature-matching comes with safeguards to allow voters to cure deficiencies. In the case of a vote-by-mail ballot, the voter's signature is first reviewed by the local supervisor of elections or by the county canvassing board. §101.68(2)(c)(1), Fla. Stat. In either case, the signature on the voter's certificate is compared "with the signature of the elector in the registration books or the precinct register." §101.68(2)(c)(1)(a), Fla. Stat. The local supervisor of elections must "immediately notify" a voter if his or her ballot was rejected due to a signature defect. §101.68(4)(a), Fla. Stat. The voter can then cure the defect by submitting a signed "cure affidavit" along with a copy of a "Tier 1" or "Tier 2" identification. §101.68(4)(b)-(c), Fla. Stat.[7] The canvassing board may accept a cured ballot even if the signature on the cure affidavit does not match the voter's signature on file, so long as the voter included a copy of a current and valid Tier 1 identification. §101.68(2)(c)(1)(b), Fla. Stat.

---

[7] Tier 1 forms of identification include a Florida driver's license, a United States passport, and other similar forms of identification, while Tier 2 identifications include a current utility bill or bank statement showing the voter's current name and address. §101.68(4)(c)3, Fla. Stat.

County canvassing boards review provisional ballots.  As an initial matter, the board determines whether the voter was entitled to vote at the precinct where the provisional ballot was cast.  §101.048(2)(b)(1), Fla. Stat.  If they were, then the board "shall compare the signature on the Provisional Ballot Voter's Certificate and Affirmation with the signature on the voter's registration and, if it matches, shall count the ballot." *Id*.  A voter "has the right" to cure deficiencies, including any signature-related deficiencies, by "present[ing] written evidence supporting his or her eligibility to vote to the supervisor of elections by not later than 5 p.m. on the second day following the election."  § 101.048(1), Fla. Stat.; *see also* § 101.048(5) and (6) (requiring notice of the right to provide evidence establishing eligibility and access to a free system where voter can determine whether his or her ballot was counted and, if not, the reason why).

Thus, in addition to a uniform statewide standard, Florida has safeguards for vote-by-mail and provisional ballots that provide more than the "minimal procedural safeguards" lacking in *Bush*.  531 U.S. at 109.  If *Bush* applies, then sections 101.68(2)(c)(1) and 101.048(2)(b)(1) satisfy its requirements.

All that remains then is the Plaintiffs' argument that differences in the number of rejected ballots from county to county or the processes used to notify voters of deficiencies from county to county violates their right to equal protection. *See* DE 4 at 9.  The Plaintiffs are wrong.  Different results without more cannot

establish an equal protection violation because even "uniform standards can produce different results"—equal protection is not the same thing as equal results. *Lemons*, 538 F.3d 1098.  Variations in how counties immediately inform their voters of deficiencies—in rural versus urban counties, large versus small counties—also do not violate the equal protection clause.  After all, equal protection does not require *complete* uniformity.  Some experimentation, deviation, or variation within the State is permissible; "local variety … can be justified by concerns about cost, the potential value of innovation, and so on.'" *Wexler v. Anderson*, 452 F.3d 1226, 1233 (11th Cir. 2006); *see also Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) (rejecting theory that California must impose a new all-mail voting system on all fifty-eight counties at once and noting that "democratic federalism permits states to serve as laboratories … By phasing in a new election system gradually … California is doing just that"); *Barber v. Bennett,* 2014 WL 6694451 at *15 (D. Ariz. Nov. 27, 2014) (noting that even *Bush* did not require uniformity from county to county in its equal protection analysis).

In the end, sections 101.68(2)(c)(1) and 101.048(2)(b)(1) of the Florida Statutes are the kind of "reasonable, politically neutral regulations" that the federal courts have "repeatedly upheld."  *Burdick,* 504 U.S. at 438.  The State has a "strong public interest in permitting legitimate statutory processes to operate to preclude voting by those who are not entitled to vote."  *Summit Cnty.,* 388 F.3d at

551.    The State also has a "strong public interest in smooth and effective administration of the voting laws that militates against changing the rules in the hours immediately preceding the election," or in the midst of an election. *Id.*; *see also Crawford,* 553 U.S. at 194-97 (noting that states have an important interest in preventing fraud and protecting voter confidence in the integrity of the elections).

