# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

DEMOCRATIC EXECUTIVE
COMMITTEE OF FLORIDA and
BILL NELSON FOR U.S. SENATE,

  Plaintiffs,

v.

KENNETH DETZNER, in his official
capacity as the Florida Secretary of
State,

  Defendant.

Case No. 4:18-cv-00520-RH-MJF

**INTERVENOR-DEFENDANT NATIONAL REPUBLICAN SENATORIAL
COMMITTEE'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' EMERGENCY MOTION FOR
TEMPORARY INJUNCTION, TEMPORARY RESTRAINING ORDER,
<u>AND PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................1

ARGUMENT ...............................................................................................4

I.   Plaintiffs Are Not Entitled To A Preliminary Injunction When They
     Waited Until After The Election To Bring Claims That Could Have
     Been Brought Long Before. .........................................................................4

II.  Plaintiffs Cannot Demonstrate A Likelihood Of Success On The
     Merits. ..........................................................................................................8

     A.   Plaintiffs Have Not Demonstrated Standing To Challenge The
          Exclusion Of Late-Arriving Vote-by-Mail Ballots Or
          Provisional Ballots. ................................................................................ 8

     B.   There Is No Constitutional Violation. ................................................ 9

III. Plaintiffs Cannot Demonstrate Irreparable Injury. ..................................22

IV.  The Balance Of The Equities And The Public Interest Favor Denial
     Of The Motion. ...........................................................................................24

V.   Plaintiffs' Requested Relief Is Unwarranted ...........................................26

CONCLUSION .........................................................................................28

## INTRODUCTION

Plaintiffs—the Democratic Executive Committee of Florida and Bill Nelson for U.S. Senate—have not followed the basic rules of the road necessary to obtain the extraordinary relief they seek.  They ask this federal court to issue an injunction against state election officials across Florida on an "emergency" basis after Election Day has come and gone—based on a supposed defect in Florida's statutory scheme that was the subject of extensive litigation brought by the Florida Democratic Party in this Court two years ago.  These same Plaintiffs brought the exact same challenge in 2016 and obtained precisely the relief that they sought—the opportunity to cure mismatched signatures.

Now, *after* the 2018 election has occurred, they argue that the relief that they themselves requested, or that was otherwise provided for in the statute—is insufficient.  If their own remedy was truly inadequate, as Plaintiffs now urge, the issue could easily have been raised in the prior suit—or at any point over the past two-plus years.  But it was not.  Since then, the Florida Legislature faithfully adopted into statute this Court's cure remedy for mismatched signatures on vote-by-mail ballots, and all interested parties, including Intervenor-Defendant National Republican Senatorial Committee ("NRSC"), relied on the amended statute as establishing the legal framework for the 2018 election.

Voting in that election is over.  Plaintiffs are just now raising the signature-mismatch issue, having waited until three days *after* the election to do so on an "emergency" basis in a transparent effort to upset the outcome of the race for the United States Senate and other offices.  And they rely on a study that has been available to them since at least September 2018.

These tactics are impermissible.  "[T]he law imposes the duty" to bring such claims forward "for *pre-election* adjudication."  *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973) (en banc) (emphasis added).[1]  A contrary rule would "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action."  *Id.* (internal quotations omitted).

Plaintiffs offer no explanation for their delay.  This Court should deny a preliminary injunction and decline to reach the merits of Plaintiffs' claims at this time.

Plaintiffs' constitutional arguments are unfounded in any event.  As this Court previously recognized, state "[e]lection laws almost always burden the right to vote," and "[s]ome of these regulations must be substantial to ensure that order rather than chaos accompanies our democratic process."  *Fla. Democratic Party v. Detzner*, No.

---

[1]  Fifth Circuit cases decided before October 1, 1981, are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

4:16-cv-607-MW/CAS, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016) (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)).  Plaintiffs claim that the requirement that mail-in and provisional ballots utilize signature verification, rather than the photo identification asked of in-person voters, is a severe burden unsupported by substantial government interests, even though, as this Court previously recognized, it is black-letter law that a state has a compelling interest in voter identification.  And Plaintiffs entirely ignore that under Florida law, vote-by-mail voters now have the statutory protection of notice and the opportunity to cure a mismatched signature— the very reform that this Court determined would make the statute constitutional.

Rather than seek purely prospective relief, Plaintiffs demand that this Court enjoin application of the signature-match requirements in their entirety—statewide. They also seek to force all 67 Florida counties to immediately halt or change the machine recounts that have been ongoing for two days and are almost complete, and to require them to consider ballots that were excluded based on a signature mismatch after an opportunity to cure.  Yet they cannot demonstrate irreparable harm since they cannot identify a single voter who was unable to utilize the ability to cure. Moreover, they ignore the strong public interests counseling against an injunction, including the undeniable fact that an injunction at this point in time would throw the canvassing process into chaos by changing the rules long after Election Day.

