# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

DEMOCRATIC EXECUTIVE
COMMITTEE OF FLORIDA; and BILL
NELSON FOR U.S. SENATE,

    *Plaintiffs*,

    v.                               CASE NO. 4:18-cv-00520-RH-MJF

KEN DETZNER, in his official capacity
as Florida Secretary of State,

    *Defendant*.
_____/

## ATTORNEY GENERAL'S BRIEF IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs ask this Court to block the enforcement of two Florida laws—sections 101.68(2)(c)(1) and 101.048(2)(b)(1), Florida Statutes—claiming that certain signature verification requirements applicable to provisional and vote-by-mail ballots violate the First and Fourteenth Amendments to the United States Constitution. DE3:2; *see* DE1 ¶¶ 37-47. Plaintiffs' claims lack merit. The challenged statutes reasonably effectuate the State's interest in protecting the fairness and integrity of its elections; those provisions apply uniformly to all Florida voters, without regard to race, sex, age, party affiliation, or any other improper

consideration; adequate procedural protections guard against the risk of error; persuasive judicial authority supports the validity of the challenged procedures; and no appellate court has ever held that the laws at issue—or other laws like them—impermissibly burden the right to vote. Accordingly, Plaintiffs have failed to demonstrate a strong likelihood of success on the merits of their claims.

Equitable and prudential considerations provide an independent basis for denying Plaintiffs' application for preliminary injunctive relief. Elections should be governed by rules put in place before votes have been cast. The election procedures Plaintiffs ask this Court to enjoin have been on the books for years. Nothing about them has changed since voters cast their ballots on November 6, and nothing prevented Plaintiffs from bringing this challenge before the date of the election. Nevertheless, Plaintiffs did not file suit until November 8, two days *after* an election was held pursuant to the laws Plaintiffs now ask this Court to undo.

What is more, the sole remedy Plaintiffs request is far worse than the alleged problem they seek to solve. Florida law expressly and unambiguously requires signature verification as the mechanism by which election authorities "determine whether the elector is duly registered in the county" and legally authorized to cast certain kinds of ballots. § 101.68(1), Fla. Stat.; *see id.* § 101.048(2)(b)(1). Notably, Plaintiffs do not claim that such signature verification requirements are inherently unconstitutional; instead, they challenge the allegedly non-uniform manner in which

Florida's requirements are enforced. In order to remedy that asserted wrong, however, Plaintiffs do not ask for Florida's signature-verification procedures to be applied in a uniform manner. Rather, they ask this Court to "issue an order enjoining [the Secretary of State], including canvassing boards and supervisors of election from rejecting provisional and vote-by-mail ballots on the ground of signature mismatch." DE4:3; DE3:2.

In other words, Plaintiffs ask this Court to substantially rewrite Florida's election code, to do so in a way that would enjoin generally applicable statutory requirements that are not—even in Plaintiffs' view—unconstitutional, and to retroactively apply a new set of rules to ballots that have already been cast.

This Court should decline that invitation. The Constitution requires elections to be governed by laws that have been passed by the state Legislature, not by ad hoc rules that have been judicially promulgated by a federal court; and procedural fairness dictates that the rules governing the conduct of elections be put in place before elections are conducted, not after votes have already been cast.

In sum, Plaintiffs have failed to demonstrate that the challenged state laws are unconstitutional, and they have otherwise failed to satisfy the stringent criteria for obtaining immediate injunctive relief. Accordingly, the motion for a preliminary injunction should be denied.

## ARGUMENT

A district court may issue a preliminary injunction only if the moving party shows "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015). "In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation marks and alteration omitted).

As explained below, Plaintiffs have not shown that the challenged state laws are invalid, and equitable and prudential considerations provide an independent basis for denying their request for the drastic and extraordinary relief of enjoining enforcement of duly-enacted election laws after voters have already cast their ballots. Accordingly, their emergency motion for a preliminary injunction should be denied.[1]

---

[1] This filing, prepared in less than one business day to comply with the expedited briefing schedule for responding to Plaintiffs' emergency motion, focuses on Plaintiffs' challenge to the constitutionality and continued enforcement of two duly enacted state statutes. The Attorney General reserves the right to argue that

## I. Plaintiffs Have Failed To Show A Substantial Likelihood Of Success On The Merits.

Plaintiffs bring two constitutional challenges to sections 101.68(2)(c)(1) and 101.048(2)(b)(1), Florida Statutes. Neither is likely to succeed on the merits.

