# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DEMOCRATIC EXECUTIVE COMMITTEE OF FLORIDA, AND BILL NELSON FOR U.S. SENATE,**

*Plaintiffs*,

v.                                    Case No. **4:18-CV-520-MW/MJF**

**KEN DETZNER, IN HIS OFFICIAL CAPACITY AS FLORIDA SECRETARY OF STATE,**

*Defendant.*

_____/

## ORDER GRANTING PRELIMINARY INJUNCTION[1]

Consider the game of football. Football fans may quibble about the substance of the rules, but no one quibbles that rules are necessary to play the game. *See generally* Nat'l Football League, *2018 Official Playing Rules of the National Football League* (2018). And no one quibbles that football referees make certain calls, under the rules, that deserve review. Indeed, not every call is going to be clear—the ultimate decision may hinge on highly subjective factors. Hence, a call will be overturned only when there is "clear

---

[1] This Court recognizes that time is of the essence inasmuch as the supervisors of elections have received thousands of vote-by-mail ballots and the recount of votes is currently underway.   Moreover, this Court wishes to afford the parties a meaningful opportunity to seek a stay of this order. Accordingly, this order issues on an expedited basis.

1

and obvious visual evidence available that warrants the change." *Id.* at 63.

Among other things, the 2018 NFL Rules allow video review for plays involving possession, boundary lines, the line of scrimmage, and the goal line. *See id.* The NFL likewise provides review for disqualification of players. *Id.* Coaches may challenge calls themselves by throwing a red flag, or, in certain circumstances, the referees may initiate review on their own. *Id.* at 62.

All that process. Just for a game.

In this case, the Plaintiffs have thrown a red flag. But this is not football. Rather, this is a case about the precious and fundamental right to vote—the right preservative of all other rights. And it is about the right of a voter to have his or her vote counted. There is no doubt there must be election laws. There is no doubt that to run an election, the state must impose deadlines and rules to govern an efficient and transparent election process. There is no doubt that election officials must make certain calls, under the rules, that deserve review. And there is no doubt some of those calls may hinge on highly subjective factors.

The precise issue in this case is whether Florida's law that allows county election officials to reject vote-by-mail and provisional ballots for mismatched signatures—with no standards, an illusory process to cure, and no process to challenge the rejection—passes constitutional muster. The answer is simple. It does not.

I

This is a case about vote-by-mail and provisional ballots. Florida allows registered eligible voters, without an excuse, to cast their ballots by mail, as opposed to casting their votes at their assigned precinct on Election Day. Fla. Stat. § 101.62 (2016). Voting by mail has become a popular option for Florida voters. In the 2016 General Election, more than 2.7 million Florida voters either voted or attempted to vote by mail. Fla. Dep't. of State, *Voting Activity by Ballot Type for 2016 General Election*, Florida Department of State, Division of Elections (last visited Nov. 13, 2018), https://dos.myflorida.com/media/697842/2016-ge-summaries-ballots-by-type-activity.pdf. Provisional ballots may be cast when there is uncertainty over whether a voter is eligible to vote. In the 2016 General Election, 24,460 Florida voters cast or attempted to

cast a provisional ballot. *Id.* Both vote-by-mail and provisional ballots are at risk of being rejected, and thus not cast, based on the mismatch of a signature.

Voters who choose to vote by mail must follow certain instructions provided by Florida law. For example, vote-by-mail voters must send their marked ballot back in a specially marked secrecy envelope. *Id.* § 101.65 (2016). Those voters also must insert the secrecy envelope into another mailing envelope addressed to the supervisor, seal that mailing envelope, and fill out the "Voter's Certificate" on the back of the mailing envelope. *Id.*

For a vote-by-mail ballot to be counted, the envelope of that ballot must include the voter's signature. *Id.* Once the vote-by-mail ballots are received, county canvassing boards review those ballots to verify the signature requirement has been met. *Id.* § 101.68(c). In addition to confirming the envelope is signed, the county canvassing boards confirm the signature on the envelope matches the signature on file for a voter. These county canvassing boards are staffed by laypersons that are not required to undergo formal

handwriting-analysis education or training.[2] Moreover, Florida has no formalized statewide procedure for canvassing boards to evaluate whether the signature on a vote-by-mail ballot matches the signature on file with the elections office. If the canvassing board believes the signature on the vote-by-mail ballot does not correspond to the signature on file with the supervisor of elections office, the ballot is deemed "illegal" and is therefore rejected. Fla. Stat. § 101.68(5). Under an earlier version of Florida law, vote-by-mail voters had no opportunity to cure a mismatched signature on a vote-by-mail ballot.

