**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| DNC SERVICES CORPORATION / DEMOCRATIC NATIONAL COMMITTEE, DEMOCRATIC EXECUTIVE COMMITTEE OF FLORIDA, DSCC a/k/a DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE, and DCCC a/k/a DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, | Case No. 4:18-cv-520 (RH/MJF) |
| Plaintiffs, | |
| v. | |
| LAUREL M. LEE, in her official capacity as Florida Secretary of State, *et al.*, | |
| Defendant and Defendant-Intervenors. | |

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND**
**DECLARATORY RELIEF**

Plaintiffs DNC SERVICES CORPORATION / DEMOCRATIC NATIONAL

COMMITTEE (the "DNC"), DEMOCRATIC EXECUTIVE COMMITTEE OF

FLORIDA ("DECF"), DSCC a/k/a DEMOCRATIC SENATORIAL CAMPAIGN

COMMITTEE, and DCCC a/k/a DEMOCRATIC CONGRESSIONAL

CAMPAIGN COMMITTEE, by and through the undersigned attorneys, file this

FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY

RELIEF against Defendant Laurel M. Lee, in her official capacity as Florida

Secretary of State, and allege the following grounds for their entitlement to relief:

**NATURE OF THE CASE**

1.     "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Yet in the 2018 general election, Florida election officials rejected over 5,500 vote-by-mail ("VBM") and provisional ballots on the ground that the signature on the voter's certificate did not match the signatures on file with election authorities, as determined by supervisors of elections or canvassing boards in each of Florida's 67 counties.

2.     This signature matching exercise is mandated by Florida law, which requires the canvassing board or supervisor of elections to "compare the signature of the elector on the voter's certificate . . . with the signature of the elector in the registration books or the precinct register . . . to determine the legality of that [VBM] ballot." The law further instructs that a VBM ballot may only be counted if "[t]he signature on the voter's certificate . . . matches the elector's signature in the registration books or precinct register," Fla. Stat. § 101.68(2)(c)(1)(a), and imposes similar requirements for provisional ballots, Fla. Stat. § 101.048(2)(b)(1).

3.     But the law does not provide any guidance, procedures, or criteria for supervisors of elections or canvassing boards to follow when comparing signatures

and determining the fate of a VBM or provisional ballot, much less clear guidelines to ensure that voters are timely notified of any signature mismatch determinations.

4. Election officials are not even required to undergo any training in signature examination or any other aspect of the signature matching process, nor are they subject to any significant oversight to monitor signature match errors and prevent the disenfranchisement of eligible, qualified voters. In deciding whether to accept and count these ballots, or to reject and discard the ballots and disenfranchise the voters who cast them, local canvassing boards are left to their own devices, resulting in processes that are demonstrably standardless, inconsistent, and unreliable.

5. To make matters worse, Florida law fails to provide any process for many of these voters to contest or cure erroneous signature mismatch determinations. While election officials may accept affidavits to cure a VBM ballot rejected for signature mismatch if the affidavit is submitted by 5 p.m. on the day before Election Day, voters who submit their ballots after that cutoff, but before the 7 p.m. Election Day deadline for VBM ballots, are effectively denied an opportunity to cure any signature mismatch determinations. The same is true for voters who are not notified of the signature mismatch until after the cure deadline.

6. Voters who cast provisional ballots are provided no opportunity to cure a signature mismatch determination at any time.

7.     Studies have shown that signature matching conducted by laypersons results in a high rate of error that skews toward the over-rejection of legitimate signatures. This high risk of error, combined with the absence of any uniform standards or criteria for signature matching, all but ensures unlawful disenfranchisement of VBM and provisional voters, and creates a regime in which the fate of a VBM or provisional ballot often depends on whichever arbitrary standard is employed by the county in which the voter resides, or the specific election official charged with reviewing the voter's signatures.

8.     Such arbitrary rejection of VBM and provisional ballots—often without an opportunity to contest or cure a signature mismatch determination—imposes an undue burden on the constitutional right to vote, subjects similarly-situated voters to diverging standards, and erroneously deprives thousands of voters of fundamental rights, all in violation of the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION

9.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

10.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy

arise under the Constitution and laws of the United States.