Thus, the Plaintiffs have not established—and cannot establish—likelihood of success on the merits.

### B.    *The Plaintiffs cannot clearly establish irreparable harm.*

The Plaintiffs' claims about irreparable harm also ring hollow.   The Plaintiffs' prior positions before this Court make several things clear:   (1) *res judicata* now bars the Plaintiffs from raising these issues and claiming any harm; (2) they agree that the 2017 legislative amendments to section 101.68 cured any constitutional defects and therefore remedied any harm; and (3) due to their delay in bringing this suit, the Plaintiffs cannot otherwise establish irreparable harm.

### 1.    *Res Judicata Bars the Plaintiffs' Claims*

This litigation is foreclosed by the doctrine of *res judicata*.  "*Res judicata …* bars relitigation of matters decided in a prior proceeding," including "the specific legal theory [raised] in the old case *as well as any other legal theory that could have been raised in the old case*."  *Delgado v. Crood*, No. 18-10346-E, 2018 U.S. App. LEXIS 19547, at *6 (11th Cir. July 16, 2018) (emphasis added) (citations

omitted).  The Florida Democratic Party already successfully challenged section 101.68 and secured legislative changes to effectively codify that result.  Now, over a year later and with an election underway, they cry foul and challenge section 101.68 again.  *Res judicata* applies.

Prior to 2004, voters had an opportunity to cure both "no-signature" and "mismatched signature" defects in vote-by-mail ballots.  The statute was later amended twice, with the ultimate result being that voters could cure "no-signature" defects, but not "mismatched signature" defects.  *Fla. Democratic Party v. Detzner*, 2016 U.S. Dist. LEXIS 143620, at *4 n.4 (N.D. Fla. Oct. 16, 2016).  In 2016, the Florida Democratic Party challenged section 101.68 on the grounds that the failure to provide a cure mechanism for mismatched-signature ballots was unconstitutional.  *Id*. at *3.  This Court agreed, finding that a cure mechanism for signature defects was "highly effective" at protecting the right to vote and ordering its imposition for mismatched-signature ballots. *Id*. at *25.  Following entry of this Court's Order, this Court stayed the litigation to give the Florida Legislature an opportunity to cure the constitutional defect in the statute.  Fla. H.R., *Final Bill Analysis, Canvassing of Vote-by-mail Ballots*, at 3, n.21 (2017).  The Florida Legislature did so by amending section 101.68 during the 2017 legislative session. *Id*.  The Florida Democratic Party sought no further relief from this Court related

to the statute.  *See* Docket, *Fla. Democratic Party v. Detzner*, 4:16-cv-00607-MW-CAS.

Based on this procedural history, each element for *res judicata* is met.  To establish *res judicata*, a litigant must show "(1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases."  *Delgado,* 2018 U.S. App. LEXIS 19547 at *6 (citations omitted). There was plainly a final judgment on the merits, as this Court granted the relief requested by the Florida Democratic Party and that relief was ultimately codified by the Florida Legislature.  Furthermore, this Court plainly had jurisdiction to rule on a federal constitutional challenge to section 101.68. Secretary Detzner is the defendant in both suits.  The Plaintiffs are also identical for purposes of res judicata.[8]  Finally, the specific legal theory raised in this case— the constitutionality of the signature review procedure—could have been raised in