The Legislature amended the statute in accordance with this Court's direction, and Florida voters, candidates, and election officials all relied on the statutory scheme as it existed leading up to and on Election Day. Plaintiffs stood on the sidelines until the election results did not go their way and then asserted an "emergency" claim that they could have presented years ago.  Changing the law retroactively would be fundamentally unfair, especially when these constitutional issues could easily have been adjudicated years before the election, and the statutes amended accordingly if necessary.

Plaintiffs' motion for a preliminary injunction must be denied.

## ARGUMENT

**I.      Plaintiffs Are Not Entitled To A Preliminary Injunction When They Waited Until After The Election To Bring Claims That Could Have Been Brought Long Before.**

"[I]n election law cases as elsewhere," a party requesting preliminary injunctive relief "must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).  The doctrine of laches enforces this requirement, barring a claim when "(1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the delay caused [an opposing party] undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005).  Indeed, laches applies with particular force in election cases:  "Interference with impending elections is extraordinary, and interference with an election after voting has begun

is unprecedented." *Sw. Voter Registration Educ. Proj. v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (internal citation omitted).

Here, Plaintiffs waited until *after the election* to file suit even though the signature-match requirement has been law for about *twenty years*. *See* Fla. Stat. § 101.68 (absentee ballot matching requirement since 1996); Fla. Stat. § 101.048 (provisional ballot matching requirement since 2001). The leading case on which they base their equal protection claim—*Bush v. Gore*—was decided in 2000, and is hardly new either.

As a matter of well-established precedent, this delay forecloses a preliminary injunction. "[T]he law imposes the duty" to bring election grievances forward "for *pre-election* adjudication." *Toney*, 488 F.2d at 314 (emphasis added). A contrary rule would "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.* (internal quotations omitted); *see also Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988) (collecting cases to show that courts do not generally forgive delays in the election context "lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs").

Plaintiffs have no legitimate justification for their delay. Strikingly, their papers are completely silent on this point. Although the aspects of the signature-

matching process that Plaintiffs complain of now were "highlighted" by this Court more than two years ago, Plaintiffs never raised that objection to their chosen remedy of notice and an opportunity to cure.  To be sure, Plaintiffs discussed supposed problems with signature-matching, but the solution they proposed for those problems was the cure remedy—they never suggested those problems constituted an *independent* constitutional violation.  The Florida Legislature amended the statute to conform to the Court's directive; and the amended statutes were passed by the Legislature and signed into law by Governor Scott and administered in the 2018 election.  *See* Plaintiffs' TRO Mem., ECF 4, at 8.  Plaintiffs have known about the 5 p.m. cure deadline, in particular, since at least June 2017 when they notified this Court of the amendment to Section 101.68 that allowed voters to cure mismatched signatures and created that deadline.  *See Fla. Democratic Party v. Detzner*, No. 16-cv-607, ECF 57 (N.D. Fla. June 5, 2017) (informing the Court that a bill codifying the Court's 2016 order had been signed by Governor Scott).[2]

---

[2] One particularly troubling aspect of Plaintiffs' lawsuit is that in many places they have simply cut-and-pasted language from their papers in the 2016 litigation. *Compare Fla. Democratic Party v. Detzner*, No. 16-cv-607, ECF 4, at 18 (N.D. Fla. Oct. 3, 2016) ("In other words, the statutory scheme affords canvassing boards complete discretion over signature comparison with no statewide oversight or standards. . . .  The statutory scheme accordingly *ensures* that the metrics used for comparing signatures will not and cannot be standardized across county canvassing boards.  Nor can the Division of Elections ameliorate the problem by ensuring that the particular standard or scheme used by each canvassing board is sufficiently reliable—it lacks the statutory authority to do

The matching requirement "is not a new enactment," and Plaintiffs were "sufficiently familiar with the statute's requirements and could have sued earlier." *Fishman v. Schaffer*, 429 U.S. 1325, 1330 (1976) (Marshall, J., in chambers) (denying application for an injunction against state election officials). This is not "a gray area where" the problem "even if known before the election, was discovered at a late hour." *Toney*, 488 F.2d at 314.

Plaintiffs' strategic timing prejudices the Secretary, election officials, Intervenor-Defendants, and the public. As the Secretary has explained, Plaintiffs' delay has prejudiced his office in its administration of election laws by creating uncertainty in the application of those laws. Plaintiffs have also prejudiced Intervenor-Defendants and voting members of the public, who conducted themselves in accordance with the existing regime and may now have the rug pulled out from under them, facing the potential confusion of after-the-fact, retroactive changes to longstanding election laws. *See Fishman*, 429 U.S. at 1330 ("[A]n injunction at this time would have a chaotic and disruptive effect upon the electoral process."). And Florida's 67 county supervisors of elections (non-parties to this case), who are responsible for fulfilling their statutory obligations to ensure

---

so."), *with* Plaintiffs' TRO Mem., ECF 4, at 17–18 (identical). This is smoking-gun evidence that they could have easily brought their present claims sooner, but chose not to.

transparency and legitimacy, have also been prejudiced by Plaintiffs' unjustified delay in asserting their claims.  *See* Defendant's Mem., ECF 22, at 2.