**1.** Plaintiffs first claim that the challenged statutes are invalid because Florida's "signature-matching process imposes a hodge-podge of arbitrary, non-uniform standards upon voters in violation of the equal protection clause." DE4:7; *see id.* at 7-10. In support of that claim, they allege that the "signature-matching standards" inappropriately "vary depending upon the county in which the voter resides." *Id.* at 7. "And even among voters within the same county," Plaintiffs allege, "different standards may apply depending on which election official reviews their signatures." *Id.*; *see id.* at 5-6. The alleged lack of a uniform standard for comparing signatures, Plaintiffs contend, "is clearly violative of the Equal Protection Clause," because "'[h]aving once granted the right to vote on equal terms, the State may not,

---

Plaintiffs lack standing or have otherwise failed to establish a justiciable case or controversy. *But cf. Fla. Democratic Party v. Detzner*, 2016 WL 6090943, at *4 (N.D. Fla. 2016) (concluding that plaintiffs had standing to assert "the rights of its members who will vote in an upcoming election," "even though the political party could not identify *specific* voters that would be affected") (emphasis in original). Yesterday, this Court notified the parties that they should be prepared to address at Wednesday's hearing a constitutional issue not raised by Plaintiffs—i.e., "whether Section 101.68(2)(c)4 . . . violates the First and/or Fourteenth Amendments"—at a hearing on November 14. DE26:3. This filing does not address that issue.

by later arbitrary and disparate treatment, value one person's vote over that of another.'" *Id.* at 7-8 (quoting *Bush v. Gore*, 531 U.S. 98, 104-05 (2000)).

Plaintiffs' argument fails. Florida law does not subject voters to "disparate treatment," because all voters are treated the same. When election officials are tasked with authenticating certain provisional ballots, "the canvassing board shall compare the signature on the Provisional Ballot Voter's Certificate and Affirmation with the signature on the voter's registration and, if it matches, shall count the ballot." § 101.048(2)(b)1, Fla. Stat.. A uniform standard also applies when authenticating vote-by-mail ballots:

> The supervisor of the county where the absent elector resides shall receive the voted ballot, at which time the supervisor shall compare the signature of the elector on the voter's certificate with the signature of the elector in the registration books or the precinct register to determine whether the elector is duly registered in the county and may record on the elector's registration certificate that the elector has voted."

Fla. Stat. § 101.68(1).

In other words, Florida law uniformly prescribes when ballots must be authenticated via signature comparison, who is tasked with conducting that authentication, which documents should be compared, and what happens if the signatures do not match. No authority holds that, in addition to those uniform requirements, Florida law also must specify a precise mechanism by which election officers determine whether the signature on a ballot matches the signature on a voter

Page 6 of 19

registration card. Indeed, the sole appellate authority to address this issue rejected a claim similar to the one Plaintiffs raise here.

In *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008), a group of Oregon voters claimed that the state's "procedures for verifying referendum petition signatures violated their equal protection and due process rights." *Id.* at 1100. Those procedures, like the procedures at issue in this case, required "county election officials [to] verify sampled referendum signatures by determining whether each petition signature matches the signature on the signer's existing voter registration card." *Id.* at 1101.

A three-judge panel of the Ninth Circuit unanimously rejected the argument that the absence of specific and objective guidance on how to determine whether two signatures match meant "that county elections officials lack[ed] uniform statewide rules for verifying referendum signatures," in violation of *Bush v. Gore*. *Id.* at 1102. The court concluded that, "[e]ven were *Bush* applicable to more than the one election to which the [Supreme] Court appears to have limited it, Oregon's standard for verifying referendum signatures would be sufficiently uniform and specific to ensure equal treatment of voters." *Id.* at 1106. This was because "[t]he Secretary uniformly instructs county elections officials to verify referendum signatures by determining whether each petition signature matches the signature on the signer's voter registration card," and "all counties refused to consider extrinsic evidence" beyond

the referendum and voter card signatures. *Id.*[2] Moreover, *Lemons* rejected the plaintiffs' argument—echoed by Plaintiffs here, Mot. 5-7—that "differences in the number of signatures rejected by various counties" demonstrated "the absence of a uniform standard," noting that, "[m]ost importantly, uniform standards can produce different results." *Id.* at 1106-07.