In a previous case, this Court found the Florida statutory scheme that provided an opportunity to cure no-signature ballots, but denied that opportunity to mismatched-signature ballots, was unconstitutional. *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607-MW/CAS, 2016 WL 6090943, at *1 (N.D. Fla. Oct. 16, 2016). Thus, this Court entered a preliminary injunction requiring the Florida Secretary of State to issue a directive to the supervisors of

---

[2] The canvassing boards consist of "the [local] supervisor of elections; a county court judge, who shall act as chair; and the chair of the board of county commissioners." Fla. Stat. § 102.141 (2018). Substitute members can be appointed as necessary. *Id.*

elections advising them that Florida's statutory scheme as it related to mismatched-signature ballots was unconstitutional. *Id.* at *9. And in light of that finding, they were required to allow mismatched-signature ballots to be cured in the same way provided for non-signature ballots. *Id.*

In response to that injunction, Florida law was amended. Now, if the canvassing board determines a vote-by-mail ballot contains a signature that does not match the voter's signature in the registration books or precinct register, the supervisor "shall . . . immediately notify" the voter. Fla. Stat. § 101.68(4)(a) (2017). After notification, the voter may complete and submit an affidavit to cure the vote-by-mail ballot until 5 p.m. on the day before the election. *Id.* But notably, a vote-by-mail ballot may be received "not later than 7 p.m. on the day of the election." *Id.* § 101.6103(5)(c).

The opportunity to cure is the last chance a vote-by-mail voter has to save their vote from being rejected and not counted. Florida law provides no opportunity for voters to challenge the determination of the canvassing board that their signatures do not match, and their votes do not count. Interestingly, Florida law does provide an opportunity for any voter or candidate to challenge a

signature that was accepted and thus a vote that was counted. *Id.* § 101.68(4). If any candidate or voter believes a vote-by-mail should not have been counted because of a defect on the voter's certificate or cure affidavit "he or she may, at any time before the ballot is removed from the envelope, file with the canvassing board a protest against the canvass of the ballot, specifying the precinct, the ballot, and the reason he or she believes the ballot to be illegal." *Id.* Even more striking is the fact that under Florida law, canvassing boards may begin canvassing of vote-by-mail ballots at 7 a.m. on the 15th day before the election, but no later than noon on the day following the election. Fla. Stat. § 101.68(2)(a). Thus, a vote-by-mail voter could mail their ballot in weeks early, but the canvassing board could also wait, canvass the ballot the day after the election, determine there is a mismatched signature, and toss the vote. The voter therefore gets no chance to cure, since curing must be done by 5 p.m. the day before the election.

Provisional ballots are also at issue in this case. In all elections, a voter claiming to be properly registered in the state and eligible to vote at the precinct in the election, but whose eligibility cannot be determined, or whom an election official asserts is not eligible, is entitled to cast a provisional ballot. *Id.* § 101.048(1).

Provisional ballots are placed in a secrecy envelope and sealed. The person casting a provisional ballot has until 5 p.m. on the second day following an election to present written evidence supporting his or her eligibility to vote. *Id.* County canvassing boards examine the provisional ballot voter's certificate and affirmation, written evidence provided by the provisional voter, any other evidence presented by the supervisor of elections, and, in the case of a change, any evidence presented by the challenger to determine if the person was eligible to vote. *Id.* § 101.048(2)(a). A provisional ballot shall be cast unless the canvassing board finds by a preponderance of the evidence the person was not entitled to vote. *Id.* After making the initial eligibility determination, the county canvassing board must further compare the signature on the provisional ballot voter's certificate with the signature on the voter's registration. *Id.* § 101.048(2)(b)1. If the signatures match, the vote is counted. *Id.* There is no mechanism for a voter to challenge the canvassing board's determination that the voter was or was not eligible to vote. Nor is there a cure period for provisional ballots rejected based on signature mismatch.