11.    This Court has personal jurisdiction over Defendant, who is sued in his official capacity only.

12.    Venue is proper in this Court under 28 U.S.C. § 1391(b), because a substantial part of the events that gave rise to Plaintiffs' claim occurred in this judicial district.

13.    This Court has the authority to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

14.    Plaintiff DNC SERVICES CORPORATION / DEMOCRATIC NATIONAL COMMITTEE (the "DNC") is the national committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14), and its mission is to elect local, state, and national candidates of the Democratic Party to public office throughout the United States, including in Florida. The DNC works to accomplish its mission across the country and in Florida by, among other things, making expenditures for, and contributions to, Democratic candidates (at all levels) and assisting state parties throughout the country, including in Florida. The DNC has members and constituents across the United States, including Florida, where the DNC's members and constituents include Democratic Party candidates, elected

officials, and voters in Florida. A core component of DNC's constituents consists of younger voters as well as racial and ethnic minorities who are disproportionately more likely to have their ballots rejected for signature mismatch. The signature match process mandated by Florida law, and the erroneous rejection of VBM and provisional ballots for signature mismatch, directly harms the DNC by disenfranchising Democratic voters and frustrating the DNC's mission of, and efforts in, electing Democratic Party candidates in Florida. In the absence of relief, the DNC's voter members and its constituency of Democratic voters will also suffer serious and irreparable injury in the form of unlawful disenfranchisement in upcoming elections. Furthermore, the DNC will also have to expend and divert additional funds and resources in Florida, at the expense of its efforts in other states, in order to combat the effects of the signature match laws and the resulting disenfranchisement of Democratic voters.

15.     Plaintiff DEMOCRATIC EXECUTIVE COMMITTEE OF FLORIDA ("DECF"), is the statewide organization representing Democratic candidates and voters throughout the State of Florida within the meaning of Florida Statute § 103.121 and all other applicable provisions of the election laws. DECF's purpose is to elect Democratic Party candidates to public office throughout Florida. To accomplish its purpose, DECF engages in vitally important activities, including supporting Democratic Party candidates in national, state, and local elections

through fundraising and organizing efforts; protecting the legal rights of voters; and ensuring that all voters have a meaningful ability to cast ballots in Florida. DECF has millions of members and constituents from across Florida, including millions of Floridians who are registered with the Florida Department of State's Division of Elections as Democrats, and many other Floridians who regularly support and vote for candidates affiliated with the Democratic Party. Among its members and constituents are Florida voters whose provisional or VBM ballots will be rejected, and who will therefore be disenfranchised, absent injunctive relief.

16. DECF is directly harmed because Democratic voters have had—and, absent relief from this Court, will continue to have—their votes denied due to an alleged signature mismatch. Moreover, it is more likely that Democratic voters will not have their votes counted due to erroneous signature mismatch determinations, thereby decreasing the overall likelihood that DECF will be successful in its efforts to help elect Democratic candidates to public office. Further, as part of DECF's get-out-the-vote efforts, it engages in a robust VBM voter contact program, informing thousands of voters statewide about their ability to cast VBM ballots; the rules and deadlines surrounding vote-by-mail; and encouraging voters to utilize vote-by-mail. Florida's policy regarding mismatched signatures decreases overall confidence in the VBM and provisional ballot processes, and our democracy, generally, and, as a result, directly undermines the efforts that DECF takes to encourage voters to

utilize VBM ballots and to assist them in exercising their right to vote.

17.     Young and first-time voters, in particular, who are disproportionately more likely than experienced Florida voters to be required to cast a provisional ballot, and who are also disproportionately more likely to not have their VBM ballot counted, are a core component of DECF's membership and constituency.

18.     DECF's members and constituents are directly harmed by Florida's signature match policy because some of DECF's members and constituents have actually been denied their right to vote in past elections due to the policy. Each election cycle, these voters remain at a high risk of having their right to vote denied as a result of a signature mismatch on their VBM or provisional ballots.