---

[8] This litigation is nominally brought by the "Executive Committee" of the Florida Democratic Party, but there is no substantive distinction between an executive committee and a party under Florida law.  *See* §103.091(1), Fla. Stat. (requiring each political party to establish an executive committee)*; Chi., R. I. & P. R. Co. v. Schendel*, 270 U.S. 611, 618, 46 S. Ct. 420, 423 (1926) (identity of parties is determined by the substance of their interests, not "mere form"). While Senator Nelson was not a named plaintiff in the 2016 litigation, he was a member of the Executive Committee in 2016 as a matter of Florida law.  *See* §103.091(6)(b) ("Each state executive committee shall include…all members of the United States Congress representing the State of Florida who are members of the party…"); https://www.billnelson.senate.gov/about-bill (noting he was first elected to the Senate in November 2000).

the 2016 litigation.  This Court specifically discussed the statewide process for reviewing signatures on vote-by-mail ballots.  *See*, *e.g., id*. at *22-23.  But because the Florida Democratic Party did not challenge that process, this Court concluded that the process "need not" be addressed.  *Id*. at *23.

Thus, each element of *res judicata* is present, and the doctrine bars the Plaintiffs' assertion of a constitutional challenge to Florida's signature-matching procedure.  As a result, the Plaintiffs can suffer no irreparable harm.

> 2.    *The 2017 Amendments to Section 101.68 Cured Any Constitutional Defects*

Even assuming that *res judicata* fails to bar the Plaintiffs' claims, the Plaintiffs did previously agree that the 2017 amendment to section 101.68 cured any constitutional defects in that statute.  The author of the Plaintiffs' expert report, Smith, notes that there were nearly 14,000 voters who participated in both the 2012 and 2016 general elections in Florida and who had their mail-in ballot rejected in the 2012 race.  DE 4, Exhibit A at 22.  "Over half of these 2012 rejected VBM voters successfully cast a VBM ballot in the 2016 election, *evidently resolving the issues that led to their ballot being invalidated four years earlier*."  *Id*. (emphasis added)  The clear implication here is that the remedy this Court imposed for the 2016 election, which the Florida Legislature later codified, and the Plaintiffs earlier decided *not* to challenge before this Court, was highly effective at safeguarding the right to vote.  Yet the Plaintiffs now claim irreparable harm from the provision

they previously applauded and which their purported expert still applauds.  The Plaintiffs cannot have it both ways—they cannot applaud the thing that they allege causes irreparable harm.

Furthermore, the only material supporting the Plaintiffs' claims of disparate treatment is Smith's September 2018 study.  This study is flawed.  Smith utilized a dataset submitted by Orange County to the Division of Elections following the 2016 General Election.[9]  This dataset contained not only the number of vote-by-mail ballots that were rejected, but also the number of vote-by-mail ballots that were returned as undeliverable.  Since this dataset was submitted by a county to the Division of Elections, Smith's error likely infects his calculations of mail-in ballot acceptance rates for all other Florida counties as well.  In short, the Plaintiffs would have this Court halt the State's entire election apparatus based on a fundamentally flawed study.

### 3.   Due to the Plaintiffs' Delay, There can be no Irreparable Harm

The Plaintiffs also cannot demonstrate irreparable harm because of their delay in bringing this suit.  "A preliminary injunction requires showing 'imminent' irreparable harm."  *Wreal LLC v. Amazon.com*, 840 F.3d 1244, 1248-49 (11th Cir. 2016).  A "delay in seeking a preliminary injunction of even only a few months—

---

[9] http://floridapolitics.com/archives/275277-bill-cowles-contends-aclu-rejected-votes-study-used-incorrect-data

although not necessarily fatal—militates against a finding of irreparable harm." *Id.* at 1248-49; *see also Tutoringzone v. Skoolers Tutoring Ctr., LLC,* 2017 U.S. Dist. LEXIS 219630 (N.D. Fla. Dec. 17, 2017) (citing *Wreal* and denying injunction in part based on seven-month delay in bringing suit). "Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights…" *Wreal*, 840 F.3d at 1248.

The Plaintiffs successfully challenged section 101.68 over two years ago, and were plainly aware that the statute was amended in response to their challenge. And yet, Plaintiffs did not seek further relief from this Court after the statute was amended, nor did they immediately bring suit to challenge the amended statute. Instead, they waited until the next general election was already underway to seek relief.  As such, they simply cannot demonstrate irreparable harm.