"Timing is everything."  *United States v. Heard*, No. 18-10479, 2018 WL 4181736, at *3 (11th Cir. Aug. 30, 2018).  Plaintiffs' tactical decision to hold their lawsuit in reserve until *after* the initial returns showed them losing this election bars a preliminary injunction, if not this entire lawsuit.

**II.**     **Plaintiffs Cannot Demonstrate A Likelihood Of Success On The Merits.**

    **A.**     **Plaintiffs Have Not Demonstrated Standing To Challenge The Exclusion Of Late-Arriving Vote-by-Mail Ballots Or Provisional Ballots.**

Standing to sue is a constitutional requirement and "a threshold matter required for a claim to be considered by the federal courts," and "[a]t the heart of Article III standing is the existence of an injury."  *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1262 (11th Cir. 2006).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating'" injury.  *Id.* at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Plaintiffs have failed to allege facts sufficient to show that they have suffered an injury-in-fact in all the situations for which they request relief. This Court previously held that "Plaintiffs need not identify *specific* voters that are registered as Democrats that will have her vote-by-mail ballot rejected due to apparent mismatched signatures; it is sufficient that some inevitably will." *Detzner*, 2016 WL 6090943, at *4. In that case, no ballots had yet been cast, whereas here all votes have already been submitted. In these circumstances, Plaintiffs should be expected to show actual, not presumed, injury since the relevant events have occurred. But even assuming that it was inevitable that some Democratic voter might have his or her ballot rejected for a mismatched signature, it is not even remotely inevitable that such a person was denied the opportunity to cure—and Plaintiffs have not alleged that any person was in fact denied that opportunity. Indeed, Plaintiffs have not alleged that any individual who wanted to cure a signature mismatch in her ballot has been unable to do so, and that such a person would have voted for Senator Nelson. These failings are fatal.

### B. There Is No Constitutional Violation.

Even if the Court reaches the merits at this time, which it need not and should not for the reasons explained above, Plaintiffs are unlikely to prevail on their argument that Florida's signature-match requirement violates the Constitution.

"[N]o right is more precious in a free country than the right to vote." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  Still, "states retain the power to regulate their own elections" and "[e]lection laws almost always burden the right to vote." *Detzner*, 2016 WL 6090943, at *6 (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)).  "Some of these regulations must be substantial to ensure that order rather than chaos accompanies our democratic process." *Id.*

Florida's signature-match requirement is precisely the sort of "reasonable, politically neutral regulation[]" that the Supreme Court has "repeatedly upheld." *Burdick*, 504 U.S. at 438; *see also Crawford v. Marion Cty. Election Bd.,* 553 U.S. 181, 197 (2008) ("States employ different methods of identifying eligible voters at the polls. . . . [S]ome require voters to sign their names so their signatures can be compared with those on file.").

### 1.   The Signature-Match Requirement Imposes Minimal Burdens To Further The State's Compelling Interests.

It is undisputed that Florida has a "compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)). And "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford*, 553 U.S. at 196.  Indeed, as this Court has previously recognized, "preventing voter fraud is a compelling interest." *Detzner*, 2016 WL 6090943, at *7.   Likewise, Florida has the "closely

related" but distinct "interest in protecting public confidence 'in the integrity and legitimacy of representative government.'" *Crawford*, 553 U.S. at 197 (internal quotation marks and citation omitted). "[P]ublic confidence in the integrity of the electoral process" is significant "because it encourages citizen participation in the democratic process." *Id.*

These concerns apply with particular force here because "voting by mail makes vote fraud much easier to commit." *Nader v. Keith*, 385 F.3d 729, 734 (7th Cir. 2004).[3] "[A]bsentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004). Florida, regrettably, has had "a rich history of absentee-ballot fraud, including at least two elections in which courts invalidated every single absentee ballot because of widespread fraud." *Fla. State Conference of NAACP v. Browning*, 569 F. Supp. 2d

---

[3] *See, e.g.*, *Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994) (addressing absentee voter fraud in state senatorial election); *Keeley v. Ayala*, 179 A.3d 1249 (Conn. 2018) (new primary election was required where the number of invalidated absentee ballots was greater than winner's margin of victory); *Gooch v. Hendrix*, 5 Cal. 4th 266 (Cal. 1993) (finding sufficient circumstantial evidence of absentee ballot fraud affecting election outcome); *Pabey v. Pastrick*, 816 N.E.2d 1138 (Ind. 2004) (absentee ballot fraud "substantially undermin[ed] the reliability of the election and the trustworthiness of its outcome"); *McCranie v. Mullis*, 478 S.E.2d 377 (Ga. 1996) (new election ordered when there was sufficient number of invalid absentee to cast doubt on the election results); *Rogers v. Holder*, 636 So. 2d 645 (Miss. 1994) (fraudulent absentee ballots made it impossible to discern the will of the voters); *Hileman v. McGinness*, 739 N.E.2d 81 (Ill. App. Ct. 5th Dist. 2000) (remanding for factual findings to determine absentee ballot fraud); *Valence v. Rosiere*, 675 So. 2d 1138 (La. App. 1996) (holding that allegations of absentee voter fraud were sufficient to require a trial on the merits).