At bottom, the Court of Appeals ruled that a signature-match requirement is itself a uniform standard—i.e., that a "standard for verifying" signatures is "sufficiently uniform and specific to ensure equal treatment of voters" if state law "uniformly instructs county election officials to verify" those signatures "by determining whether each . . . signature matches the signature on the signer's voter registration card." *Id.* at 1106. And, similar to the regime at issue in *Lemons*, the law governing Florida's signature-match requirement also provides "sufficient guarantees of equal protection," *id.*, including procedural protections reasonably calculated to guard against the risk of error in verifying a signature match. *See* DE22:10-11. In the case of vote-by-mail ballots, a voter may cure a signature deficiency by submitting a "cure affidavit," §101.68(4)(b)-(c), Fla. Stat.; so long as the voter provides a copy of a "Tier 1" identification (e.g., a Florida

---

[2] While Oregon sponsored signature-verification training and some officials attended these sessions, it does not appear that these sessions were mandatory. 538 F.3d at 1106. In any event, as explained below, Florida's system offers more procedural safeguards than did the system upheld in *Lemons*.

driver's license or a United States passport), the canvasing board may accept the ballot even if the signature on the cure affidavit does not match the signature on file. And, for provisional ballots, voters have the right to cure deficiencies, including by "present[ing] written evidence supporting [their] eligibility to vote to the supervisor of elections by not later than 5 p.m. on the second day following the election." § 101.048(1), Fla. Stat. Neither of these safeguards was provided in the referendum-signature system that *Lemons* upheld. Moreover, unlike in *Lemons*, Florida's system provides for verification of each signature, rather than a sample-and-extrapolate method. Such safeguards, even more than those afforded in *Lemons*, provide sufficient guarantees against the risk of erroneous signature determinations.

Plaintiffs' reliance on *Bush v. Gore* is misplaced. The Court there expressly and unambiguously explained that the precedential significance of its decision was "limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities." 531 U.S. at 109. And the Court precisely identified "the present circumstances" to which its ruling was confined: "a situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards." *Id.* "When a court orders a statewide remedy," the Court explained, "there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." *Id.*

Such circumstances are not present here. Indeed, Plaintiffs ask this Court to do what the Supreme Court in *Bush v. Gore* disapproved—to replace preexisting statutory requirements governing the conduct of an election with judicially promulgated procedures put in place after voters have already cast their ballots. *See id.*

**2.** Plaintiffs next claim that "the categorical disqualification of signature-mismatch ballots imposes a severe burden on Florida citizens' right to vote," DE4:10-11, and that the "rejection of ballots for signature-mismatch does not advance any sufficiently weighty government interest," *id.* at 18. Here too, Plaintiffs fail to show that their claim is likely to succeed on the merits.

In *Lemons*, the Ninth Circuit rejected the argument that Oregon's signature-match requirement impermissibly burdened the right to vote. 538 F.3d at 1103. The court reasoned that "the magnitude of plaintiffs' asserted injury is minimal," while "Oregon's interests in detecting fraud and in the orderly administration of elections are weighty and undeniable." *Id.* at 1104. The burden was minimal, the court reasoned, because voters were instructed to "[s]ign your full name, as you did when you registered to vote," and counties "uniformly limit their review to a comparison between petition signatures and existing voter registration cards." *Id.*

Likewise, here, the burden on the right to vote imposed by Florida's signature-verification procedure is minimal. Voters are instructed to sign their names, and all

counties limit their review to a comparison between the signature on the ballot and the signature on the voter's registration card. *See, e.g.*, § 101.68(1), Fla. Stat. Like Oregon, Florida has a "weighty and undeniable" interest "in detecting fraud and in the orderly administration of elections." 538 F.3d at 1104.