Plaintiffs brought this case arguing Florida's use of signature matching for vote-by-mail and provisional ballots unconstitutionally burdens the rights of Florida's voters and deprives them of equal protection of the law. Specifically, Plaintiffs seek an injunction that requires Defendants and anyone under their supervision to count any vote-by-mail or provisional ballots rejected based on signature mismatching.

## II

Before addressing the merits, this Court must address some preliminary issues. The first is whether the Plaintiffs have standing. Next, this Court will address affirmative defenses raised by Defendants.

## A

Standing is a threshold matter this Court must determine before proceeding to consider the merits of Plaintiffs' claims. *E.g.*, *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1262 (11th Cir. 2006). In certain scenarios, associations or organizations have standing to assert claims based on injuries to itself or its members if that organization or its members are affected in a tan-

gible way. The organization must allege "that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

More specifically, an association or organization may "enforce the rights of its members 'when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.' " *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (quoting *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). This Court has further found political parties "have standing to assert, at least, the rights of its members who will vote in an upcoming election." *Detzner*, 2016 WL 6090943, at *4.

The Democratic Executive Committee of Florida ("DECF") "is the statewide organization representing Democratic candidates and voters throughout the State of Florida . . ." ECF No. 1, at 4. Its purpose "is to elect Democratic Party candidates to public office throughout Florida." *Id.* It has "millions of members and constituents from across Florida, including millions of Floridians who are

registered [to vote in Florida], and many other Floridians who regularly support and vote for candidates affiliated with the Democratic Party." *Id.* The other Plaintiff, Bill Nelson for U.S. Senate, is the "duly organized political campaign in support of Bill Nelson's election to the United States Senate . . ." *Id.* at 7.

The Plaintiffs need not identify specific voters that are registered as Democrats who have had their vote-by-mail ballot rejected due to apparent mismatched signatures. Two years ago, it was enough that some Democratic voters inevitably would. *Detzner*, 2016 WL 6090943 at *4. Now, it is enough that some inevitably have.

To be sure, Intervenor-Defendant the National Republican Senatorial Committee ("NRSC"), challenges the Plaintiffs' standing. They say the Plaintiffs must "show actual, not presumed, injury since the relevant events have occurred," and that "it is not even remotely inevitable" that a member of the Plaintiff organizations was denied the opportunity to cure a mismatched signature on a vote-by-mail or provisional ballot. ECF No. 27, at 11. Their argument is belied by the record. The Plaintiffs have set forth four affidavits of Democratic voters who attempted to vote by mail, only to have their ballots belatedly rejected for a signature mismatch.

11

*See* ECF Nos. 29, 32, 44, 45. The Florida Secretary of State's division chief of elections likewise provided evidence that out of 45 counties reporting so far, the state has rejected 3,688 vote-by-mail ballots and a further 93 provisional vote-by-mail ballots.

In short, Plaintiffs have standing.

B

The Defendants argue the equitable doctrine of laches bars relief in this case. That is, they claim the Plaintiffs waited too long to assert their claim, can offer no legitimate justification for the delay, and the Defendants will be prejudiced. The Defendants rely on a Fourth Circuit case in which the court held laches barred a constitutional challenge to state election laws relating to a candidate's ability to appear on a ballot. *Perry v. Judd*, 471 F. App'x 219, 224-25 (4th Cir. 2012). In this case, the Plaintiffs' interest in having their votes counted is more substantial than an individual's right to be on a ballot. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (stating that "a court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury"). Thus, *Perry* is distinct and not determinative. Moreover, as discussed below, laches may not apply to prospective injunction

relief. Regardless, laches will not bar the Plaintiffs' requests for a preliminary injunction in this case.