19.     Plaintiff DSCC is the national senatorial committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14), and its mission is to elect candidates of the Democratic Party to the United States Senate, including in Florida. DSCC works to accomplish its mission across the country and in Florida by, among other things, making expenditures for, and contributions to, Democratic candidates for U.S. Senate and assisting state parties throughout the country, including in Florida. As a result, DSCC again expects to make substantial contributions and expenditures to support the Democratic candidate for U.S. Senate in Florida in future elections, as it had done for the 2018 general election. Florida's signature match laws directly harm DSCC by frustrating its mission of, and efforts in, electing the Democratic Party

candidate to the U.S. Senate in Florida by disenfranchising Democratic votes. DSCC will have to expend and divert additional funds and resources, at the expense of its efforts in other states, in order to combat the disenfranchising effects of the signature match laws in future elections for U.S. Senate in Florida.

20. Plaintiff DCCC is the national congressional committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14). DCCC's mission is electing Democratic candidates to the U.S. House of Representatives from congressional districts across the United States, including from Florida's 27 congressional districts. DCCC works to accomplish its mission across the country and in Florida by, among other things, making expenditures for, and contributions to, Democratic candidates for U.S. Congress and assisting state parties throughout the country, including in Florida. In 2018, DCCC made contributions and expenditures in the tens of millions of dollars to persuade and mobilize voters to support Democratic congressional candidates—several million dollars of which were spent for those purposes in Florida. For 2020, the DCCC has identified several congressional districts in Florida as targeted races, in which it will expend resources to support the Democratic candidate and expects to make contributions and expenditures to persuade and mobilize voters to support Democratic candidates in congressional elections around the country, including in Florida. The signature match laws directly harm the DCCC by frustrating its mission of, and efforts in, electing Democratic Party candidates to

the U.S. Congress in Florida by disenfranchising Democratic voters. DCCC will have to expend and divert additional funds and resources, at the expense of its efforts in other states, in order to combat the disenfranchising effects of the signature match laws in getting Democratic candidates elected in Florida in the 2020 general election.

21.     Defendant LAUREL M. LEE is sued in her official capacity as Secretary of State of the State of Florida. Defendant Lee is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. Pursuant to Florida Statute § 97.012, the Secretary of State is the chief elections officer of the State of Florida and is therefore responsible for the administration of state laws affecting voting.  As Secretary of State, Defendant Lee's duties consist, among other things, of "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws." *Id.* at § 97.012(1). The Secretary of State is also tasked with ensuring that county supervisors perform their statutory duties, *see id.* at § 97.012(14); providing technical assistance to county supervisors on voter education, election personnel training services, and voting systems, *see id.* at §§ 97.012(4)-(5); and "[p]rovid[ing] written direction and opinions to the supervisors of elections on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State." *Id.* at § 97.012(16).

# STATEMENT OF FACTS AND LAW

## Vote by Mail

22.     Voting by mail is very popular among Florida voters. "Both the overall number of VBM ballots, as well as the percentage of VBM ballots of all votes cast, have steadily ticked up over the past three presidential elections in the Sunshine State. In the 2016 general election, more than 2.7 million registered voters, some 28.7 percent of the 9.6 million Floridians who turned out to vote, cast their ballot by mail, up from the nearly 2.4 million registrants (or 27.8 percent of the electorate) who voted VBM in 2012."[1]

23.     And despite the fact that turnout has historically been lower in midterm elections than in presidential elections, the number of VBM ballots cast in the 2018 midterm election (2,623,798) nearly matched the number of VBM ballots cast in the 2016 presidential election (2,758,617).[2]

24.     Not all VBM ballots are counted, however. Under Florida law, a VBM ballot will only be counted if, among other requirements: (1) "[t]he signature on the

---

[1] Dr. Daniel A. Smith, *Vote-By-Mail Ballots Cast in Florida* at 5, AMERICAN CIVIL LIBERTIES UNION ("ACLU") OF FLORIDA (Rev. Sept. 2018), https://www.aclufl.org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf.