### C.   The Plaintiffs cannot clearly establish that the equities and the public interest favor extraordinary relief.

The equities and public interest decidedly weigh against extraordinary relief. "Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections [or in this case *ongoing* elections] absent a powerful reason for doing so."  *Crookston v. Johnson,* 841 F.3d 396, 398 (6th Cir. 2016) (citing *Purcell v. Gonzalez,* 549 U.S. 1, 5–6 (2006)).[10]  "Courts

---

[10] In *Crookston*, the Sixth Circuit stayed a district court's preliminary injunction, which the plaintiff requested approximately 5 weeks before the 2016 General

have imposed a duty on parties having grievances based on election laws to bring their complaints forward for pre-election adjudication when possible." *Hendon v. North Carolina State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (citing *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973)); *see also Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176, 1180 (9th Cir. 1988). On a related note, "[p]reliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution." *Ne. Fla. Chapter. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

The Plaintiffs' request for extraordinary relief is too late. Instead of resolving grievances before the election, the Plaintiffs waited until two days *after* ballots had been cast to sue. They sued when the Florida Legislature was not in session, effectively preventing that body from remedying any concerns about the

---

Election so that he could take a selfie with his ballot. *Id.* at 399. In *Conservative Party of New York State v. New York State Board of Elections,* 2010 U.S. Dist. LEXIS 114155, at *2 (S.D.N.Y. 2010) the district court similarly denied a preliminary injunction where the plaintiffs waited until 6 weeks before an election to file their action. In *Silberberg v. Board of Elections of New York,* 216 F. Supp. 3d 411, 420 (S.D.N.Y. 2016) the district court denied a late-filed action for fear of the disruption. In June of this year, the U.S. Supreme Court held that the balance of equities did not weigh in favor of a request for a preliminary injunction in an election law case where the plaintiffs did not demonstrate reasonable diligence in requesting injunctive relief. *See Benisek*, 138 S. Ct. at 1944.

relevant statutory provisions. If imminence is at all a factor when considering requests for extraordinary relief, then the time for such relief has long since passed. *See Wreal,* 840 F.3d 1244, 1246 (11th Cir. 2016) (affirming denial of preliminary injunction where "the plaintiff pursued its preliminary injunction motion with the urgency of someone out on a meandering evening stroll rather than someone in a race against time").

Delays, confusion, and the potential for errors highlighted in the introduction section further militate against granting any extraordinary relief.  As the U.S. Supreme Court noted, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 24, (2008).  The public consequences weigh against extraordinary relief.

### IV.   <u>Conclusion</u>

Because the Plaintiffs have failed to clear the high thresholds for the extraordinary relief they seek, the Secretary asks that this Court deny the Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULES</u>

The undersigned further certifies that this filing complies with the size, font, and formatting requirements of Local Rule 5.1(C), and that this filing complies with the word limit in Local Rule 7.1(F) because it contains 4,802 words, excluding the case style, signature block, and certificates.

\*\*\*

Respectfully submitted by:

BRADLEY R. MCVAY (FBN 79034)
 *Interim General Counsel*
 brad.mcvay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48032)
 *Deputy General Counsel*
 ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building Suite, 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
(850) 245-6536 /   (850) 245-6127 (fax)

*/s/ Mohammad O. Jazil*
MOHAMMAD O. JAZIL (FBN 72556)
 mjazil@hgslaw.com
GARY V. PERKO (FBN 855898)
 gperko@hgslaw.com
MALCOLM N. MEANS  (FBN 0127586)
 mmeans@hgslaw.com
HOPPING GREEN & SAMS, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
(850) 222-7500 / (850) 224-8551 (fax)

Dated:  November 10, 2018         ***Counsel for the Secretary of State***

21

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served to all counsel of record through the Court's CM/ECF system to the following on this 10th day of November, 2018.


*/s/ Mohammad O. Jazil*

Attorney