1237, 1251 (citing *In re Protest of Election Returns & Absentee Ballots in the Nov, 4, 1997 Election for Miami*, 707 So. 2d 1170 (Fla. 3d DCA 1998); *Bolden v. Potter*, 452 So. 2d 564 (Fla. 1984)).

The burdens imposed by Florida's signature-match requirement are minimal and reasonably related to this compelling governmental interest. The only burden the statute imposes on a vote-by-mail ("VBM") voter is that the signature on the voter's ballot matches the signature on file for that voter and, if there is a mismatch, the voter still may cure any inconsistency by 5:00 p.m. the day before the election. *See* Fla. Stat. § 101.68(4). This is not an undue burden.

In *Florida State Conference of NAACP v. Browning*, this Court upheld a similar requirement that voter-registration applicants provide proof of their identity on their applications, where the statute required applicants with errors on their applications to respond to a notice and cure the defect either by mail, email, fax, or in person. 569 F. Supp. 2d at 1240–41, 1256–57. Those burdens—"to drive to an elections office or send a piece of mail"—"are not constitutionally cognizable impediments to the right to vote." *Id.* at 1253.

By any measure, the burden imposed by Florida's signature-match requirement is no greater than the burden imposed by the voter-ID requirement the Supreme Court upheld in *Crawford*. There, the Court held that "the inconvenience of making a trip to the [bureau of motor vehicles], gathering the required documents,

12

and posing for a photograph, surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198. Signing the back of a security envelope when voting by mail, as a preferred alternative to in-person voting, is no more inconvenient. *Cf. McDonald v. Bd. Of Election Comm'rs of Chi.*, 394 U.S. 802, 807–08 (inability to vote absentee is no constitutional burden where in-person voting is option).

In Plaintiffs' view, every election regulation would be unconstitutional because the result of noncompliance is an uncounted vote. But even the most minimal "procedural step filters out some potential voters. No one calls this effect disfranchisement, even though states could [always] make things easier by, say, allowing everyone to register or vote from a computer or smartphone without travel or standing in line." *Frank v. Walker*, 768 F.3d 744, 749 (7th Cir. 2014).

Moreover, Plaintiffs "fail[] to identify a single individual who would be unable to vote" because of Florida's signature-match requirement. *CommonCause/Georgia v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009). "[T]he inability to locate a single voter who would bear a significant burden provides significant support for a conclusion that" Florida's requirements do not impose an undue burden. *Id.* (internal quotation marks omitted).

To be sure, in 2016 this Court held that Florida's previous signature-match requirement imposed an impermissible burden on voters because the previous

13

statutory scheme lacked provisions providing notice and an opportunity to cure. *Detzner*, 2016 WL 6090943, at *7. But the Court designed and ordered relief to address that finding, at Plaintiffs' request, and Florida duly complied with the Court's mandate that election officials "allow mismatched-signature ballots to be cured in precisely the same fashion as currently provided for non-signature ballots." *Id.*, at *9. Plaintiffs do not claim that Defendants failed to abide by that requirement.[4]

### 2. Plaintiffs' Challenge To The Standard For Assessing Signature Matches Lacks Merit.

Relying on *Bush v. Gore*, 531 U.S. 98 (2000), Plaintiffs argue that the statute remains unconstitutional because "there are no uniform standards that election officials follow, nor is there any known state-wide training, for signature-matching processes." Plaintiffs' Br. 7.[5] In *Bush v. Gore*, the Supreme Court made clear that

---

[4] NRSC respectfully preserves the argument that the Constitution does not require notice and an opportunity to cure in order for a signature-match requirement to be valid. *See Protect Marriage Ill. v. Orr*, 463 F.3d 604, 608 (7th Cir. 2006) (invalidating signatures without an individual opportunity to challenge signature invalidation does not violate Constitution because the "costs of allowing tens of thousands of people to demand a hearing on the validity of their signatures would be disproportionate to the benefits"); *but see Martin v. Kemp*, No. 1:18-CV-4776-LMM, 2018 WL 5276242, at *11 (N.D. Ga. Oct. 24, 2018) (enjoining Georgia signature-match requirement that did not provide notice or opportunity to cure).