The claim at issue here is even weaker than the one that *Lemons* rejected. Unlike the verification procedure under review here, *Lemons* confronted a "statistical sampling method for verifying referendum petition signatures," wherein only "approximately five percent of the submitted signatures" were reviewed for a signature match, and the failure rate was extrapolated to the overall number of signatures. *Id.* at 1100-01. The signature-match requirement at issue in *Lemons* "[did] not provide procedures by which a voter can introduce extrinsic evidence to rehabilitate a referendum signature after its rejection," *id.* at 1101, and officials "[did] not notify voters after rejecting non-matching [petition] signatures," *id.* at 1104. Nonetheless, the Ninth Circuit held that Oregon's signature-verification procedure for petition signatures did not impermissibly burden the right to vote. *Id.*

Rather than identify analogous precedent examining a signature-match requirement, Plaintiffs rely on cases addressing, *inter alia*, wrong-precinct votes induced by poll-worker error, *Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580, 586-87 (6th Cir. 2012), unreliable punch-card ballots and optical scans, *Stewart v. Blackwell*, 444 F.3d 843, 846 (6th Cir. 2006), *op. superseded on reh'g en banc*,

473 F.3d 692 (6th Cir. 2007) (en banc), and "local misapplication of state law" resulting in ballot rejections for which voters bore "no responsibility," *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219 (6th Cir. 2011). DE4:12-13. Plaintiffs cite no case holding or even suggesting that a signature-match requirement impermissibly burdens the right to vote.

Plaintiffs' claim that the challenged laws impermissibly impose burdens that fall "disproportionately on African American voters and young voters," DE4:14; *see* DE1 ¶¶ 45-46, is unavailing. A "disparate impact," standing alone, does not suffice to establish an equal-protection violation. *See, e.g.*, *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, 42 (2012) ("Although disparate impact may be relevant evidence of . . . discrimination . . . such evidence alone is insufficient [to prove a constitutional violation] even where the Fourteenth Amendment subjects state action to strict scrutiny."); *Morrissey v. United States*, 871 F.3d 1260, 1272 n.10 (11th Cir. 2017) (explaining that a claim that a statute's "burden falls more heavily on [the plaintiff] than on" others, while sufficient under some civil rights statutes, . . . will not support an equal protection claim.").

Plaintiffs variously allege "disparate treatment" and "disparate impact," *e.g.*, DE1:3 ¶3 (alleging both in same sentence), but those terms are not interchangeable. In a "disparate impact" claim, the complaining party alleges impermissible discrimination "through the use of a facially race-neutral sorting device that has the

effect" of harming members of a protected class more than other groups. *United States v. Houston*, 456 F.3d 1328, 1336 (11th Cir. 2006) (citation omitted). "This type of claim can be distinguished from a 'disparate treatment' claim," which directly alleges that members of a protected class have been singled out and treated differently from others on the basis of an impermissible consideration. *Id.* "The Supreme Court has held that claims of disparate impact are not cognizable under the Equal Protection Clause of the Fourteenth Amendment, or by extension the Due Process Clause of the Fifth Amendment." *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Under the law of this Circuit, that principle applies to challenges implicating the right to vote. *See Hand v. Scott*, 888 F.3d 1206, 1210 (11th Cir. 2018) (citing *Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985); *Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977)).

Applying those principles here, Plaintiffs' allegations of "disparate treatment" and "disparate impact" fail to make out an equal protection violation. The statutes Plaintiffs challenge do not classify voters on the basis of race, age, party affiliation, or any other impermissible consideration; the mere allegation of a "disparate impact," standing alone, does not provide a basis for invalidating duly enacted statutes regulating the conduct of elections; and Plaintiffs have not adduced the requisite "'[p]roof of racially [or similarly invidious] discriminatory intent or purpose.'" *Id.* At a minimum, Plaintiffs have not met their burden of showing, based

on the record before this Court, a strong likelihood of success as to any such "disparate treatment" or "disparate impact" claim at this stage of the litigation.

In sum, relevant caselaw holds that a signature-verification requirement does not impermissibly burden the right to vote; Plaintiffs cite no authority going the other way; the law of this Circuit establishes that disparate impact is not sufficient to establish an equal protection violation; and, based on the record before this Court, Plaintiffs have not adduced proof of discriminatory intent or purpose. Accordingly, Plaintiffs have failed to demonstrate a likelihood of success on their second claim as well.

## II. Plaintiffs Have Failed To Show That The Relief Sought Is Necessary To Prevent Irreparable Injury Or That The Threatened Injury Outweighs The Harm The Preliminary Injunction Would Cause.