First, it is not clear laches applies when a plaintiff seeks prospective relief for continuing constitutional violations. *See Garza v. Cty. of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990); *see also Peter Letterese & Assocs. Inc., v. World Inst. of Scientology Enters. Int'l*, 533 F.3d 1287, 1321 (11th Cir. 2008) (stating in a copyright case "laches serves as a bar only to the recovery of retrospective damage, not to prospective relief"). And laches has not prevented courts in this Circuit from entering prospective injunctive relief in close temporal proximity to an election. *See, e.g.*, *Ga. Coal. for the People's Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345-46 (S.D. Ga. 2016); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005); *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607, 2016 WL 6090943 at *9-*10 (N.D. Fla. Oct. 16, 2016).

Second, even if laches were to apply, it is a factually-intense question that requires a court to determine whether the delay is excusable based not only on the period of the delay, but the reasons for the delay. *See SunAmerica Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325, 1345 (11th Cir. 1996); *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 616 F.2d 1315, 1325 (5th Cir.

13

1980). Therefore, as other district courts have also recently found, this Court concludes that laches does not bar the Plaintiffs' request for an injunction. *See, e.g.*, *Ga. Coal. for People's Agenda, Inc. v. Kemp*, No. 1:18-cv-04727, 2018 WL 5729058 (N.D. Ga. Nov. 2, 2018); *Martin v. Kemp*, No. 1:18-cv-4776, 2018 WL 5276242 (N.D. Ga. Oct. 24, 2018).

## C

The Defendants also assert the doctrine of res judicata bars the Plaintiffs' claims. For res judicata to apply, Defendants must establish four elements: (1) there must be a prior decision that is a final judgment on the merits; (2) rendered by a court of competent jurisdiction; (3) both cases involve the same parties; and (4) both cases must involve the same causes of action. *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001). Cases involve the same cause of action if they arise out of the same nucleus of operative facts. *Id.* at 1297. Res judicata bars the litigation of matters that were raised or could have been raised in an earlier suit. *McKinnon v. Blue Cross & Blue Shield of Ala.*, 935 F.2d 1187, 1192 (11th Cir. 1991). A claim could have been raised if it existed at the time the complaint in the first case was filed. *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992). Not every potential

claim arising prior to a final judgment in a previous case must be brought into the pending litigation or risk being lost forever. *Id.* The application of res judicata is not strictly mechanical, courts have some discretion in deciding whether it applies. *Maldonado v. U.S. Atty. Gen.*, 664 F.2d 1369, 1375 (11th Cir. 2011).

The Defendants argue the Plaintiffs should have raised the issue of whether signature matching is constitutional in a case previously decided by this Court. *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016). In that case, the plaintiffs were deprived of the right to vote in an election because state law required the rejection of their votes without any opportunity to cure a mismatched signature. Res judicata is inapplicable for two reasons. First, the cases do not involve the same parties. A Plaintiff in this case, Bill Nelson for U.S. Senate, was not a party to the first case. In the present controversy, Bill Nelson is suing as a candidate. It is no answer to say he is a part of the Democratic Party Executive Committee because, in this case, he is suing in a different capacity. The position the Defendants ask this Court to adopt—that every future candidate for office is barred from challenging an election law that was previously challenged—is nonsense. Second, the cases do not involve the

same causes of action. This case involves a different election that was conducted using amended state law election procedures. Plaintiffs now allege that, despite a cure period, voters are still unconstitutionally denied the right to vote because state election law requires ballots with mismatched signatures be rejected. This is not a situation where the Plaintiffs are trying to take a second bite at the apple. Rather, this is a new alleged constitutional violation under a different iteration of state law that did not exist at the time the complaint was filed in the first case. *See Kirksey v. City of Jackson*, 714 F.2d 42, 44 (5th Cir. 1983) (" 'Faced with changing law, courts hearing questions of constitutional right cannot be limited by res judicata.' ") (quoting *Parnell v. Rapides Parish Sch. Bd.*, 563 F. 2d 180, 185 (5th Cir. 1977)).[3] Thus, this Court finds the doctrine inapplicable.