[2] Florida Department of State: Division of Elections, *Vote-by-Mail Request & Early Voting Statistics* (Last visited Feb. 14, 2019), https://dos.myflorida.com/media/700669/early-voting-and-vote-by-mail-report-2018-genpdf.pdf.

voter's [VBM] certificate . . . matches the elector's signature in the registration books or precinct register," Fla. Stat. § 101.68(2)(c); or (2) upon notification that there is a signature mismatch, the voter submits a "cure affidavit" before "5 p.m. on the day before the election," *and* the affidavit's signature "matches the elector's signature in the registration books or precinct register" *and* the canvassing board is able to "confirm the identity of the elector" with certain forms of accepted identification. Fla. Stat. §§ 101.68(2)(c) and 101.68(4).

25.    Although Florida law allows voters to submit VBM ballots to supervisors of elections as late as 7:00 p.m. on the day of the election, Fla. Stat. § 101.6103(2), the deadline to cure a VBM ballot that is rejected is 5:00 p.m. on the day *before* the election, Fla. Stat. § 101.68(4). Thus, voters who timely submit their VBM ballots between 5:00 p.m. on the day before the election and 7:00 p.m. on Election Day are denied the opportunity to cure any signature mismatch determinations.

**Provisional Ballots**

26.    In the 2016 presidential election, where the overall turnout rate was similar to the record-breaking turnout in the 2018 midterm election,[3] Florida voters

---

[3] Alejandro De La Garza, *'A High Water Mark for Midterm Turnout.' 2018 Could be a Historic Election for Voter Participation*, TIME (Nov. 7, 2018), http://time.com/5447210/2018-voter-turnout/ ("'Certainly in states like Florida and Virginia we're seeing turnout rates that are at least at 20-year highs,' says Corwin

cast a total of 24,460 provisional ballots.[4]

27.     Among the reasons why a voter would be required to cast a provisional ballot include instances when a voter "claim[s] to be properly registered in the state and eligible to vote at the precinct in the election but [her] eligibility cannot be determined," or when "an election official asserts [the voter] is not eligible." Fla. Stat. § 101.048(1).

28.     A person casting a provisional ballot has the right to submit evidence supporting his or her eligibility to vote to the supervisor of elections by 5:00 p.m. on the second day after the election. Fla. Stat. § 101.048(1).

29.     As a threshold matter, the county canvassing board will first examine a provisional ballot's voter certificate and affirmation to determine if the voter was entitled to vote in the precinct where the vote was cast. Fla. Stat. § 101.048(2). "If it is determined that the person voting the provisional ballot was not registered or entitled to vote at the precinct where the person cast a vote in the election, the provisional ballot shall not be counted and the ballot shall remain in the envelope containing the Provisional Ballot Voter's Certificate and Affirmation and the

---

Smidt, an associate professor of political science at Michigan State University. 'This is a high-water mark for midterm turnout.'").

[4] Florida Department of State: Division of Elections, *Voting Activity by Ballot Type for the 2016 General Election* (Rev. Mar. 24, 2017), https://dos.myflorida.com/media/697842/2016-ge-summaries-ballots-by-type-activity.pdf.

envelope shall be marked 'Rejected as Illegal.'" Fla. Stat. § 101.048(2)(b)(2).

30.     If a provisional ballot passes this first level of review, then the canvassing board must "compare the signature on the Provisional Ballot Voter's Certificate and Affirmation with the signature on the voter's registration" and count the ballot only if the canvassing board determines that the signatures match. Fla. Stat. § 101.048(2)(b)(1).

31.     In the 2018 general election, at least 100 provisional ballots were rejected for signature mismatch.

32.     Florida law does not, however, provide any opportunity for voters to cure a provisional ballot signature mismatch, or to contest the canvassing board's decision to reject the ballot.

33.     Thus, voters who cast provisional ballots have no recourse against disenfranchisement caused by erroneous signature mismatch determinations.

### The Signature Match Process

34.     The State of Florida neither requires nor provides any relevant training or guidance to supervisors of elections or canvassing boards tasked with conducting signature matching that will determine the fate of VBM and provisional ballots. And Florida law provides no formal standards, criteria, or guidance for determining whether a signature on a VBM or provisional ballot matches the signature on file with the election authority.