[5] Plaintiffs at times suggest that *Bush v. Gore* imposes a heightened Equal Protection standard, *see* Plaintiffs' Br. 7–8, 10, but that is wrong. The standard that governs here is *Anderson-Burdick*, as Plaintiffs elsewhere concede. *See id.* at 11. Plaintiffs' *Bush v. Gore* argument in this case is also fundamentally

its holding was "limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities." 531 U.S. at 109. The Court did not question the well-settled rule that "local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Id. See also Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) ("[F]ederalism permits states to serve as laboratories for experimentation." (internal quotations omitted)).

Moreover, Plaintiffs' argument again ignores the relief this Court provided in 2016. All elections officials must now notify VBM voters of a signature mismatch and provide the voter an opportunity to cure the defect by submitting a cure affidavit. Those new protections provide the substantial statewide uniformity that was previously found to be lacking. *See Lemons v. Bradbury*, 538 F.3d 1098, 1105–06 (9th Cir. 2008) (requirement that county elections officials verify signatures satisfied *Bush v. Gore* because "it uniformly requires all counties to compare two existing signature specimens when determining the validity of each sampled signature on a referendum petition").

---

inconsistent with the substantive arguments Plaintiffs' counsel is making in opposition to preliminary relief in an ongoing election dispute in Arizona. *See* Response in Opposition to Plaintiffs' Request for a Temporary Restraining Order at 2, *Maricopa County Republican Party v. Michele Reagan*, No. CV2018-013963, (Ariz. Super. Ct. Nov. 8, 2018).

Plaintiffs assert that some counties use different methods to notify VBM voters of a signature mismatch. Plaintiffs' Br. 9–10. That argument fails, too. The Equal Protection Clause does not require all counties to use exactly the same procedures to provide notice of a signature mismatch. *Wexler v. Anderson*, 452 F.3d 1226, 1233 (11th Cir. 2006); *cf. Short*, 893 F.3d at 679 (denying preliminary injunction to California mail-in ballot law that initially applied only to certain counties). Indeed, doing so is almost certainly infeasible for counties that differ greatly in size, population, demographics, and many other ways. Plaintiffs' mistaken understanding of the extent of uniformity that equal protection requires would lead to absurd results. For example, Plaintiffs point out that one county provides notice of mismatches by locating the prospective voters on Facebook and contacting them through the social network. *Id.* In Plaintiffs' view, either that one county must immediately halt that creative and low-cost method of tracking down difficult-to-find voters—or else all counties throughout Florida must begin tracking voters down through Facebook when other approaches might be more effective for those counties. Surely this is not the "uniformity" that equal protection contemplates.

The critical point is that all counties—without exception and across Florida—must compare a voter's signature with the signature on file, notify VBM voters of a signature mismatch, and provide them with an opportunity to submit a cure affidavit.

Fla. Stat. § 101.68(4).  That is more than enough uniformity to pass constitutional muster under *Bush v. Gore*.  *See Lemons*, 538 F.3d at 1105; *Short*, 893 F.3d at 679.

### 3.   There Is No Constitutional Violation As To The Few Ballots That Arrive On Election Day.

Nor can Plaintiffs argue that Florida law imposes an undue burden on the very small subset of VBM ballots with mismatched signatures that are received *after* the deadline to cure—5:00 p.m. on the day before the election.  As a threshold matter, Plaintiffs did not raise this issue in their Complaint and allege no facts showing they have standing to seek relief on behalf of this category of Florida voters.

In any event, the deadline to cure does not create an undue burden for this tiny subset of Florida residents.  It is beyond dispute that Florida law gives every person who sends in a VBM ballot ample opportunity to cast a valid ballot under Florida law.  The requirements to vote by mail are straightforward and easily accessible to all Florida voters.  Clear and concise instructions for how to request and cast a valid VBM ballot are available on Florida's Department of State website.[6]  And Florida provides multiple ways for a registrant to receive and return a VBM ballot.  Fla. Stat. § 101.62(4)(c)(1)–(5); *id*. § 101.6103(2).  People who elect to use VBM ballots are also on notice that: (1) they must sign their ballots; (2) their signature must match the one in their voter-registration file; and (3) they have the opportunity to submit a

---

[6]  "Vote-by-Mail," Florida Department of State, Division of Elections, available at https://dos.myflorida.com/elections/for-voters/voting/vote-by-mail/.

cure affidavit if their signature does not match until 5:00 p.m. the day before the election.   Fla. Stat. § 101.6103(3) ("The return mailing envelope shall contain a statement in substantially the following form: . . . I understand that failure to sign this certificate and give my residence address will invalidate my ballot"); *Vote-by-Mail*, Fla. Dept. of State, Div. of Elections, https://dos.myflorida.com/elections/for-voters/voting/vote-by-mail/ (instructing voters how to cure).   Florida also provides all voters who have requested a VBM ballot an online system to track the status of his or her ballot, a link to which is provided on the Department of State website.[7] Voters can verify or update the signature on their voter-registration records before sending in their ballot up until fifteen days before the election.   They can also preemptively submit a cure affidavit by mail, fax, or email in case their signature on the ballot is rejected as a mismatch on Election Day.   *See* Fla. Stat. § 101.68. Moreover, people who request a VBM ballot also have the opportunity to change their mind and vote in person.   *Id*. § 101.69(2).