As the Supreme Court has explained, "a party requesting a preliminary injunction must generally show reasonable diligence"; "[t]hat is as true in election law cases as elsewhere." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (citations omitted). Indeed, "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). That is because "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.* Thus, "[c]ourts typically decline to grant preliminary injunctions

in the face of unexplained delays of more than two months." *Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-cv-23905, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) (holding that three-month delay was "by itself sufficient grounds to deny [plaintiff's] request for an injunction") (internal quotation marks omitted); *see also Rodriguez v. Bryson*, No. 5:17-cv-10, 2018 WL 2750232, at *4 (M.D. Ga. June 7, 2018) (five-month delay "militate[d] against a finding of irreparable harm" (internal quotation marks omitted)).

Insofar as Plaintiffs challenge section 101.68(2)(c)(1), Florida Statutes, the current version of that provision became law on June 2, 2017. *See* 2017 Fla. Sess. Law Serv. Ch. 2017-45. Plaintiffs therefore could have brought the same challenge more than fifteen months before the 2018 General Election, avoiding both (1) unnecessary interference with the election process and (2) the harm Plaintiffs insist they will suffer should this lawsuit proceed in the ordinary course. The other statute Plaintiffs challenge—section 101.048(2)(b)(1), Florida Statutes—predates Plaintiffs' challenge by more than *ten years*. *See* 2007 Fla. Sess. Law Serv. Ch. 2007-30. Indeed, to bolster their challenge, Plaintiffs point to alleged examples from previous elections going back to 2012, DE:1, ¶ 34, and similar litigation against the Florida Secretary of State in 2016, *see Fla. Democratic Party v. Detzner*, No. 4:16-cv-607, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016). Plaintiffs offer no reason why they could not have raised these specific challenges earlier than forty-eight hours

*after* the 2018 General Election concluded. *See Fishman v. Schaffer*, 429 U.S. 1325, 1330 (1976) (Marshall, J., in chambers) ("[A]pplicants delayed unnecessarily in commencing this suit. The statute is not a new enactment and applicants have, in fact, utilized it before."). At a minimum, "[i]n considering the balance of equities among the parties," Plaintiffs' "unnecessary, years-long delay in asking for preliminary injunctive relief weigh[s] against their request." *Benisek*, 138 S. Ct. at 1944.

### III. Plaintiffs Have Failed to Show That The Preliminary Injunction Would Not Be Adverse To The Public Interest.

The Supreme Court has held that "a due regard for the public interest in orderly elections support[s]" a "decision to deny a preliminary injunction and to stay the proceedings." *Benisek*, 138 S. Ct. at 1944-45. Faced with "inadequate time to resolve" disputes, the Supreme Court has, "of necessity," allowed elections "to proceed without an injunction suspending" challenged elections rules. *Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006). Indeed, "applications for a preliminary injunction granting ballot access have been consistently denied when they threaten to disrupt an orderly election." *Perry v. Judd*, 471 F. App'x 219, 227 (4th Cir. 2012) (citing cases). Plaintiffs offer no basis to deviate from that practice and set aside the public interest in orderly elections in this case, especially since any exigency was created solely by Plaintiffs' decision to wait until the election had passed to file their lawsuit.

## CONCLUSION

For the foregoing reasons, Plaintiffs' emergency motion for a temporary restraining order and a preliminary injunction should be denied.

Respectfully submitted,

PAMELA BONDI
Attorney General

*/s/ Edward M. Wenger*
EDWARD M. WENGER
Chief Deputy Solicitor General
Fla. Bar. No. 85568
Edward.Wenger@myfloridalegal.com

Jordan E. Pratt
Deputy Solicitor General
Fla. Bar. No. 100958

*/s/ Blaine H. Winship*
BLAINE H. WINSHIP
Special Counsel
Fla. Bar No. 356213
Baline.Winship@myfloridalegal.com

Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Tel.: (850) 414-3300
Fax: (850) 413-7555

## RULE 7.1(F) CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.1(F), I certify that according to the word count feature of the word-processing system used to prepare this document, the document contains 3,679 words.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent by CM/ECF only to Counsel of Record this 12th day of November, 2018.

>   */s/ Edward M. Wenger*
>   Edward M. Wenger