## D

The Defendants rely on *Toney v. White*, 488 F.2d 310 (5th Cir. 1973) (en banc), to argue that the Plaintiffs' lawsuit is barred because it was not brought before the election. There is no doubt

---

[3] Decisions of the Fifth Circuit prior to October 1, 1981, are binding within the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

*Toney* stated there is a "requirement of diligence," and "the law imposes the duty on parties having grievances . . . to bring the grievances forward for pre-election adjudications." *Id.* at 314. Thus, parties should not be permitted to "lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in court." *Id.*

But this Court cannot read only the portions of *Toney* damning to the Plaintiffs' case. Rather, this Court must consider the entirety of *Toney*, which also stated that public officials in charge of elections must "show by clear and convincing evidence that there was in fact a deliberate bypass of a pre-election judicial remedy," by the Plaintiffs. *Id.* at 315. To be sure, the dissent disagreed with the majority on this point. *Id.* at 318 (Clark, J., dissenting) (noting the majority erred in requiring a defendant meet the "heavy burden" of proving plaintiffs "knowingly" and "deliberately bypassed pre-election judicial relief" and instead stating the burden should be on the plaintiff to show the challenged election practices were not known or discoverable by the plaintiff pre-election).

The Defendants' argument that *Toney* bars the Plaintiffs' claim fails for a multitude of reasons. To start, *Toney* is a case that involved setting aside the results of an election and ordering a new

election. And notably, the Fifth Circuit affirmed the district court's grant of that relief. Voiding an election is an extreme and extraordinary remedy. Here, Plaintiffs do not ask for such a remedy. Moreover, Plaintiffs in this case have petitioned for judicial resolution over certain issues while the election count and results are still pending. This is not a situation where an election result is final, and a losing party seeks to invalidate the result. Here, the counting of votes is still occurring, and the Plaintiffs want certain votes counted.

Further, *Toney* itself recognized there are "gray" areas where the facts and circumstances of a case are not discovered until a "late hour." *Id*. at 314. In *Toney*, the Fifth Circuit found there was no deliberate bypass of a pre-election judicial remedy by the plaintiffs because the racially discriminatory voter purge began only thirty days before the election. *Id*. at 315. Similarly, in this case, Plaintiffs did not—and could not—know prior to the election that this Court's prior injunction and the subsequent amendment to Florida law would be such a dismal failure. As this case's facts demonstrate, the opportunity to cure provided in Florida law is woefully inadequate. In this election, vote-by-mail voters followed every vote-by-mail rule to ensure their legal votes were counted.

*See* ECF Nos. 29, 32, 44. Their legal votes were rejected based on a signature mismatch, but they did not even receive notice that their votes would not count until the time to cure—as established by state law—had passed.[4] ECF No. 29 at 2, ¶¶ 4-5; ECF No. 32 at 2, ¶¶ 6-7; ECF No. 44 at 2, ¶ 7. These voters went above and beyond trying to get their legal votes counted. They contacted their local boards of election, presented valid identification, and tried to cure the incorrect signature mismatch determination. ECF No. 29 at 2, ¶ 5; ECF No. 32 at 2-3, ¶ 9; ECF No. 44 at 2-3, ¶¶ 8-9, 12. But there was nothing they could do, and their votes were not counted. ECF No. 29 at 2, ¶ 6; ECF No. 32 at 3, ¶ 9; ECF No. 44 at 3, ¶ 12. Simply put, even if *Toney* does stand for the proposition that voters must be diligent in asserting their rights, it still supports the Plaintiffs' case. There was no possible way for voters to foresee before the election that the cure period would absolutely fail them.

Lastly, as already noted, *Toney* would require Defendants in this case to prove by clear and convincing evidence that there was a deliberate bypass of a pre-election judicial remedy by Plaintiffs.