35.     The rejection of thousands of ballots based on a perceived signature mismatch, and the absence of sufficient training or consistent standards applied across counties, is particularly problematic because handwriting can change—and quickly—for a variety of reasons.

36.     Factors that can affect a person's handwriting include physical factors such as age, illness, injury, medicine, eyesight, alcohol, and drugs; mechanical factors such as pen type, ink, surface, position, paper quality; and psychological factors such as distress, anger, fear, depression, happiness, and nervousness.[5]

37.     The signature match requirement therefore disparately impacts and burdens seniors and voters with disabilities who may be unable to enter a consistent signature or may require assistance from others to do so.

38.     Moreover, a recent study found that, "in Florida, younger voters as well as racial and ethnic minorities are disproportionately more likely *not* to have their VBM ballot counted as valid," and that due to "issues with their signature, eligible

---

[5] *See* Richard Orsini, *Signature Evaluation,* Fla. State Ass'n of Supervisors of Elections 2015 Annual Summer Conference, at 6 (June 7-10, 2016), *available at:* https://www.myfloridaelections.com/portals/fsase/Documents/Conference%20Presentations/2015/2011%20Elections%20presentation.pdf; Tomislav Fotak, et al., *Handwritten signature identification using basic concepts of graph theory,* 7 WSEAS Transactions on Signal Processing 145, 145 (2011), http://www.wseas.us/e-library/transactions/signal/2011/53-595.pdf. Moreover, a person's handwriting simply changes over time. *See, e.g.,* Michael P. Caligiuri, et al., *Kinematics of Signature Writing in Healthy Aging,* 59 J. OF FORENSIC SCI. 1020 (2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC4077921/.

registrants in Florida who are younger—particularly first-time voters—and who are racial or ethnic minorities are much more likely to have their ballot rejected by a county canvassing board."[6]

39.      Because Florida's signature match process involves untrained human reviewers, it is also highly error-prone. *See, e.g.*, Rory Conn, Gary Fielding, et al., *Signature Authentication by Forensic Document Examiners*, 46 J. OF FORENSIC SCI. 884-88 (2001). Studies conducted by experts in the field of handwriting analysis have repeatedly found that signature verification by laypersons is inherently unreliable, and that non-experts are significantly more likely to misidentify authentic signatures as forgeries.

40.      In one study, for instance, laypersons falsely declared authentic signatures to be inauthentic at least 26 percent of the time, despite having access to six authentic reference signatures for comparison. K. Gummadidala, *Signature authentication by forensic document examiners*, J. FORENSIC SCI., 46(4) 884-88 (2001). It is, therefore, inevitable that election authorities will erroneously reject legitimate ballots due to misperceived signature mismatches, resulting in the disenfranchisement of eligible voters.

41.      Absent any standards or training to differentiate between natural

---

[6] Smith, *Vote-By-Mail Ballots Cast in Florida* at 9.

signature variation and signature mismatches, the result is "a crazy quilt of conflicting and diverging procedures." *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607, 2016 WL 6090943, at *7 (N.D. Fla. Oct. 16, 2016).

42.     Some counties use signature verification technology, for example, while others do not. Some counties are equipped with technology that allows them to view a signature on a VBM or provisional ballot alongside all signatures on file for a particular voter. Some counties review signatures without the aid of technology.

43.     In fact, the absence of adequate guidance and uniform standards has resulted in significant variations in VBM and provisional ballot rejection rates for signature mismatch across Florida's 67 counties. In the 2012 general election, for instance, Seminole and Alachua counties were ten times more likely than Sarasota, Hillsborough, and Leon counties to reject a VBM ballot for signature mismatch.

44.     The 2018 general election also saw significant variation among counties in the rejection of ballots for signature mismatch. Palm Beach County, for example, rejected 933 VBM ballots for signature mismatch, compared to 165 in Broward County, even though Broward County received nearly 35,000 more VBM ballots than Palm Beach.

45.     In another example, Lake County rejected 290 VBM ballots for signature mismatch despite receiving only approximately 33,000 VBM ballots; by comparison, Pinellas County received approximately 241,000 VBM ballots and

rejected 63 for signature mismatch.