For all these reasons, the deadline to cure a mismatched signature cannot create an undue burden on the very small number of people whose signature does not match their registration records and who fail to return their timely received VBM ballots in time to be cured within the statutory cure period.

---

[7] *Vote-by-Mail*, Fla. Department of State, Div. of Elections, https://dos.myflorida.com/elections/for-voters/voting/vote-by-mail/.

Regardless, the 5:00 p.m. deadline to cure the day before the election advances important state interests.  States have a strong interest in "orderly administration" of elections.  *Crawford*, 553 U.S. at 196.  Election Day and its aftermath are incredibly busy and sometimes frenetic as election officials verify, count, and certify the number of votes cast.  Just as states are justified in setting poll closing times and "reasonable cutoff point[s] for registration," *Rosario v. Rockefeller*, 410 U.S. 752, 760 (1973), they need not extend a cure period indefinitely.

It would be impossible for election officials to fulfill their statutory duties without the imposition of reasonable voting-related deadlines.  *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("[I]t is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995) (discussing "States' interest in having orderly, fair, and honest elections 'rather than chaos.'") (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1995)).  Under Florida law, election officials must upload "results of all early voting and vote-by-mail ballots that have been canvassed and tabulated" by 7 p.m. prior to Election Day, Fla. Stat. § 102.141(4)(a), and the canvassing board must report "all early voting and all tabulated vote-by-mail results" to the Department of State 30 minutes after the polls close, and update precinct election results "at least every 45 minutes until all results are completely reported," *id.* § 102.141(4)(b).  In

19

the midst of these responsibilities, election officials should not also be required to contact voters whose signatures did not match, and who were so notified—but who nonetheless failed to submit their vote-by-mail ballot in advance of the cure deadline.

"When evaluating a neutral, nondiscriminatory regulation of voting procedure, [courts] must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Crawford*, 553 U.S. at 203 (internal quotations and alteration omitted). There is no ground here for invalidating the challenged statute—particularly after it had been amended in accordance with this Court's direction, and two elections have been conducted in reliance on that amendment.

**4.    There Are No Constitutional Flaws in the Signature Match Requirement As Applied To Provisional Ballots.**

Plaintiffs also challenge the signature-match requirement applicable to provisional ballots. *See* Fla. Stat. § 101.048(2). But Plaintiffs have been unable to identify a single voter who cast a provisional ballot that was rejected because of a mismatch between signatures, much less one who was not given an opportunity to cure a mismatched signature. *See supra* 9, 13. Notably, a provisional voter has "the right to present written evidence supporting his or her eligibility to vote . . . by not later than 5 p.m. on the second day following the election." Fla. Stat. § 101.048(1). Without any evidence that the signature-match requirement has actually hampered

the voting rights of provisional voters, any burden is slight, if it exists at all.  *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009) (finding "insignificant burden" in challenge to voter ID law where Plaintiffs were "unable to direct this Court to any admissible and reliable evidence that quantifies the extent and scope of the burden imposed by the Georgia statute").

Requiring the signatures of absentee and provisional voters to match the signatures on their voter registration applications is reasonably related to Florida's important governmental interests in an orderly election.  *See Wexler*, 452 F.3d at 1232.  Unlike regular in-person voting, neither absentee nor provisional ballots are generally subject to a photo ID requirement.  *Compare* Fla. Stat. § 101.043(1) (requiring photo ID for in-person voters) *with id.* § 101.048(2) (requiring voters without such identification to cast a provisional ballot), *and id.* §§ 97.0535, 101.6923(6) (requiring only certain, first time Florida voters who registered by mail without submitting photo ID and have never been issued Florida identification to include copy of photo ID with mail-in ballot).  For these voters, the signature-match requirement is an alternative form of identification.[8]

---

[8] Other states, including all three states that conduct elections entirely by mail, have similar signature-match requirements.  *E.g.*, Colo. Rev. Stat. § 1-7.5-107.3 (requiring election judges to "compare the signature on the self-affirmation on each return envelope with the signature of the eligible elector stored in the statewide registration system"); Or. Rev. Stat. § 254.470(9) (same); Cal. Elec. Code § 3019(a)(A)(1); Ariz. Rev. Stat. § 16-550(A); Utah Code Ann. § 20A-3-

In the context of such a "reasonable" restriction on the rights of voters, "the State's important regulatory interests are . . . sufficient." *Burdick*, 504 U.S. at 434.