---

[4] This Court suggests this problem—notification of mismatch after the time to cure has passed—could be fixed if Florida were to follow the lead of Oregon and provide a 14-day cure period *after* the election. *See* Or. Rev. Stat. § 254.431(1)(a) (2017).

Defendants failed to carry their burden. They have presented no evidence—let alone clear and convincing evidence—that the Plaintiffs deliberately bypassed a pre-election judicial remedy. In one sense, they could argue the lawyers involved in this case should have foreseen problems with the statute, but even that is not clear. Ultimately, Plaintiffs could not have known before the election that the injunction entered by this Court in 2016 and the amendment to Florida law added nothing. The deficiencies of the law were not realized until voters were informed after the time to cure passed that their votes were rejected.

To the extent the Defendants argue the Plaintiffs have failed to show they will suffer an irreparable injury without injunctive relief because they have not exercised due diligence in protecting their rights, that argument is rejected. As discussed above—and below—Plaintiffs could not have foreseen that this Court's previous injunction and the amended Florida law that requires an opportunity to cure would, in reality, be an illusory solution that fails to meaningfully protect the right to vote.

## III

Under Rule 65 of the Federal Rules of Civil Procedure, a district court may grant a preliminary injunction "only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although a "preliminary injunction is an extraordinary and drastic remedy," it nonetheless should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974)). None of these elements, however, is controlling; rather, this Court must consider the elements jointly, and a strong showing of one element may compensate for a weaker showing of another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

A

This Court will first address whether Plaintiffs have shown a likelihood of success on the merits. They have.

States retain the power to regulate their own elections. *Burdick*, 504 U.S. at 433 (citation omitted). This power includes the right to create laws that will impose some burden on the right to vote. *Id.* But the right to vote is precious and foundational for every other right. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). When a court is faced with a challenge to an election law, the court must first determine what standard applies. For example, rational basis review applies when a plaintiff alleges only that a state treated him or her differently than similarly situated voters without a corresponding burden on the fundamental right to vote. *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-09 (1969)). On the other hand, strict scrutiny applies when a state severely burdens the fundamental right to vote. *Id.* (citing *Burdick*, 504 U.S. at 428). Examples of laws triggering strict scrutiny include laws that impose a poll tax, a property ownership requirement, or a law that

violates the "one person one vote" principal. *Lemons v. Bradbury*, 538 F.3d 1098, 1103-04 (9th Cir. 2008).

But most cases involving election laws fall in between these two standards. This is such a case. Thus, the more flexible *Anderson-Burdick* standard applies. Under *Anderson-Burdick*, a court considering a challenge to a state election law "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' " *Burdick*, 504 U.S. at 434 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). When an election law imposes only reasonable, nondiscriminatory restrictions upon the constitutional rights of voters, the states' important regulatory interests are generally sufficient to justify the restrictions. *Id.* But, "[h]owever slight the burden may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitations." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009). This is not a litmus test, rather the court must balance these factors and make hard

judgments. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008). Finally, "*Anderson/Burdick* balancing . . . should not be divorced from reality, and [] both the burden and legitimate regulatory interest should be evaluated in context." *Obama for Am.*, 697 F.3d at 441 (White, J., concurring); *see also Swanson v. Worley*, 490 F.3d 894, 909 (11th Cir. 2007).

Applying the framework here, this Court first identifies the asserted injury. Here, the injury is the deprivation of the right to vote based on a standardless determination made by laypeople that the signature on a voters' vote-by-mail or provisional ballot does not match the signature on file with the supervisor of elections. There are dozens of reasons a signature mismatch may occur, even when the individual signing is in fact the voter. Disenfranchisement of approximately 5,000 voters based on signature mismatch is a substantial burden. Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry*, 376 U.S. at 1.

Next, this Court turns to the precise interests put forward by the Defendants: to prevent fraud, to efficiently and quickly report election results, and to promote faith and certainty in election results. These are all compelling interests. *See Crawford*, 553 U.S. at 225 ("There is no denying the abstract importance, the compelling nature, of combating voter fraud."); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997) (states have a legitimate interest "in protecting the integrity, fairness, and efficiency of their ballots and election process as means for electing public officials").