46.     Moreover, out of the 100 provisional ballots rejected for signature mismatch in the 2018 general election, more than one-third (35) came from Putnam County.

47.     To put this figure in perspective, in the 2016 presidential election, Putnam County received only 74 provisional ballots in total. The next highest total for provisional ballots rejected due to signature mismatch in the 2018 election came from Broward County (23). Notably, Broward County received 1,623 provisional ballots in the 2016 election.

48.     Counties also employ diverging procedures in providing notice to voters whose signatures, as determined by county election officials, did not match. Some counties attempt to provide notice by telephone, email, even social media, while others provide notice by mail only, resulting in significant variations in the timeliness of such notifications, which also affects the ability of VBM voters to cure a signature mismatch before the statutory deadline.

49.     Because voters in each county are subject to such varying, arbitrary signature matching standards, along with wildly divergent rejection rates, the fate of a voter's VBM or provisional ballot depends in large part on the county in which they reside.

**Disenfranchised Voters**

50.     Events that have transpired since the 2018 general election provide further confirmation that the signature match process has disenfranchised many eligible voters in Florida.

51.     A number of voters have reported, including in declarations filed with this Court, that their VBM ballots were rejected for signature mismatch, despite the fact that their signatures on the ballots were authentic.

52.     Among those voters was former United States Congressman Patrick Murphy, who stated that his VBM ballot was rejected by the Palm Beach County Supervisor of Elections for signature mismatch even though he used the same signature on his 2018 primary election VBM ballot, which was counted. And because former Rep. Murphy's VBM ballot was delivered on Election Day (November 6, 2018), he had no opportunity to cure the alleged signature mismatch.

53.     Furthermore, following this Court's November 15, 2018 Preliminary Injunction Order—granting an additional two-day window, from November 15 to November 17, 2018 at 5:00 p.m., to allow certain voters who received belated notice of their allegedly mismatched signatures to cure their ballots—more than 10 percent (637) of the voters whose ballots had been rejected for signature mismatch came forward with additional evidence to demonstrate that their signatures (and ballots) were indeed legitimate.

54.     Absent preliminary injunctive relief, all 637 voters—in addition to many other voters who were unable to cure their VBM ballots within the two-day window provided by the Court—would have been disenfranchised. Absent permanent injunctive relief, Florida's signature matching process will inevitably disenfranchise many more eligible voters.

## CLAIMS FOR RELIEF

## COUNT 1

**First and Fourteenth Amendments**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 and 2202**
*Undue Burden on the Right to Vote*

55.     Plaintiffs incorporate by reference and reallege paragraphs 1 to 54 of this Complaint.

56.     Under the First Amendment and Equal Protection Clause of the Fourteenth Amendment, a state cannot utilize election practices that unduly burden the fundamental right to vote.

57.     A court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). A challenged regulation that imposes a severe burden on the right to vote must be

narrowly tailored to advance a compelling state interest. *See Burdick*, 504 U.S. at 434.

58.     The practices outlined above impose a severe burden—outright disenfranchisement—on the right to vote. Rejecting thousands of VBM and provisional ballots based solely on an error-prone, signature matching exercise conducted by election officials who are not trained in signature verification, and often without providing voters any opportunity to contest or cure signature mismatch determinations, is neither reasonable nor narrowly tailored to serve any compelling state interest, particularly where the State has already otherwise verified the voters' eligibility to cast their ballots.

59.     Absent permanent injunctive relief, Plaintiffs will suffer imminent and irreparable injury to their core missions, including the disenfranchisement of their members and constituents, for which Plaintiffs have no adequate remedy at law.

## COUNT II

### Fourteenth Amendment
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202**
*Equal Protection*

60.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 59, as though fully set forth herein.

61.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its

jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This constitutional provision requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburn Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

62.     "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). Florida's standardless and error-prone signature matching process, however, subjects voters casting VBM and provisional ballots to arbitrary and diverging standards throughout Florida's 67 counties.

63.     Florida's signature matching process further results in the disparate treatment of similarly situated voters across Florida's 67 counties, such that by virtue of their residence, voters in certain counties are comparatively less likely to cast an effective VBM or provisional ballot.