### 5. Section 101.68(2)(c)4 Is Not Properly Before The Court.

The Court's scheduling order directed the parties to be prepared to discuss whether the ballot-challenge procedures in Fla. Stat. § 101.68(2)(c)4 violate the First or Fourteenth Amendments.  Order (Dkt. 26) at 3.  No party in this litigation has challenged § 101.68(2)(c)4.  Thus, this issue is not properly before the Court and any ruling on it would violate Article III of the United States Constitution.

### III.     Plaintiffs Cannot Demonstrate Irreparable Injury.

Plaintiffs cannot show that they likely will be imminently and irreparably injured in the absence of a preliminary injunction.  *See Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247–48 (11th Cir. 2016).  "A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (internal quotation marks omitted).  Thus, "even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury

---

308(1)(b)(ii) (similar); Haw. Rev. Stat. § 15-9(c) (same); Ind. Code § 3-11-10-15(3) (same); Mich. Comp. Laws § 168.766 (similar); Iowa Code § 53.18(3) (same); N.D. Cent. Code § 16.1-07-12 (similar); Tex. Elec. Code § 87.041(b)(2) (same); Wash. Rev. Code § 29A.40.110 (similar).

would, *standing alone*, make preliminary injunctive relief improper." *Id.* (emphasis added).

Plaintiffs argue that they will suffer irreparable injury unless this Court enjoins Florida election officials from following Florida law and rejecting ballots that contain signature mismatches. Complaint (Dkt. 1) at 18. Not so. As detailed above, Plaintiffs knew about the alleged constitutional violation for years, yet did nothing about it. The law is clear "that a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal*, 840 F.3d at 1248; *see also Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (Plaintiffs claim of " a serious injury become less credible by their having slept on their rights."). Plaintiffs have provided no explanation for not challenging the signature-match requirement (or related process) sooner.

Furthermore, Plaintiffs have other adequate remedies, negating their allegation of irreparable injury. *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1127 (11th Cir. 2005) ("However, because [an injunction] is an extraordinary remedy, it is available not simply when the legal right asserted has been infringed, but only when that legal right has been infringed by an injury for which there is no adequate legal remedy and which will result in irreparable injury if the injunction does not issue."). Florida law provides a process by which "any elector qualified to

23

vote in the election" may contest the certification of election results.  Fla. Stat. § 102.168(1).  It specifically provides a mechanism to contest an election on the basis of "[r]eceipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election."  *Id.* § 102.168(3)(c). Rather than enjoin the operation of a facially neutral state law supported by legitimate state interests, this Court should recognize that Plaintiffs may challenge the rejection of the ballots at issue here through the statutorily directed procedure set forth in Fla. Stat. § 102.168.

## IV. The Balance Of The Equities And The Public Interest Favor Denial Of The Motion.

The public interest and balance of harms militate strongly against the post-Election Day, statewide injunctive relief sought by the Plaintiffs because of the hugely disruptive consequences such an order would carry.  Even when faced with a request to enjoin election procedures "weeks before" an election, a court must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to elections cases."  *Purcell*, 549 U.S. at 4.  For example, "[c]ourt orders affecting elections . . . can themselves result in voter confusion."  *Id.*  Even "seemingly innocent alterations in election rules" can result in "danger[ous] unanticipated consequences."  *Griffin*, 385 F.3d at 1132.

For these reasons, courts overwhelmingly seek to avoid interfering with voting laws even in the weeks *leading up to* an election.  *See, e.g.*, *Williams v.*

*Rhodes*, 393 U.S. 23, 34 (1968) (declining to order the printing of new ballots at a "late date" even where the existing ballots were held to have unconstitutionally excluded a certain candidate); *Ariz. Sec'y of State's Office v. Feldman*, 137 S. Ct. 446 (2016) (immediately staying circuit court's injunction of Arizona voting laws issued four days before election); *North Carolina v. League of Women Voters of N.C.*, 135 S. Ct. 6 (2014) (granting stay to prevent interference with election procedures roughly one month before election); *Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) (staying a district court's injunction "given the imminent nature of the election"); *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014) (staying an injunction "in light of the importance of maintaining the status quo on the eve of an election"); *Colon–Marrero v. Conty–Perez*, 703 F.3d 134, 139 n.9 (1st Cir. 2012) (noting that "even where plaintiff has demonstrated a likelihood of success, issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own"); *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012) ("As a general rule, last-minute injunctions changing election procedures are strongly disfavored."); *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1012 (6th Cir. 2006) (vacating in part a temporary restraining order that "creates disorder in electoral processes").  Changing the law shortly before an election is bad enough; changing the law *after* the election is even worse.