What this case comes down to is that without procedural safeguards, the use of signature matching is not reasonable and may lead to unconstitutional disenfranchisement.

Signature matching is a questionable practice, but it is hard to think of another way for canvassing boards to confirm vote-by-mail voters' identities. What makes Florida's signature matching process even more problematic is that fact that counties have discretion to apply their own standards and procedures. Certain counties, such as Leon County, go above and beyond to ensure voters

have a chance to cure a signature mismatch.[5] But nothing in the law requires that and other counties may choose not to exercise the level of care and concern Leon County does. The only way such a scheme can be reasonable is if there are mechanisms in place to protect against arbitrary and unreasonable decisions by canvassing boards to reject ballots based on signature mismatches. In *Lemons*, the Ninth Circuit upheld the use of signature matching for referendum petitions. *Lemons*, 528 F.3d at 1102. But in that decision, the court noted "the verification process is already weighted in favor of accepting questionable signature, in part because only rejected signatures are subject to more than one level of review by county elections officials," and the "procedures . . . allow chief petitioners and members of the public to observe the signature verification process and challenge decisions by county elections officials." *Id.* at 1105.

The cure period was intended to solve the inherent problems in signature matching, but the opportunity to cure has proven illusory. Vote-by-mail voters, in this election, were not notified of a

---

[5] Leon County Supervisor of Elections Mark Earley described in his testimony before this Court the great lengths the canvassing board of Leon County goes to in order to ensure every legal vote is counted.

signature mismatch problem until it was too late to cure. Provisional ballot voters are provided no opportunity to cure under the law. Without this Court's intervention, these potential voters have no remedy. Rather, they are simply out of luck and deprived of the right to vote. What is shocking about Florida law is that even though a voter cannot challenge a vote rejected as illegal, any voter or candidate could challenge a vote accepted as legal. The burden on the right to vote, in this case, outweighs the state's reasons for the practice. Thus, under *Anderson-Burdick*, this scheme unconstitutionally burdens the fundamental right of Florida citizens to vote and have their votes counted.

This Court notes the Plaintiffs' claims are brought under the Fourteenth Amendment, but they have not made any argument their rights to procedural due process have been violated. However, as an aside, this Court further notes that as my colleague recently found in a case involving a similar Georgia law, the statutory scheme presents procedural due process concerns as well. *See Martin v. Kemp*, No. 1:18-cv-4776, 2018 WL 5276242 (N.D. Ga. Oct. 24, 2018).

B

The remaining injunction factors also weigh in the Plaintiffs'
favor. This Court finds that the Plaintiffs have established irrepa-
rable injury. Here, potentially thousands of voters have been de-
prived of the right to cast a legal vote—and have that vote
counted—by an untrained canvassing board member based on an
arbitrary determination that their respective signatures did not
match. Such a violation of the right to vote cannot be undone. *See
Detzner*, 2016 WL 6090943 at *8 ("This is not golf; there are no
mulligans.") (quoting *Fla. Democratic Party v. Scott*, No.4:16-cv-
626, at 13).

Defendants argue to the contrary. They say the Plaintiffs
"knew about the alleged constitutional violations for years, yet did
nothing about it," and that electors qualified to vote may nonethe-
less contest the certification of election results. ECF No. 27, at 25-
26. Not so.

First, some Plaintiffs clearly relied—much to their dismay—
on a recently enacted statutory guarantee of notice and an oppor-
tunity to cure a mismatched ballot before the election. *See* ECF
Nos. 29, 32, 44, 45. None had reason to know the system would fail

them. The Plaintiffs here are not expected to search and destroy every conceivable potential unconstitutional deprivation they might suffer in advance of the election. Nor are the other Floridians that relied on the 2017 law working.