64.     The signature matching process outlined above, and the resulting disparate treatment of similarly situated voters, will result in the disenfranchisement of thousands of voters casting VBM and provisional ballots, and is neither reasonable nor narrowly tailored to serve any compelling state interest, particularly where the State has already otherwise verified the voters' eligibility to cast their ballots.

65. Absent injunctive relief, Plaintiffs will suffer imminent and irreparable injury to their core missions, including the disenfranchisement of their members and constituents, for which Plaintiffs have no adequate remedy at law.

## COUNT III

### Fourteenth Amendment
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202
### *Procedural Due Process*

66. Plaintiffs reallege and incorporate by reference paragraphs 1 through 65, as though fully set forth herein.

67. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. This constitutional provision protects the fundamental right to vote and prohibits its arbitrary or erroneous deprivation. *See Burdick*, 504 U.S. at 433; *see also Bush v. Gore*, 531 U.S. at 104-05.

68. Florida's signature matching process results in the rejection of thousands of VBM and provisional ballots in each election, and the disenfranchisement of Florida voters, many of them without any opportunity to cure or contest the signature mismatch determinations.

69. Among the categories of voters who have been—and will continue to

be—denied the opportunity to cure a ballot rejected for signature mismatch include: (1) VBM voters who submit their ballots after 5:00 p.m. on the day before the election ("cure deadline"), and before 7:00 p.m. on Election Day, Fla. Stat. § 101.68(4)(a) (allowing VBM voters to cure a VBM ballot for signature mismatch only until 5:00 p.m. on the day before the election); (2) VBM voters who submit their ballots before 5:00 p.m. on the day before the election, but do not receive notice of their signature mismatch until after the cure deadline; and (3) all voters who cast provisional ballots, *see* Fla. Stat. § 101.048(2)(b).

70. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. at 104–05. The State, having created a VBM regime, "must administer it in accordance with the Constitution," including with "adequate due process protection." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018).

71. Florida election officials have rejected, and will continue to reject, thousands of VBM and provisional ballots based solely on an error-prone, signature matching exercise conducted by election officials who are not trained in signature verification, and often without providing voters any opportunity to contest or cure signature mismatch determinations, resulting in the erroneous deprivation of their right to vote.

72.     Providing adequate safeguards to prevent the arbitrary and erroneous deprivation of the right to vote would impose no more than a minimal burden on the State, if any.

73.     Absent injunctive relief, Plaintiffs will suffer imminent and irreparable injury to their core missions, including the disenfranchisement of their members and constituents, for which Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A.     Declaring, under the authority granted to this Court by 28 U.S.C. § 2201, the portions of Florida Statute §§ 101.048, 101.68 and any other source of state law that requires election officials to reject (or prohibits election officials from counting) VBM and provisional ballots based on a signature mismatch unconstitutional in violation of the First and Fourteenth Amendments to the United States Constitution.

B.     Permanently enjoining enforcement by Defendant of the portions of Florida Statute §§ 101.048, 101.68, and any other source of state law that requires election officials to reject (or prohibits election officials from counting) VBM and provisional ballots based on a signature mismatch.

C.     Awarding Plaintiffs their costs, expenses, and reasonable attorneys'

fees pursuant to, *inter alia,* 42 U.S.C. § 1988 and other applicable laws; and

D.      Granting such other and further relief as the Court deems just and proper.

Dated: February 14, 2019                    Respectfully submitted,

/s/ *Uzoma Nkwonta*
Marc E. Elias
Email:  MElias@perkinscoie.com
Uzoma N. Nkwonta*
Email:  UNkwonta@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

RONALD G. MEYER
Florida Bar No. 0148248
Email:  rmeyer@meyerbrookslaw.com
JENNIFER S. BLOHM
Florida Bar No. 0106290
Email:  jblohm@meyerbrookslaw.com
Meyer, Brooks, Blohm and Hearn, P.A.
131 North Gadsden Street
Post Office Box 1547
Tallahassee, FL 32302-1547
(850) 878-5212

*Counsel for Plaintiffs*
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 14, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Uzoma Nkwonta*
Uzoma N. Nkwonta