Relatedly, the "balance of equities and the public interest tilt[] against" Plaintiffs because they "could have sought [preliminary relief] much earlier." *Benisek*, 138 S. Ct. at 1944. As discussed above, there is no reason this lawsuit could not have been filed months (or even years) in advance of the present election cycle. If Plaintiffs believed that Florida's failure to adopt the signature-matching protocol they desired was a constitutional violation, they had every opportunity to bring their claims long ago, rather than wait until after Election Day and approximately 24 hours before the initial certification deadline. The Court should not reward their calculated decision to "seek to undo the ballot results in a court action" when things did not go their way on Election Day. *Toney*, 488 F.2d at 314.

## V.        Plaintiffs' Requested Relief Is Unwarranted.

Assuming, *arguendo*, that Plaintiffs could find a way around the numerous cases barring last-minute (much less post-Election Day) relief in the election context, establish a constitutional violation, show irreparable injury, and demonstrate that the public interest and balance of equities tip in their favor, they are not entitled to the particular remedy they seek.

Plaintiffs have asked this Court to declare, after the election has been held, that *all* ballots with signature mismatches must "be counted as valid votes"— whether or not the ballot can be verified as meeting all legal requirements—and to enjoin rejection of all such ballots. Complaint (Dkt. 1) at 19. That extreme request

is far more than necessary to remedy their alleged injuries, and makes plain that Plaintiffs' true goal is not to establish a uniform process for signature-matching to be used to verify the legitimacy of the ballots, but to get the ballots included *regardless* of their legitimacy.  Yet, the State, and the people of the State, have a strong interest in seeing that only legally valid votes are counted.  There is a significant history of cases where courts have considered absentee ballot fraud, including here in Florida.  *See supra* 11-12. Indeed, only prospective relief could possibly be warranted.  At this stage—after millions of votes have been cast, and a statewide recount is underway—implementing any remedy for this election would raise massive practical difficulties, undermine reasonable reliance interests, interfere with state deadlines for certification of the election, disrupt post-election procedures under the State's election code, and erode public confidence in the integrity and security of the electoral process.  Recognizing these concerns, "[t]he Supreme Court has repeatedly expressed its disapproval of such disruptions," *Perry v. Judd*, 471 F. App'x 219, 227 (4th Cir. 2012), even where the statute at issue is found to be unconstitutional, *Williams v. Rhodes*, 393 U.S. 23, 34–35 (1968).  Granting relief during the pendency of this post-election recount would impermissibly disrupt Florida's ascertainment of results.

It would be impossible to research, develop, adopt, and implement a uniform signature-matching protocol throughout the State of Florida in the remaining few

days before all recounts are concluded.  Imposing new standards or reopening the cure period would overwhelm state officials who are already racing to comply with statutory deadlines.  Standards would have to be decided upon and promulgated, and training presumably would have to be conducted to implement the new standards, particularly if signature-recognition software is required.  And even if standards could be promulgated and staff trained in time, there simply is not enough manpower to implement a new set of rules when election officials are busy conducting multiple machine and manual recounts.  Reopening the cure period would require review by the canvassing board, yet the board is required to have at least two of three members present for the machine and manual recounts.  Staff are also needed to assist with the recounts.  Changing the rules retroactively at this stage, as Plaintiffs demand, would undermine public confidence and throw the electoral process into a state of chaos.[9]

## CONCLUSION

The Court should decline to issue a preliminary injunction.

---

[9] If the Court grants a preliminary injunction, Intervenor-Defendant respectfully requests that the Court stay its order pending appeal, or deny a stay pending appeal in the order itself, as it did in *Florida Democratic Party* in 2016. *See* 2016 WL 6090943, at *8.

Dated: November 12, 2018

Respectfully submitted,

Thomas H. Dupree Jr.*
Helgi C. Walker*
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-8500
tdupree@gibsondunn.com
hwalker@gibsondunn.com
*admitted pro hac vice*

/s/ Andy Bardos
Andy Bardos (FBN 822671)
George T. Levesque (FBN 555541)
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida 32302-3189
Telephone: 850-577-9090
andy.bardos@gray-robinson.com
george.levesque@gray-robinson.com

Jason Torchinsky (VA Bar No. 47481)
Holtzman Vogel Josefiak Torchinsky PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20106
Telephone: (540) 341-8808
JTorchinsky@hvjt.law

*Attorneys for the National Republican Senatorial Committee*

29

## <u>LOCAL RULE 7.1(F) CERTIFICATION</u>

The undersigned certifies that the attached memorandum of law contains 6,872 words.

<div style="margin-left: 50%;">

Respectfully submitted,

*/s/ Andy Bardos*
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida 32302-3189
Telephone: 850-577-9090
andy.bardos@gray-robinson.com

</div>

30

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing was served to all counsel of record through the Court's CM/ECF system on this 12th day of November, 2018.

<div align="right">

*/s/ Andy Bardos*

Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida 32302-3189
Telephone: 850-577-9090
andy.bardos@gray-robinson.com

</div>