Second, a voter's opportunity to contest the certification of election results under Florida Statutes § 102.168 will not prevent irreparable harm. The voter's potential remedy under Section 102.168 is limited to a circuit court's review of only the voter's signature on the voter's certificate and the signature of the voter in the registration records. *Id.* § 102.168(8). The review is to determine whether "the canvassing board abused its discretion in making its decision." *Id.* But to cure an allegedly mismatched vote-by-mail or provisional ballot, the voter may present identification or other forms of proof. The Plaintiffs are likely to nonetheless suffer irreparable harm even with the availability of the election contest provisions.

The balances of hardships also favor Plaintiffs. The Defendants surely have an interest in an orderly administration of the election. *See Crawford*, 553 U.S. at 196. The Defendants argue that requiring additional procedures—to ensure legal votes are

counted—will unduly burden the election. They also argue that the disruption of election procedures—to ensure legal votes are counted—will erode public confidence in the electoral process. But, as recently stated by another district court this "[c]ourt does not understand how assuring that all eligible voters are permitted to vote undermines the integrity of the election process." *Martin v. Kemp*, No. 1:18-cv-4776, 2018 WL 5276242 at *10 (N.D. Ga. Oct. 24, 2018). Regardless, any potential hardship imposed by providing an actual opportunity to challenge the determination that a signature does not match, and thus, a vote does not count, is outweighed by the risk of unconstitutionally depriving eligible voters of their right to vote and have that vote counted.

Finally, the injunction is in the public interest. The right of voters to cast their ballots and have them counted is guaranteed in the Constitution. *United States v. Classic*, 315 U.S. 229, 315 (1941). Once again, Florida's statutory scheme threatens that right by rejecting votes based on signature mismatch without an opportunity to challenge that determination.

IV

This Order requires Plaintiffs to give security for costs in a modest amount; namely, $500.00. Any party may move at any time to adjust the amount of security.

V

Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000). Courts rarely stay a preliminary injunction pending appeal given that the test for a stay is so similar to the test for a preliminary injunction. There are no exceptional circumstances justifying the stay pending appeal in this case.

# VI

Let this Court be clear: it is NOT ordering county canvassing boards to count every mismatched vote, sight unseen. Rather, the county supervisors of elections are directed to allow those voters who should have had an opportunity to cure their ballots in the first place to cure their vote-by-mail and provisional ballots now, before the second official results are fully counted. This should give sufficient time, within the state's and counties' current administrative constraints, for Florida's voters to ensure their votes will be counted.

This is therefore a limited order providing limited relief for a limited number of affected voters. Across 45 of Florida's 67 counties, there are just over 4,000 rejected ballots for mismatched signatures. The county supervisors of elections and canvassing boards are surely up to the task. When this Court proceeds to the merits, it may consider additional relief. However, in balancing the equities for this emergency motion, this is the only constitutional cure that takes into account all the parties' concerns.

**IT IS THEREFORE ORDERED:**

1. Plaintiffs' Motion for Preliminary Injunction, ECF No. 3, is **GRANTED**.

2. Defendant Detzner is ordered to issue a directive to the supervisors of elections (with this Order attached) advising them (1) Florida's statutory scheme as it relates to curing mismatched-signature ballots has been applied unconstitutionally; and (2) in light of this Court's order, they are required to allow voters who have been belatedly notified they have submitted a mismatched-signature ballot to cure their ballots by November 17, 2018, at 5:00 p.m. The supervisors of elections shall allow mismatched-signature ballots to be cured in the same manner and with the same proof a mismatched-signature ballot could have otherwise been cured before November 5, 2018, at 5:00 p.m.

3. The preliminary injunction set out above will take effect upon the posting of security in the amount of $500 for costs and damages sustained by a party found to have

been wrongfully enjoined. Plaintiffs will immediately notify Defendant when the bond has been posted and thereafter immediately file proof of such notice through the electronic case files system.

4. Likewise, upon receipt of the notice of the posting of security, Defendant shall notify this Court whether he intends to comply with this Order by filing a notice through the electronic case files system on or before 5:00 P.M. on November 15, 2018.

5. Defendants' motions to stay the preliminary injunction are **DENIED**.

**SO ORDERED on November 15, 2018.**

**s/Mark E. Walker**
**Chief United States District Judge**