[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14758
_____

D.C. Docket No. 4:18-cv-00520-MW-MJF

DEMOCRATIC EXECUTIVE COMMITTEE OF FLORIDA,
BILL NELSON FOR US SENATE,

                                             Plaintiffs-Appellees,

versus

LAUREL M. LEE,[1] in her official capacity as Florida Secretary of State,
ATTORNEY GENERAL OF THE STATE OF FLORIDA,

                                             Defendants-Appellants,

NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

                                             Intervenor Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(February 15, 2019)

---

[1] As Florida's current Secretary of State, Laurel M. Lee has been automatically substituted for Florida's prior Secretary of State as a party. *See* Fed. R. App. P. 43(c)(2).

Before TJOFLAT, MARTIN, and ROSENBAUM, Circuit Judges.

ROSENBAUM, Circuit Judge:

> Voting is the beating heart of democracy. It is a "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).

*League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1215 (N.D. Fla. 2018). We can't say it any better than that. But, of course, voting alone is not enough keep democracy's heart beating. Legitimately cast votes must then be counted.

This case requires us to consider Florida's practice of counting vote-by-mail ballots only after verifying that the voter's signature provided with the ballot matches the voter's signature in the state's records. Although this practice is designed to prevent fraud, signature mismatches occur for a variety of reasons— including purely innocent ones. And Florida's lack of any standards or formal training requirements for those who assess the signatures as mismatched can also contribute to false positives for signature mismatches. So the fact that a Florida election official may decide a voter's signature provided with her ballot does not match her signature in the state's records does not necessarily mean her vote is fraudulent and should not be counted.

But Florida's election code allows for just that. Because of the way Florida has scheduled its election process, some voters who submit a vote-by-mail ballot by the stated deadline are not notified about a signature mismatch until after it is too late to demonstrate their eligibility to vote. As a result, their votes do not count, and they are disenfranchised.

Upon Plaintiffs-Appellees the Democratic Executive Committee of Florida ("DECF") and Bill Nelson for U.S. Senate's (the "Nelson Campaign") motion, the district court here entered an order providing these voters with a 48-hour period to cure their signature mismatch, so their votes could be counted. Defendants-Appellants the National Republican Senatorial Committee ("NRSC"), the Florida Secretary of State[2] ("Secretary"), and the Florida Attorney General ("Attorney General") appealed the district court's order, and the NRSC sought an emergency stay of the order.

---

[2] As we have noted, Laurel M. Lee was substituted as a defendant in this case when she recently became Florida's Secretary of State. Florida's prior secretary of state was a man. For ease of reference and clarity and since Florida's current Secretary of State is a woman, we use the feminine gender throughout this opinion to refer to Florida's Secretary of State, regardless of whether a man or a woman held the position at the time of any specific event discussed in this opinion.

In this opinion, we address only the NRSC's motion for emergency stay. Because the NRSC has not satisfied the requirements for the issuance of a stay in this case, we deny its motion.[3]

## I.    Background[4]

Florida allows eligible voters to cast their votes by mailing in their ballots rather than voting in person on Election Day.  *See* Fla. Stat. § 101.62 (2016).  This option can be especially useful to those temporarily residing away from home, such as college students, and those with physical impairments that make it difficult to get around.

To protect against fraud, Florida requires those who choose to vote by mail to sign the voter's certificate on the back of the envelope on which they mail their ballots.  Fla. Stat. § 101.65 (2016).  Voting officials later compare the signature on the certificate with the signature on file for that voter.  Fla. Stat. § 101.68 (2017).  If the reviewing official believes the signatures do not match, the ballot is rejected.  *Id.*

For a period, Florida did not afford voters whose ballots were rejected due to signature mismatch the opportunity to cure their votes by proving their identities. *See  Fla.  Democratic  Party  v.  Detzner*, No.  4:16CV607-MW/CAS,  2016  WL

---

[3] Since the NRSC filed its appeal as an emergency motion for stay, we previously issued our order denying that motion over one dissent.  We indicated in that order that written opinions explaining the basis for our decision would follow.  This opinion sets forth our reasoning.

[4] The facts provided come from the record evidence unless otherwise indicated.

6090943, at *2 (N.D. Fla. Oct. 16, 2016).  But the signature-match scheme calls on officials who are not required to receive formal training to judge the similarities of signatures, and everyday factors "such as body position, writing surface, and noise" all affect one's signature.  *Id.* at *2, 7.  So the signature-match scheme can result in the rejection of an eligible voter's ballot, through no fault of the voter.  *Id.* at *8.

The shortcomings of the signature-match scheme made it nearly certain to incorrectly reject the ballots of some legitimate voters.  As a result, a district court in Florida (the same one that ruled in the case now under review) held that the scheme would unconstitutionally disenfranchise legitimate voters and ordered the state to provide a way for those voters who had their ballots rejected for signature mismatch to prove their identities and have their votes count.  *Id.* at *9.

In response to the district court's decision, the Florida legislature amended the election code to allow voters to cure improperly rejected ballots.  After that amendment, a voter, upon learning that her vote had been rejected for signature-mismatch, had until 5 p.m. one day before the election to verify her identity by submitting a cure affidavit and an accepted form of identification.  Fla. Stat. § 101.68(4).  Working in tandem, the cure provision and the original signature-match requirement were supposed to guard against both vote-by-mail fraud and arbitrary disenfranchisement of legitimate voters.

Florida also allows prospective voters who cannot prove their eligibility to vote to cast provisional ballots. Fla. Stat. § 101.048(1) (2008). Like vote-by-mail ballots, provisional ones are also protected by the signature-match requirement: if the signature on the provisional ballot voter's certificate and affirmation does not match the signature on the voter's registration, the ballot will not count. *Id.* § 101.048(2)(b)1. But unlike for vote-by-mail ballots, Florida does not provide a way for provisional voters whose ballots were rejected for signature mismatch to cure their ballots.[5] *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, No. 4:18-CV-520-MW/MJF, 2018 WL 5986766, at *3 (N.D. Fla. 2018).

Plaintiffs DECF and the Nelson Campaign challenged the constitutionality of the signature-match scheme as it relates to vote-by-mail and provisional voters. They asserted that the scheme continues to disenfranchise eligible voters on an arbitrary basis, in violation of the First and Fourteenth Amendments. As relevant here, Plaintiffs asked the district court for an emergency injunction requiring

---

[5] Before the district court, the Attorney General posited that Fla. Stat. § 101.048(1) empowers a provisional voter to cure her mismatched signature by 5 p.m. on the second day following the election. However, § 101.048(1) merely allows a provisional voter to present written evidence supporting her eligibility to vote. That evidence is then considered by the county canvassing board when determining whether the person is entitled to vote. *Id.* § 101.048(2)(a). Only after determining that the person is entitled to vote does the canvassing board compare signatures. *Id.* § 101.048(2)(b). The section provides no information about giving notice of signature mismatch in time to implement a cure, let alone information on how to cure. On its face, § 101.048(1) cannot fairly be said to provide provisional voters an opportunity to cure.

officials to stop rejecting ballots based on signature mismatch and to count every vote-by-mail and provisional vote that had been rejected for that reason.

The district court agreed that the signature-match protection provided by Florida's amended election laws still blocked too many eligible voters. But rather than granting plaintiffs' request to count every vote-by-mail and provisional ballot that had been rejected for signature mismatch, the district court issued a much narrower preliminary injunction: under it, only the ballots of those voters who were belatedly notified of signature mismatch could be counted, and they would be counted only after those voters timely verified their identities by following the normal cure procedures. *See Democratic Exec. Comm.*, 2018 WL 5986766, at *9.

Defendants the NRSC, the Secretary, and the Attorney General appealed. The NRSC also sought an emergency stay of the district court's preliminary injunction.

## II. Legal Standard

A stay of a preliminary injunction requires the exercise of our judicial discretion, and the party requesting the stay must demonstrate that the circumstances justify the exercise of that discretion. In considering a motion for stay, we account for the following factors, which substantially overlap with the factors governing preliminary injunctions: (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether issuance of the stay will substantially injure the

other parties interested in the proceeding, and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009).[6] The first two factors are the most critical. *Id.* at 434-35. To satisfy its burden as to those factors, the party seeking the stay must show more than the mere possibility of success on the merits or of irreparable injury. *Id*.

In considering whether to stay a preliminary injunction, we apply the usual standards of review governing our review of the merits of the preliminary injunction. *See U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 380 (6th Cir. 2008). So we examine the district court's grant of the preliminary injunction for abuse of discretion, reviewing *de novo* any underlying legal conclusions and for clear error any findings of fact. *See id.*; *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*, 910 F.3d 1130, 1163 (11th Cir. 2018).

After careful consideration, we deny the NRSC's motion to stay the preliminary injunction.

## III. The *Nken* factors militate against a stay of the preliminary injunction.

---

[6] The preliminary-injunction factors a district court considers include the following: (1) the likelihood of success on the merits, (2) whether irreparable injury will occur in the absence of the preliminary injunction, (3) the balance of burdens on the parties, and (4) the public interest. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

Before jumping into our application of the *Nken* factors, we begin by noting that Plaintiffs properly sued the Secretary in her official capacity when they asserted that Florida's signature-match regime imposed an undue burden on the right to vote. "A state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011).  Here, of course, the signature-matching provisions of the election laws—including the provisions that enabled belated notice of mismatch to voters—were at issue.  Because the Secretary is the state's chief election officer with the authority to relieve the burden on Plaintiffs' right to vote, she was appropriately sued for prospective injunctive relief.  Fla. Stat. § 97.012 (2016); *Fla. Democratic Party*, 2016 WL 6090943, at *4-5; *see also Ex parte Young*, 209 U.S. 123 (1908); *Grizzle*, 634 F.3d at 1319.

With that established, we now apply the *Nken* factors to determine whether the NRSC is entitled to a stay of the district court's preliminary injunction.

A.    The first *Nken* factor disfavors a stay because the NRSC has not made a strong showing that it is likely to succeed on appeal.

We begin with whether the NRSC has demonstrated a strong likelihood of success on the merits of appeal.  Here, the NRSC has not made a strong showing that it is likely to succeed on appeal, either on the merits of the constitutional claim or on its laches argument.

> i.    *The NRSC has not made a strong showing that the burden imposed on the right to vote is constitutional as judged by the* Anderson-Burdick *balancing test.*

Plaintiffs DECF and the Nelson Campaign challenged the constitutionality of the signature-match scheme as it relates to vote-by-mail and provisional voters, on the basis that the scheme violates the prohibition against undue burdens on the right to vote, as embodied in the First and Fourteenth Amendments.[7]  We evaluate the constitutionality of a challenged election law by applying the *Anderson-Burdick* test. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  That test requires us to weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights.  *See Anderson*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434.

A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest.  *Burdick*, 504 U.S. at 434.  And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden.  *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009).  The more a challenged law burdens the right to vote, the

---

[7] In the district court, Plaintiffs also alleged that the scheme violates the Fourteenth Amendment's Equal Protection Clause, but the district court did not enter relief on this theory, and Plaintiffs did not cross-appeal on that basis.  Therefore, we do not explore this particular theory of Plaintiffs'.

stricter the scrutiny to which we subject that law. *Stein v. Ala. Sec. of State*, 774 F.3d 689, 694 (11th Cir. 2014).

### a. Burden Imposed by the Signature-match Scheme on the Right to Vote

We begin our analysis by identifying the burden that Florida's signature-match scheme imposes on the right to vote. Here, the burden falls on vote-by-mail and provisional voters' fundamental right to vote. The Supreme Court has long recognized that burdens on voters implicate fundamental First and Fourteenth Amendment rights. *See Anderson*, 460 U.S. at 787 n.7. Specifically, voters have a First Amendment right "to associate for the advancement of political beliefs"—a freedom likewise protected by the Fourteenth Amendment "from infringement by the states." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968); *see also Swanson v. Worley*, 490 F.3d 394, 902 (11th Cir. 2007).[8] They also enjoy a Fourteenth Amendment right "to participate equally in the electoral process." *See Swanson*, 490 F.3d at 902.

To establish an undue burden on the right to vote under the *Anderson-Burdick* test, Plaintiffs need not demonstrate discriminatory intent behind the signature-match scheme or the notice provisions because we are considering the

---

[8] *Swanson* discussed these rights in relation to a candidate, but "the rights of voters and the rights of candidates do not lend themselves to neat separation." *Bullock v. Carter*, 405 U.S. 134, 143 (1972).

constitutionality of a generalized burden on the fundamental right to vote, for which we apply the *Anderson-Burdick* balancing test instead of a traditional equal-protection inquiry.[9] *See*, *e.g.*, *Anderson*, 460 U.S. at 806 (showing that, even without proof of discriminatory intent, a state's early filing deadline was still an impermissible burden since it was insufficiently justified by legitimate state interests); *Obama for America v. Husted*, 697 F.3d 423, 429-30 (6th Cir. 2012) (rejecting calls to apply "a straightforward equal protection analysis" and explaining that "when a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson-Burdick* standard applies").

Here, Florida's signature-match scheme subjects vote-by-mail and provisional electors to the risk of disenfranchisement in two ways. First, problems occur because of the way in which Florida implements the scheme. And second, deficiencies arise because of the very nature of matching signatures.

With respect to Florida's execution of the signature-match requirement, Florida has not enacted uniform standards for matching signatures, nor has it created

---

[9] Under *Anderson-Burdick*, it is not necessary for a plaintiff to show discriminatory intent to make out a claim that the state has unconstitutionally burdened the right to vote. To be sure, a traditional Equal Protection Clause claim is cognizable in the voting context if the plaintiff alleges that discriminatory animus motivated the legislature to enact a voting law. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). And Plaintiffs' complaint contained allegations that could be construed as a traditional Equal Protection Clause challenge. But that is not what the district court focused on in granting the preliminary injunction under review. So that issue is not before us.

qualifications or training for those who engage in the job. Indeed, election officials in Florida tasked with comparing signatures on ballots to those on file need not undergo formal training in handwriting analysis or receive formal guidelines for how to compare signatures. *Democratic Exec. Comm.*, 2018 WL 5986766, at \*2. And Florida allows each county to apply its own standards and procedures for executing the signature-match requirement, virtually guaranteeing a crazy quilt of enforcement of the requirement from county to county. *Id.* at \*7 & n.5. While some counties may make Herculean efforts to ensure that legitimate vote-by-mail or provisional votes, or both, are counted, other counties may do very little to ensure even and accurate application of the signature-match requirements. *See id.* Florida's scheme prohibits neither.

And even if election officials uniformly and expertly judged signatures, rightful ballots still would be rejected just because of the inherent nature of signatures. Citing a declaration by Dr. Linton A. Mohammed, a certified forensic document examiner, the DECF and the Nelson Campaign presented evidence that innocent factors like the writer's body position, writing surface, type of pen, and mental and physical states, as well as the surrounding noise, can alter a person's signature and produce mismatches. Consequently, legitimate vote-by-mail and provisional voters, through factors out of their control, are burdened with the risk that their ballots will incorrectly be rejected for signature mismatch.

Recognizing this problem, in a 2016 case before the same district court that entered the preliminary injunction now under review, the district court tried to remedy the deficiencies in Florida's signature-match scheme by mandating that those with mismatched-signature ballots be given a chance to cure. *Fla. Democratic Party*, 2016 WL 6090943, at *9. In response to the court's order, the Florida legislature codified a cure provision into the election code. But as it turned out, the changes did not adequately address the scheme's shortcomings.

Heading into the 2018 election, Florida law provided that the deadline for the supervisor of elections to receive vote-by-mail ballots was 7 p.m. on the day of the election. Fla. Stat. § 101.6103(2) (2008). Even though the opportunity to cure signature mismatch should have been part and parcel of any constitutional use of the signature-match protection after the district court's 2016 opinion, Florida required a cure to be submitted by 5 p.m. on the day *before* the election—meaning that the deadline to cure a rejected ballot came before the deadline for the supervisor to receive the ballot in the first place. Fla. Stat. § 101.68(4)(a). And even more problematically, the law did not require canvassing boards to even begin the canvassing of vote-by-mail ballots and check for signature match before noon on the day *after* the election.[10] *Id.* § 101.68(2)(a) ("The county canvassing board may begin

---

[10] The Dissent takes issue with this legal conclusion and instead asserts that Florida law requires the county supervisor of election to (1) immediately "compare the signature on the voter's

the canvassing of vote-by-mail ballots at 7 a.m. on the 15th day before the election, but not later than noon on the day following the election."). So voters whose signatures were deemed a mismatch might not learn that their vote would not be counted until it was too late to do anything about it.

---

certificate with the signature on the voter's registration entry," and (2) "immediately notify the voter" if the supervisor finds the signatures do not match. Dissent at 65. But the Dissent's interpretation of the governing statute is not consistent with either what that statute actually requires or what, in practice, occurs in Florida. To reach its mistaken conclusion, the Dissent relies on § 101.68(1) and (4)(a). Dissent at 65 & n.32. In relevant part, § 101.68(1) provides, "The supervisor . . . shall receive the voted ballot, at which time the supervisor shall compare the signature of the elector on the voter's certificate with the signature of the elector in the registration books or the precinct register to determine whether the elector is duly registered in the county *and may record on the elector's registration certificate that the elector has voted. . . . Except as provided in subsection (4), after a vote-by-mail ballot is received by the supervisor, the ballot is deemed to have been cast . . . ."* (emphasis added). By its language, this provision requires the supervisor to compare signatures and record all votes the supervisor deems to be legitimately cast. As for votes the supervisor cannot certify as validly cast, the provision directs us to § 101.68(4). That provision states, "The supervisor shall, *on behalf of the county canvassing board,* immediately notify an elector who has returned a vote-by-mail ballot . . . that does not match the elector's signature in the registration books or precinct register." *Id.* (emphasis added). By its terms, this provision requires the supervisor to notify voters whose signatures do not match—but only on behalf of the county canvassing board, not on the supervisor's own. A third provision not cited by the Dissent also comes into play: § 101.68(2)(c)1. That provision directs, "The canvassing board must, if the supervisor has not already done so, compare the signature of the elector on the voter's certificate or on the vote-by-mail ballot cure affidavit as provided in subsection (4) with the signature of the elector in the registration books or the precinct register . . . . to determine the legality of that vote-by-mail ballot." This provision tasks the canvassing board with performing the signature-match function for ballots the supervisor, in exercising her authority under § 101.68(1), cannot deem valid ballots. And that is why § 101.68(4) requires the supervisor, *on behalf of the canvassing board,* to notify voters whose ballots have been rejected for signature mismatch. Indeed, evidence admitted during the hearing in this case bears this out. Leon County's supervisor of elections testified that while members of his staff immediately make an initial comparison of signatures and approve some ballots, any ballot with a signature that the staff cannot validate is referred to the canvassing board for review—so it is the canvassing board that rejects the ballots. Of course, nothing stops a county from going above and beyond and notifying voters of *potential* mismatch as soon as the supervisor's staff flags a ballot for the canvassing board's review. But the relevant code provision requires only that the supervisor notify voters when an actual mismatch is found, and the evidence shows that only the canvassing board may make that determination.

That is exactly what happened to former U.S. Congressman Patrick Murphy. A registered voter, Murphy explained in a sworn declaration to the district court that he voted by mail using the same signature that he had used in the 2018 primary election in Florida. Although Murphy had no issues with his signature before, Murphy's ballot was rejected for mismatched signature on Election Day. Because the cure deadline had already passed, Murphy could do nothing to have his ballot counted. And Murphy was not alone: the record contains other sworn declarations with stories of eligible voters who were similarly disenfranchised.

On these facts, we have no trouble finding that Florida's scheme imposes at least a serious burden on the right to vote.[11] *See League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (commenting that it is a "basic truth that even one disenfranchised voter—let alone several thousand— is too many"). This burden can be constitutional only if justified by legitimate state interests of sufficient weight.

### b.    The State's Asserted Justifications for the Burden

We therefore turn to the state's interests. In considering the state's interests, we account for the points the NRSC raises here as well as those raised by the Secretary and Attorney General before the district court. The identified interests fall

---

[11] We need not and do not determine whether the burden imposed is anything more than serious, since on this record, as we explain, the state's interests do not sufficiently justify the burden imposed.

into three general categories:  preventing fraud; promoting the orderly, efficient, and timely administration of the election; and ensuring fairness and public confidence in the legitimacy of the election.

We begin with Florida's interest in combatting voter fraud and making certain that only legitimate votes are counted.  Without a doubt, Florida has a legitimate and strong interest in preventing voter fraud.  *Common Cause*, 554 F.3d at 1353-54.  But that interest is not mutually exclusive of vote-by-mail and provisional voters' interest in not being disenfranchised through no fault of their own.

And that's the problem for Defendants.  We must take into consideration not only the "legitimacy and strength" of the state's asserted interest, but also "the extent to which those interests make it *necessary* to burden" voting rights.  *Anderson*, 460 U.S. at 789 (emphasis added).  Here, Defendants offer no satisfying explanation for why Florida cannot have both a robust signature-match protection and a way to allow every eligible vote-by-mail and provisional voter whose ballot is mistakenly rejected an opportunity to verify their identities and have their votes count.  Indeed, if a voter is able to cure the signature-match problem, no fraud protected against by the signature-match provision even arguably occurs.  So even without requiring the state to engage in narrow tailoring—that is, saying nothing about Florida's lack of

uniform training or standards from county to county[12]—Defendants have identified no fraud-prevention interest that justifies depriving legitimate vote-by-mail and provisional voters of the ability to cure the signature mismatch, thereby disenfranchising them.

Next, we turn to Florida's interest in the orderly, efficient, and quick administration of an election. Again, we agree that Florida has an important interest in structuring and regulating its elections to avoid chaos and to promote the smooth administration of its elections. *See Burdick*, 504 U.S. at 433. But that interest does not warrant the complained-of burden on voters because Defendants have not demonstrated that permitting voters who were belatedly notified of signature mismatch to cure their ballots would inordinately disrupt the smooth facilitation of the election.

As the district court noted, only about 4,000 ballots were rejected for signature mismatch at the time of its order—less than 5 hundredths of a percent of the more than 9 million total ballots cast in Florida for the 2016 general election. *Democratic Exec. Comm.*, 2018 WL 5986766, at *9; Fla. Dep't of State, Div. of Elections, *Voting Activity by Ballot Type for 2016 General Election* (last updated Mar. 24, 2017), https://dos.myflorida.com/media/697842/2016-ge-summaries-ballots-by-type-

---

[12] The availability of an effective cure process should incidentally also have the salutary effect of relieving the burden inflicted on voters by the unevenness of signature-match standards and training from county to county.

activity.pdf.  Of those 4,000 ballots, not all were cast by eligible voters.  And even for those that were, only a portion of the eligible voters casting those votes were belatedly notified.  Even the NRSC has described this subset of injured voters as "tiny."  So it is difficult to see how—and Defendants have not shown how—a state equipped to deal with more than 9 million voters would be unduly burdened by providing the fraction of a percent of injured voters an opportunity to cure signature mismatch and have their rightful ballots counted in accordance with the district court's preliminary injunction.

Nor, as Defendants suggested in the district court, does *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008), support a different conclusion.  In *Lemons*, the Ninth Circuit worried about the administrative difficulties associated with suddenly requiring state officials to provide notice and a chance to cure to thousands of petition signers when no such requirement previously existed.  *See id.* at 1104-05. But here, Florida already had a cure mechanism for those with mismatched signatures.  *See* Fla. Stat. § 101.68(4)(a).

And contrary to Defendants' assertions, it is not too difficult to interpret and apply the district court's order.  Mindful that time was of the essence as the counting of votes was already underway, the district court allowed for two days from the time of its order for certain injured voters to cure their ballots, demonstrating that a reasonable cure period provides 48 hours' notice of the defect before a voter's

opportunity to cure expires. *Democratic Exec. Comm.*, 2018 WL 5986766, at *1 n.1, *9. Thus, anyone who received notice later than would allow them 48 hours to cure was belatedly notified. And consistent with our long practice of relying on the threat of penalty of perjury to guard against dishonesty and fraud, *see United States v. Yates*, 438 F.3d 1307, 1318 (11th Cir. 2006), the district court's order allows a voter to attest that she was belatedly notified by declaring under penalty of perjury that she did not timely receive actual notice of signature mismatch.[13]

Finally, we consider Florida's interest in fundamental fairness and protecting public confidence in the legitimacy of the election. Once again, we fully agree that Florida enjoys legitimate and strong interests in these things. But in this case, these considerations actually swing decisively in favor of the DECF and the Nelson Campaign.

On fundamental fairness, Defendants and the Dissent complain that the district court has unfairly upset settled expectations by changing the rules mid-contest. Dissent at 62, 72. We are not convinced.

First, we note that the record here reflects that, in violation of the language of the governing provisions, one county counted previously rejected ballots for which

---

[13] The Dissent faults the district court for not fashioning a more perfect preliminary injunction. Dissent at 73-76. But given the circumstances and the district court's broad discretion in shaping an injunction, and as we discuss *infra* at 30-32, the district court's order falls within the realm of reasonableness. *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (discussing district courts' wide discretion in molding a preliminary injunction).

it received cures after the deadline, since the Post Office had mistakenly held onto cure submissions beyond the deadline. We certainly do not criticize that county for trying to ensure the affected voters were not disenfranchised through no fault of their own. And to the extent that that county's actions can be viewed as a technical "wrong" under Florida's election code, we do not ascribe to the idea that two wrongs make a right.

But the fact remains that Florida already applied changed rules mid-election to count vote-by-mail votes that did not satisfy Florida's written rules. So if a general expectation existed at some point that the rules would be enforced so as not to count even the votes of vote-by-mail voters whose ballots had been rejected through no fault of their own, as a matter of fact, Florida's own actions decimated that anticipation and effectively created a new expectation: that opportunity would be created for the counting of legitimately cast ballots that were not counted through no fault of the voter.

Second, to the extent that an unsettled expectation and unfairness may have existed at the time the district court considered Plaintiffs' motion for preliminary injunction, it befell Plaintiffs. A realistic assessment of the facts here indicates that vote-by-mail voters who followed the ostensible deadline for their ballots only to discover that their votes would not be counted and that they would have no recourse were the ones to experience a clash with their expectations and fundamental fairness.

21

*See Bullock v. Carter*, 405 U.S. 134, 143 (1972) (explaining that "the rights of voters and the rights of candidates do not lend themselves to neat separation" and that "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters").

To understand why, we briefly visit the recent history of the cure provision in Florida. In 2016, as we have noted, the same district court that issued the preliminary injunction under review here examined Florida's signature-match scheme and tried to address the problem afflicting the subset of voters whose signatures were found not to have matched those on file but who were provided no opportunity to remedy that problem. Under the 2016 scheme, a vote-by-mail voter had no opportunity to cure under the code if her ballot was rejected for signature mismatch. *Fla. Democratic Party*, 2016 WL 6090943, at *1. The district court explained then that the scheme existing at that time "categorically disenfranchised thousands of voters arguably for no reason other than they have poor handwriting or their handwriting has changed over time." *Id.* at *7. These otherwise eligible voters, the district court said, were "robbed of one of our most basic and cherished liberties; namely, the right to vote and have that vote counted." *Id.* at *8. To remedy the constitutional infirmity of the previous signature-match scheme, the district court ordered that those with mismatched-signature ballots be given a chance to cure. *Id.* at *9. Shortly after the

district court issued its order, Florida amended its election code to add a cure provision.

Against this backdrop, a fair expectation going into the 2018 election was that vote-by-mail voters would no longer be subjected to a situation where they would be deprived of their right to vote by not having an opportunity to cure legitimately cast ballots rejected for signature mismatch. But the code's remedy to make that expectation a reality turned out, in practice, to be illusory in some instances.

As we have noted, Florida's stated deadline for ensuring that the Secretary received vote-by-mail ballots was later than the deadline to cure. And more significantly, canvassing boards were not required to start canvassing vote-by-mail ballots until a day after the election—two days after the cure deadline. To make sure her ballot was counted, then, a voter had to know that the published 7 p.m. receipt deadline did not tell the whole story. She had to anticipate that her ballot would be rejected for signature mismatch and take affirmative steps like submitting a ballot well in advance of the published deadline—which *still* would not guarantee that she would be notified of any signature mismatch until it was too late to do anything to remedy the problem. Not only is this unrealistic and unreasonable, but as the voters' declarations in this case show, it renders the opportunity to cure illusory in some circumstances. In so doing, it defeats the purpose of requiring Florida to add a cure provision as expressed in the district court's 2016 order.

For these reasons, we respectfully reject Defendants' and the Dissent's arguments that the preliminary injunction effected an unfair change to the "rules" and that voters whose votes were not counted for signature mismatch necessarily have only themselves to blame.  Dissent at 62, 68.  It is one thing to fault a voter if she fails to follow instructions about how to execute an affidavit to make her vote count, *see Roe v. Alabama*, 43 F.3d 574, 580-81 (11th Cir. 1995), or if she inexcusably fails to enroll in a political party by a stated deadline, *Rosario v. Rockefeller*, 410 U.S. 752, 757-58 (1973).  But it is quite another to blame a voter when she may have done nothing wrong and instead may have simply had the bad luck to have had her ballot reviewed by a particularly strict (and not formally trained) judge of signatures, and then to not have been notified of the problem until it was too late to do anything about it.

For these same reasons, we disagree with the Dissent that the district court improperly (1) enfranchised those who did not follow the rules, (2) disenfranchised those who would have voted or cured if not for the rules, and (3) diluted the votes of those who properly voted according to the rules.  Dissent at 72-73.

First, to the extent the district court enfranchised people, it was those vote-by-mail voters who reasonably expected to be afforded a cure if their ballots were rejected for mismatched signature.  Second, even assuming people exist who would have voted but did not because of the defective cure provision, that number is

24

nominal at best. Even Bad Luck Schleprock[14] would not have been likely to anticipate that his ballot might be rejected for signature mismatch and that he might not be notified about this problem in time to do anything to correct it, and then decide that for this reason, he would not submit a ballot in the first place. Finally—even setting aside the fact that Florida already acted on its own to count votes that did not strictly comply with the rules—the existing counted votes were artificially over-weighted because the previous vote pool excluded the votes of those who followed the vote-by-mail rules yet whose votes were excluded through no fault of their own. So allowing these voters an opportunity to have their votes counted did not impermissibly dilute the votes of those who followed the rules.

Defendants and the Dissent fret that allowing this small group of affected voters an opportunity to demonstrate their eligibility to vote undermines the public's faith in elections. Dissent at 73. But we respectfully disagree. In our view, doubling down on the disenfranchisement of vote-by-mail voters who complied with Florida's published deadline is not the way to promote faith in elections.

### c. *The Weighing of the Burden on the Right to Vote Against the State's Justifications*

---

[14] Bad Luck Schleprock was a character in the 1970s Hanna-Barbera television series *The Pebbles and Bamm-Bamm Show* and *The Flintstone Comedy Hour*. *See The Pebbles and Bamm-Bamm Show*, IMDB, https://www.imdb.com/title/tt0066699/?ref_=nv_sr_1 (last visited Feb. 15, 2019); *The Flintstone Comedy Hour*, IMDB, https://www.imdb.com/title/tt0068073/ (last visited Feb. 15, 2019). He perpetually had a rain cloud over his head and always experienced misfortune. *See*, *e.g.*, *Schleprock's New Image*, IMDB, https://www.imdb.com/title/tt1904367/ (last visited Feb. 15, 2019).

Finally, we come to the point in the *Anderson-Burdick* analysis where we weigh the serious burden Florida's signature-match scheme imposes on vote-by-mail voters who have belatedly been notified of a signature mismatch, against Florida's interests in perpetuating this scheme. We conclude on this record that the serious burden on voters outweighs Florida's identified interests: the state's interest in preventing fraud is not in conflict with the voters' interest in having their legitimately-cast ballots counted; the state has not shown that its interest in facilitating timely and orderly election processing will be impaired by providing the injured voters with a reasonable opportunity to have their votes counted; and public faith in elections benefits from providing injured voters the opportunity to have their legitimately cast ballots counted when the reason they were not counted was not the voters' fault.

For these reasons, the NRSC has failed to make a strong showing that it is likely to succeed on the merits of the constitutional issue.

> ii.   *The NRSC has not made a strong showing that it is likely to succeed on the merits of its laches argument.*

The NRSC also argues that the equitable doctrine of laches bars the district court's preliminary injunction. In response, Plaintiffs urge that laches does not apply when the plaintiff seeks only to stop continuing constitutional violations. We need not consider whether laches applies to bar prospective relief from constitutional harms, because the NRSC cannot satisfy the laches elements.

26

To succeed on a laches claim, the NRSC must demonstrate that Plaintiffs inexcusably delayed bringing their claim and that the delay caused it undue prejudice. *United States v. Barfield*, 396 F.3d 1144, 1150 (2005). This they cannot do.

At the time Plaintiffs brought this action, only about a year had passed since the Florida legislature amended the signature-match scheme by adding the defective cure provision, *see* Fla. Stat. § 101.68 (effective June 2, 2017), and the DECF had just litigated the topic of signature mismatches, *see Fla. Democratic Party*, 2016 WL 6090943, at *1. As the district court aptly noted, the DECF did not need to relentlessly "search and destroy every conceivable potential unconstitutional deprivation," *Democratic Exec. Comm.*, 2018 WL 5986766, at *8, but could catch its breath, take stock of its resources, and study the result of its efforts. In fact, between Florida's adoption of the challenged provisions and the November 2018 election, the only other major statewide election to occur was the 2018 primary election, which wrapped up just weeks before the November 2018 election. So as a matter of fact, we cannot find inexcusable delay.

Nor can the NRSC show *undue* prejudice arising from any delay, since the NRSC has not established that any of the harms it anticipates are anything more than minimal or nonexistent. As we have mentioned, the state's administrative burden

was nominal; its interest in preventing fraud was unaffected; and public faith in the election is better-served by allowing Plaintiffs' suit.

On this record, the NRSC cannot make a strong showing that it is likely to succeed on the merits of its laches argument.

B.    The remaining *Nken* factors similarly disfavor a stay.

The remaining *Nken* factors do not persuade us to exercise our discretion to stay the district court's injunction.

We begin with irreparable injury. The NRSC claims that it will suffer irreparable injury because the district court's order will trigger a chaotic restart of the election, cause the NRSC to expend unrecoverable resources on a get-out-the-cure campaign, and create the "substantial risk" of counting late-cured ballots. We disagree.

First, the NRSC's concern about a chaotic restart of the election is significantly overstated, as we have explained in our discussion about the manageability of the district court's order. Second, the threat of penalty of perjury safeguards against false claims of belated notification. Plus, the NRSC's assertion about the risk of undiscoverable fraud is entirely unsubstantiated.

This leaves the NRSC's contention that the injunction forces it to expend unrecoverable resources to encourage voters to cure their ballots. But even assuming this to be true, that injury is not enough to overcome the NRSC's inability to show

likelihood of success on the merits. *See Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926) ("A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant.").

As for the public interest and any harm caused by a stay, Defendants similarly have failed to show that these factors tilt in their favor. A stay would disenfranchise many eligible electors whose ballots were rejected by a flawed signature-match scheme. And public knowledge that legitimate votes were not counted due to no fault of the voters—and with no reasonable notice to the voters that their votes would not be counted and no opportunity to correct that situation—would be harmful to the public's perception of the election's legitimacy. Yet protecting public confidence in elections is deeply important—indeed, critical—to democracy. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008) (plurality). And the public interest is served when constitutional rights are protected. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). So the third and fourth *Nken* factors do not favor granting the stay.

In short, the NRSC has failed to make the requisite showing to justify a stay of the district court's preliminary injunction under the *Nken* factors.

## IV. Response to the Dissent

Finally, we address the Dissent's remaining arguments. These arguments arise from the Dissent's mistaken notions that the district court improperly reframed

the issue in the case, producing an injunction that was flawed. We respectfully disagree with the Dissent's reasoning. To explain why, we begin by reviewing the district court's charge when addressing a motion for preliminary injunction, as well as the relief the district court ultimately ordered. We then respond to the Dissent's other arguments based on its mistaken notion.

A.    The district court was empowered to enter the narrow and reasonable preliminary injunction it did.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). In considering whether to grant an injunction, a court evaluates the applicant's likelihood of success on the merits, whether the applicant will suffer irreparable harm without the injunction, the balance of equities, and the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).

If the court decides to grant an injunction, it must also ascertain what relief to provide, keeping in mind that the purpose of the injunction is not to conclusively determine the rights of parties, but only to balance the equities in the interim as the litigation proceeds. *Trump*, 137 S. Ct. at 2087. In executing its duties, the court must pay particular attention to the public consequences of any preliminary relief it orders. *See Winter*, 555 U.S. at 24. So it is axiomatic that a district court "need not grant the total relief sought by the applicant but may mold its decree to meet the

30

exigencies of the particular case." *Trump*, 137 S. Ct. at 2087 (quoting 11A Charles Alan Wright, et. al., Federal Practice and Procedure § 2947 (3d ed.)).

Here, the district court did just that. The preliminary injunction was quite limited. Plaintiffs requested the district court *categorically* enjoin the enforcement of the signature-match scheme as to all vote-by-mail and provisional ballots, meaning they asked the court to require all vote-by-mail and provisional ballots that had been rejected for signature mismatch to be counted.

But the district court did "not grant the total relief sought." *See id.* Rather, it "mold[ed] its decree to meet the exigencies of the particular case." *Id.* Instead of directing every mismatched ballot to be counted, the district court ordered only the ballots of those voters who had been belatedly notified of the mismatch to be counted—and only after those voters cured their ballots within a short window of time. That was well within its discretion. Indeed, nothing requires a district court to award all or nothing when it comes to a preliminary injunction. *See id.*

And in this case, the district court's targeted injunction made sense. The subset of voters who received timely notice of the signature mismatch were already afforded the cure provision that the district court had ordered in 2016. So they at least had an opportunity to cure a ballot flagged for signature mismatch. But the same could not be said of those voters who were not timely notified. They faced the same risk of disenfranchisement that the district court identified as unconstitutional

two years earlier.  The district court carved away much of the relief Plaintiffs preliminarily requested to award just the portion of the relief Plaintiffs sought that it previously found to be constitutionally demanded:  an opportunity to cure.

Striking down the signature-match scheme wholesale may have been a possibility between elections if enough time existed for the legislature to enact a replacement or prohibit vote-by-mail and provisional voting.  But given the timing, taking that course would have awarded too much relief because it might have allowed some fraudulent ballots to be counted.  On the other hand, doing nothing would have given too little relief because it risked disenfranchising voters.  So the district court's Goldilocks solution was just right to address the apparent hole in the signature-match process—that is, the lack of a reasonable opportunity to cure a signature mismatch.  And the awarded relief was a subset of the relief Plaintiffs sought.  That was within the district court's discretion under the circumstances.

> B.    The district court did not deny Defendants an opportunity to be heard on the relief it ultimately granted.

The Dissent asserts that the district court reframed the question presented by Plaintiffs from whether the signature-match scheme can withstand constitutional scrutiny to whether the signature-match scheme *and* an adequate cure provision can withstand constitutional scrutiny.  Dissent at 52-53, 71.  In the Dissent's view, the district court deprived Defendants of due process by denying them an opportunity to respond to the allegedly reframed question.  *Id.* at 70-72.

32

Again, we must respectfully disagree.

First, the district court's grant of partial relief neither reframed the issue nor denied Defendants an opportunity to discuss the cure procedure. The Dissent reaches the contrary conclusion because it equates partial relief with reframing the question. But as we have explained, that is not the case. *See supra* at 30-31 (quoting *Trump*, 137 S. Ct. at 2087) (citation and quotation marks omitted) (a district court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case").

Here, Plaintiffs asked the court to require every vote that was rejected for signature-mismatch to be counted. That would have entailed throwing out all signature-mismatch provisions as an unconstitutional burden on their right to vote. So naturally, the district court had to examine the entire signature-mismatch process—including Fla. Stat. § 101.68(4), the cure procedure, which Plaintiffs expressly identified in their complaint—to evaluate Plaintiffs' claim that the signature-match scheme unconstitutionally disenfranchised vote-by-mail voters whose signatures had been mismatched.

The preliminary injunction the court eventually entered granted only a portion of Plaintiffs' requested relief, preserving as much of the statutory scheme as possible, given the court's previous ruling that the signature-match provisions without an acceptable cure process unconstitutionally burdened the right to vote. *See*

*Fla. Democratic Party*, 2016 WL 6090943, at \*1.  Granting only part of the relief sought is not reframing the question.

Plus, every party pointed the district court to the cure provision in their filings. In their complaint, Plaintiffs first noted that the cure deadline precedes the deadline for receipt of vote-by-mail ballots before alleging that "scores of voters are disenfranchised based on the timing of the mail."  Plaintiffs reiterated this point in their memorandum in support of their preliminary injunction request, again arguing that "scores of voters who are unable to meet [the cure] deadline will be denied the right to vote."  And all three Defendants independently directed the court's attention to the cure provision in their filings, in an effort to show that the signature-match scheme contained adequate procedural protections.  Thus, both sides raised the cure provision, and the district court's consideration of whether the signature-match scheme and an adequate cure provision can withstand constitutional scrutiny was entirely appropriate.

Beyond that, the record reflects that the topic of cure came up repeatedly during the preliminary injunction hearing.  Witnesses were specifically questioned about the cure period and notice.  *See*, *e.g.*, Transcript of Nov. 14, 2018, Hearing at 23, *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017 (No. 4:18-CV-520-MW/MJF) ("So all of the ballots received between 5:30 p.m. on the date before election day and 7 p.m. on election day, those ballots cannot be cured if

there's a signature mismatch issue;  is that right?"  "But if you don't receive [the cure documentation] before 5:30 p.m. the day before election day, then [the signature mismatch] can't be cured; right?"), 24 ("[D]o you have any idea how many cure affidavits you got after that 5:30 deadline?"), 30 ("[I]f an individual wants to make the argument . . . that a mismatched signature is actually a signature match, . . . they cannot make that argument [after 5 p.m. the day before the election and between noon on Saturday, even though a person may challenge the legality of a vote-by-mail ballot under Section 101.168 during that period];  right?"), 70 ("[W]hat is your understanding of the process to challenge a ballot by either an elector, a voter, or a candidate as it relates to challenging something because there is not a matching signature?").  And Defendants did not object.

Not only that, but the court itself asked Plaintiffs' counsel, "Why would I not order—if [Plaintiffs] were to win, why wouldn't I order some process where there would be an opportunity to, for example, challenge the rejection of the votes as opposed to just outright counting them?"  Transcript of Nov. 14, 2018, Hearing at 97-98.  And Plaintiffs' counsel responded, "[I]f this Court wanted to grant these voters an opportunity to cure their vote-by-mail ballots, signature mismatches, . . . there's a way to do that . . . ."  *Id.* at 100.  Plaintiffs' counsel then went on to suggest "eliminat[ing] all instances when a ballot can be tossed for a signature mismatch and the voter be given zero opportunity to cure that signature mismatch."  *Id.* at 106.

The court responded that Oregon's "14-day period after the election to fix . . . signatures" provides "a real opportunity to fix it." *Id.* at 107.

And when the district court asked what alternative relief Plaintiffs sought, Plaintiffs expressly asked the court to fashion a more modest injunction granting only partial relief—specifically, "for all of these voters whose ballots have been rejected for signature mismatch, the alternative relief would be to grant these voters a chance to cure and extend these deadlines to give these voters a chance to have their ballots counted." *Id*. at 111. Plaintiffs' counsel also argued that the signature-mismatch scheme "impose[s] an undue burden . . . to the extent that it deprives individuals [of] the right to vote, and it does so by depriving them [of] the right to cure their ballot." *Id.* at 200.

As for Defendants, the court asked them, "Why would the world come to an end if, in the next couple of days before the 18th, if I entered an order today that said . . . that if somebody wants to challenge the rejection of their ballot, they can do so between now and the evening of the 17th." *Id.* at 127-28. It further inquired, "Why does a Florida Statute, that does not give an opportunity to challenge the decision of the canvassing board comport with due process?" *Id.* at 167.

Clearly, the cure issue was before the district court, and Defendants had an opportunity to be heard on it.

C.   To determine that Plaintiffs enjoyed a likelihood of success on the merits, the district court was not required to grant the entire preliminary

injunction Plaintiffs originally requested nor ameliorate the right to vote for every voter whose vote was not counted because of signature mismatch.

Next, we turn to the Dissent's suggestion that the district court was required to find that likelihood of success on the merits turned on whether granting the requested injunction in total was appropriate. That mistaken notion elides the difference between the merits and the remedy and incorrectly suggests that the district court's discretion is limited to an all-or-nothing choice when it comes to ordering injunctive relief. We have already explained why that is not correct. *See supra* at 31.

In a somewhat related vein, the Dissent also contends that the district court's order offered no real relief to voters subjected to a flawed signature-match scheme because disenfranchisement is irreparable. Dissent at 60 ("Approximately 5,000 [vote-by-mail] and provisional voters had been disenfranchised . . . by the operation of the Code's standardless signature-matching provisions, but they received no relief. The Court gave them no relief because the disenfranchisement could not be undone.") (quotation marks omitted). We respectfully disagree with the notion that the district court offered no relief.

As the Dissent itself notes, rejection for signature mismatch does not necessarily mean disenfranchisement. *See* Dissent at 68 (explaining how a voter could cure a ballot rejected for mismatched signature). Some voters, by

37

happenstance, will have had a meaningful opportunity to cure because they received timely notice of a mismatched signature. And as for the voters who belatedly received notice of signature mismatch, their disenfranchisement was not assured unless the district court declined to award relief. But here, the district court entered its preliminary injunction providing them with the same opportunity to cure that other vote-by-mail voters had had. Those who took advantage of the district court's relief had their ballots counted and were able to avert disenfranchisement.

> D.    The district court's preliminary injunction did not violate principles of federalism.

The Dissent's last attack on the district court's preliminary injunction alleges that the court offended principles of federalism by rewriting Florida's election laws. Dissent at 76-79. According to the Dissent, if Florida's law were truly unconstitutional, principles of federalism dictate that the district court's only recourse was to strike the signature-match scheme down in its entirety. *Id.* at 77-78 & n.42. We do not share the Dissent's view for three reasons.

First, the district court was not adjudicating *final* judgment. For the emergency preliminary injunction motion before it, the district court's duty was "not to conclusively determine the rights of parties, but only to balance the equities in the interim as the litigation proceeds." *Trump*, 137 S. Ct. at 2087. That's exactly what the court did.

Second, while federalism certainly respects states' rights, it also demands the supremacy of federal law when state law offends federally protected rights. *See Puerto Rico v. Branstad*, 483 U.S. 219, 228 (1987) (rejecting the premise that states and the federal government should always be viewed as coequal sovereigns and explaining that "[i]t has long been a settled principle that federal courts may enjoin unconstitutional action by state officials."); *Reynolds v. Sims*, 377 U.S. 533, 584 (1964) ("When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls."). Indeed, *Ex parte Young*, 209 U.S. 123, which authorizes suit against the Secretary in her official capacity in this case, was designed to "give[] life to the Supremacy Clause." *Green v. Mansour*, 474 U.S. 64, 68 (1985). So to the extent the district court concluded that any aspect of the signature-match scheme unconstitutionally burdened vote-by-mail voters' fundamental right to vote, it had a duty to strike down the offending part.

And third, rather than undermining Florida's sovereignty, the preliminary injunction's solution actually respected it. For purposes of the preliminary injunction, instead of throwing out the plausibly legal with the constitutionally problematic, the district court narrowly tailored its relief to home in on the one limited aspect of Florida's signature-match scheme it already found unduly burdened vote-by-mail voters' right to vote. And it preserved application of the rest of the scheme in the interim.

## V.    Conclusion

For these reasons, we deny the NRSC's motion to stay the district court's preliminary injunction.

TJOFLAT, Circuit Judge, dissenting:

This case concerns one of the most important rights, the right to vote, in two of the most hotly contested 2018 midterm elections.  Plaintiffs—alleging that the signature-matching provisions of Florida's Election Code violated the Equal Protection Clause—requested that the District Court enter an injunction requiring all vote-by-mail ballots rejected for signature mismatch to be counted.  Rather than granting or denying the relief the Plaintiffs actually asked for, the District Court took the unprecedented step of repleading Plaintiffs' case and granting relief completely inconsistent with what Plaintiffs requested.  Because we should have stayed the District Court's inexplicable and extraordinary grant of relief but did not, I respectfully dissent.

*     *     *

This case is about vote-by-mail ("VBM") and provisional ballots that were rejected during the 2018 general election due to signature mismatch.  Under Florida law, a VBM voter fills out his ballot, puts it in a mailing envelope, signs the voter's certificate on the back of the envelope, and mails it to the county supervisor of elections.[1]  For the county canvassing board to count the ballot, the voter's signature on the envelope certificate must match the signature in his voter's

---

[1] *See* Fla. Stat. §§ 101.6103(1)–(3) (2018).

registration entry.[2]  If the signatures do not match, a VBM voter may submit an affidavit with identification to cure the defect.[3]  The voter must deliver his cure affidavit to the county supervisor of elections by the deadline—5 p.m. the day before the election—for his VBM vote to count.[4]

A provisional voter must make a slightly different submission.  Because his eligibility to vote cannot be determined when he appears at his precinct to vote, he casts a provisional ballot and signs the voter's certificate.[5]  Not later than 5 p.m. on the second day following the election, he may submit to the supervisor of elections evidence supporting his eligibility to vote at the precinct.[6]  The canvassing board then examines the evidence, and if it finds the voter eligible, compares the signature on the voter's certificate with the signature on the voter's registration entry.[7]  If they match, the provisional ballot is counted.[8]

---

[2] *See id.* §§ 101.6103(5), 101.68(1).

[3] *Id.* § 101.68(4)(a).  The identification requirement may be met by means of a photo (Tier I) or non-photo (Tier 2) ID.  *Id.* § 101.68(4)(c).  If a Tier 2 ID is used, the signature on the cure affidavit must match the signature in the registration entry.  *Id.* §§ 101.68(2)(c)(1)(a)–(b).

[4] *Id.* § 101.68(4)(a).

[5] *Id.* § 101.048(1).

[6] *Id.*

[7] *Id.* §§ 101.048(2)(a)–(b).

[8] *Id.* § 101.048(2)(b)(1).

References to "VBM and provisional voters" are, unless indicated otherwise, to VBM and provisional voters whose ballots had been, or might be, rejected because the signature on the "voter's certificate" on the envelope enclosing the ballot did not match the signature on the "registration entry."  "Registration entry" refers to the "registration books or the precinct register" that contains the putative voter's signature.

The Democratic Executive Committee of Florida, on behalf of Democratic candidates and voters throughout the state, and Bill Nelson for U.S. Senate (collectively, "Plaintiffs") brought this lawsuit against Florida Secretary of State Ken Detzner (the "Secretary") on November 8, 2018, two days after the polls for the general election had closed and the county supervisors of elections had announced the results of all early voting and VBM ballots that had been counted.[9] Plaintiffs wanted a federal judgment declaring the signature-matching provisions of the Election Code[10] unconstitutional and enjoining the Secretary to direct the county supervisors of elections to count *all* of the votes cast by VBM and provisional ballots that had been, or might be, rejected due to signature mismatch.[11]  *Democratic Exec. Comm. v. Detzner*, __ F. Supp. 3d __, No. 4:18-CV-520-MW/MJF, 2018 WL 5986766, at *3 (N.D. Fla. Nov. 15, 2018).  Plaintiffs alleged that rejecting ballots based on a signature mismatch violated the VBM voters' rights under the Equal Protection Clause of the Fourteenth Amendment, citing *Bush v. Gore*,[12] because the signatures are compared without a standard and

---

[9] "The canvassing board shall report all early voting and all tabulated vote-by-mail results to the Department of State within 30 minutes after the polls close.  Thereafter, the canvassing board shall report . . . updated precinct election results to the department at least every 45 minutes until all results are completely reported."  Fla. Stat. § 102.141(4)(b).

[10] I refer to the relevant Florida statutes as the "Election Code" or "Code."

[11] Plaintiffs also asked the Court to toll the county canvassing boards' deadline for submitting "unofficial" election results to the Department of State to ensure that all VBM and provisional ballots would be counted and included in all submitted election results.

[12] 531 U.S. 98, 121 S. Ct. 525 (2000) (per curiam).

the decision is therefore arbitrary.  Consequently, some VBM and provisional ballots had been erroneously rejected, which denied those voters the right to vote.

After it granted the Republican National Senatorial Committee ("RNSC") leave to intervene and entertained the parties' submissions, the District Court concluded that, as Plaintiffs alleged, the Election Code's standardless signature-matching process had arbitrarily deprived "potentially thousands of VBM [and provisional] voters . . . of the right to cast a legal vote," in violation of the Equal Protection Clause.  *Democratic Exec. Comm.*, 2018 WL 5986766, at *8.  But it declined to grant the preliminary injunction Plaintiffs sought—that all of the VBM and provisional ballots be counted.

The Court's unwillingness to grant the relief Plaintiffs were seeking did not end the matter.  Acting on its own initiative and without notice to the parties, the Court shifted gears.  Ignoring the fact that the Code's standardless signature-matching process had deprived some VBM and provisional voters of the right to vote, the Court (1) acted as if the violation had not occurred, (2) declared that the provision that afforded VBM voters an opportunity to cure "mismatched signature ballots" had been "applied unconstitutionally, *id.* at *9, and (3) enjoined the Secretary to direct the county supervisors of elections to

> allow [VBM] voters who have been belatedly notified [that] they have submitted a mismatched-signature ballot to cure their ballots by November 17, 2018, at 5 p.m.  The supervisors of elections shall allow mismatched-signature ballots to be cured in the same manner

44

and with the same proof a mismatched-signature ballot could have otherwise been cured before November 5, 2018, at 5:00 p.m.

*Id.*[13]

This is the injunction now before us.[14]  The RNSC immediately appealed the order and moved this Court to stay its enforcement.  We declined the stay on the theory that the RNSC failed to make the required showing under *Nken v. Holder*, 556 U.S. 418, 434, 129 S. Ct. 1749, 1761 (2009), including "a strong showing that [it was] likely to succeed on the merits."  Order at 2.[15]  I dissented because the RNSC made the required showing here, and now I write to explain why.

The RNSC demonstrated that it was likely to succeed on the merits of its appeal.  As the District Court's injunctive order clearly implies, Plaintiffs did not have "a substantial likelihood of success on the merits" because the relief they

---

[13] Plaintiffs had not challenged the Election Code's cure provisions, nor had they sought any relief specifically for VBM voters who had been "belatedly notified" that their ballots were rejected due to mismatching signatures.

[14] The District Court did not explain why it granted this injunction rather than the one Plaintiffs had requested, except to say that "in balancing the equities for this emergency motion, this [i.e., the injunction before us] is the only constitutional cure that takes into account all the parties' concerns."  *Id.* at *9.  The implication is that the relief Plaintiffs requested would not have been an appropriate "constitutional cure."

[15] In addition, the RNSC needed to show that irreparable injury would occur without a stay, the stay would not cause substantial injury to other parties, and a stay was in the public interest.  *Nken*, 556 U.S. at 434, 129 S. Ct. at 1761.

sought—the counting of all VBM and provisional ballots rejected for lack of matching signatures—could not be granted.[16]

To show why the RNSC is likely to prevail here, I trace the District Court's analysis of Plaintiffs' equal protection claim from beginning to end. In one fleeting moment, the Court found that Plaintiffs were likely to succeed on their claim. Then, the Court shifted gears and reframed Plaintiffs' claim. In turn, it granted a preliminary injunction that matched the reframed claim and gave a remedy to a subset of VBM voters—those who, based on the Court's mistaken reading of the Code, had been "belatedly notified" that their ballots were rejected due to signature mismatch. The remedy was a chance to cure the mismatch.

---

[16] The questions presented by the RNSC's motion for a stay before this Court and Plaintiffs' motion for a preliminary injunction before the District Court were highly similar. As the *Nken* Court put it,

> [t]here is substantial overlap between [the factors governing the granting of a stay] and the factors governing preliminary injunctions; not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined.

556 U.S. at 434, 129 S. Ct. at 1761 (citation omitted). Both questions focus on the likelihood of success on the merits—on appeal in one setting, at trial in the other. Here, Plaintiffs are likely to succeed on the merits of their appeal if they can likely show that the District Court abused its discretion by issuing the preliminary injunction. In the District Court, Plaintiffs had to show they were likely to succeed on the merits of their equal protection claim. Of course, they were likely to succeed on the merits only if the District Court could grant them the injunctive relief they sought—the counting of all VBM and provisional ballots that might be rejected due to signature mismatch.

My discussion proceeds as follows.  Part I reviews Plaintiffs' complaint and its motion for a preliminary injunction.

Part II recounts the step-by-step process the Court used to conclude that Plaintiffs had a substantial likelihood of success on the merits of their claim and therefore were entitled to the preliminary injunction they requested.  The Court reached that conclusion even though Plaintiffs had not met the requisites for a preliminary injunction and thus were not entitled to such relief.  The deprivation of the right to vote that VBM and provisional voters had suffered could not be undone, *Democratic Exec. Comm.*, 2018 WL 5986766, at *8, even by the District Court.

Part III describes why, even though the District Court found that Plaintiffs had made the required showing for a preliminary injunction, it could not order the Secretary to do what Plaintiffs had requested.

Part IV discusses the injunctive relief the Court gave instead, to the VBM voters who were "belatedly notified."  I explain that the District Court granted relief neither party asked for, and I show how the District Court misread the Election Code and violated the Constitution along the way.  Part V concludes.

I.

A.

Plaintiffs' complaint contained two counts, each seeking relief under 42 U.S.C. § 1983 for violations of the Equal Protection Clause. The counts incorporated the same factual allegations: Signature matching is "entirely standardless, inconsistent, and unreliable," because it is "done without any consistent standard or relevant expertise." Moreover, since "[h]andwriting can change . . . for a variety of reasons," including "physical[,] . . . mechanical . . . and psychological factors," "the signature requirement" is "particularly problematic." Deciding whether the signature on the voter's ballot matches the signature on the voter's registration entry is therefore "arbitrary," as if the decision were made by tossing a coin.

Count I, styled "First Amendment and Equal Protection," asserted that rejecting VBM and provisional ballots based on a signature mismatch arbitrarily disenfranchises registered voters, and therefore

> is plainly violative of the Equal Protection Clause. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104–05 (2000).[17]

---

[17] Count I mentions the First Amendment only in its style, never in its allegations. And its final paragraph asserts only an equal protection claim: "Based on the foregoing, Defendant, acting under color of state law, has deprived and will continue to deprive Plaintiffs and the voters they represent of equal protection under the law secured to them by the Fourteenth Amendment to the United States Constitution and protected by 42 U.S.C. § 1983."

To remedy the violations, Plaintiffs asked the Court to enjoin the rejection of VBM and provisional ballots and to order the ballots to be counted (along with the VBM and provisional ballots that were being counted based on matching signatures).

Count II, styled "Equal Protection" and relying on the same *Bush v. Gore* language, asserted that the signature-matching process disproportionately impacts "racial or ethnic minorities and/or young and first-time voters."  Count II contained no factual allegations indicating why this is so and did not allege any intentional discrimination by relevant state actors, a required element of an equal protection claim.  *Washington v. Davis*, 426 U.S. 229, 239, 96 S. Ct. 2040, 2047 (1976).  This may explain why the District Court never mentioned Count II in its order granting a preliminary injunction.  Accordingly, like the District Court, I will focus only on Count I.

To sum up Count I, Plaintiffs alleged that signature matching is arbitrary. That is, according to Plaintiffs, ballots were rejected based on a bogus signature comparison.  Plaintiffs sued to vindicate the rights of voters whose ballots were rejected, and they asked for an injunction requiring the counting of *all* VBM and provisional ballots rejected due to signature mismatch.

B.

Plaintiffs accompanied their Complaint with a motion for a preliminary injunction. The motion asked the District Court to enjoin the Secretary to direct the county supervisors of elections to refrain from

> rejecting vote by mail and provisional ballots on the basis of a signature mismatch [and to] toll the deadline for the county canvassing board to submit "unofficial" results to the Department of State . . . , in order to ensure that all signed absentee and provisional ballots are counted and included in all submitted results.

In their responses to Plaintiffs' motion, the Secretary and the RNSC presented arguments based on laches and the four-factor standard for obtaining a preliminary injunction.[18] They argued Plaintiffs' claim was barred by laches, since Plaintiffs had known about the signature-matching requirement for years and did not sue until after the polls were closed and the votes were being counted.

On the merits, the Secretary and the RNSC argued that signature-matching was reasonable under the *Anderson-Burdick* balancing test,[19] pointing to its role in

---

[18] The RNSC additionally challenged Plaintiffs' standing to sue on behalf of the voters whose ballots were not counted and raised a res judicata argument based on a prior suit, brought by the Democratic Party in 2016, which had challenged the previous signature-matching process.

[19] The Supreme Court has recognized "that the right to vote in *any manner* and the right to associate for political purposes through the ballot are [not] absolute." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063 (1992) (emphasis added) (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S. Ct. 533, 536 (1986)). And "[e]lection laws will invariably impose some burden upon individual voters." *Id.* Thus, courts "considering a challenge to a state election law must" apply a balancing test and

> weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the

preventing fraud and the fact that many other states require a signature match for a VBM ballot to count.[20]  They additionally argued that any varying standards for signature comparisons across counties fell within the general prerogative of local governments to set their own election procedures.  On the other elements of the preliminary injunction standard, the Secretary and the RNSC argued that Plaintiffs' delay in bringing the suit, as well as the availability of adequate state remedies, suggested that no federal equitable remedy was needed.  They also argued that the balance of the equities favored them, as judicial decrees changing the rules in the middle of an election are contrary to the public interest.

In sum, what the District Court had before it was a claim that signature matching was arbitrary, every qualified voter had a constitutional right not to be disenfranchised because of it, and the appropriate remedy was to count every signature-mismatched ballot with no additional information or input from the voter.  The Court did find that signature matching is arbitrary and that it violates the Equal Protection Clause.  But as I explain below, the Court then assumed that signature matching *is* constitutional, so long as denied voters have a chance to

---

burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Id.* at 434, 112 S. Ct. at 2063 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S. Ct. 1564, 1570 (1983)).

[20] Thirty-five states other than Florida have such a signature-matching requirement.  Vote at Home, *Voting at Home Across the States*, https://www.voteathome.org/wp-content/uploads/2018/11/Vote-at-Home_50-State-Report.pdf (last visited Feb. 15, 2018).

cure.  It then granted relief that was designed to give denied voters a longer period

to cure.  Plaintiffs, who attacked the practice of signature matching altogether,

never asked for this longer-to-cure relief.

## II.

The District Court recognized that it could grant the preliminary injunction

Plaintiffs requested

> only if [Plaintiffs] (1) . . . ha[d] a substantial likelihood of success on
> the merits; (2) irreparable injury will be suffered unless the injunction
> issues; (3) the threatened injury to [VBM and provisional voters]
> outweighs whatever damage the proposed injunction may cause the
> opposing party; and (4) if issued, the injunction would not be adverse
> to the public interest.

*Democratic Exec. Comm.*, 2018 WL 5986766, at *6 (quoting *Siegel v. LePore*, 234

F.3d 1163, 1176 (11th Cir. 2000) (en banc)).  The District Court found that

Plaintiffs satisfied these four factors.  I address each in turn.

## A.

The Court found that Plaintiffs had satisfied the first factor in answering the

question it thought Plaintiffs' equal protection claim presented: "whether Florida's

law that allows county election officials to reject vote-by-mail and provisional

ballots for mismatched signatures—with no standards, an illusory process to cure,

and no process to challenge the rejection—passes constitutional muster." *Id.* at *1.

The Court answered the question perfunctorily.  "The answer is simple.  It does

not." *Id.*

In identifying the question presented, the District Court reframed Plaintiffs' equal protection claim as follows: Florida's signature-matching scheme is unconstitutional on its face because it is standardless, which causes ballots to be accepted and denied in an arbitrary fashion, without a meaningful opportunity to cure or challenge the rejection. Since these voters were afforded neither opportunity, Florida's signature-matching scheme failed to pass constitutional muster. Reframed, Plaintiffs' claim was that if VBM and provisional voters were given a meaningful opportunity to cure or challenge a ballot rejection, the fact that the signature-matching scheme had arbitrarily burdened their ballots did not matter.

The District Court answered the *reframed* question that Plaintiffs' equal protection claim presented in four steps. First, the Court explained why the Code's signature-matching provisions were standardless and produced arbitrary decisions in violation of the Equal Protection Clause. Second, it explained why the procedure the Code provided for curing a rejected ballot was illusory. Third, it found that the Code failed to provide an effective process for challenging such rejection. And last, the Court implied that it could redress with an injunctive order the injury the signature-matching provisions caused VBM and provisional voters.

1.

53

The District Court found that the Code's signature-matching provisions, Fla. Stat. §§ 101.68(1), (2)(c)(1) (VBM ballots), and §§ 101.048(2)(b), 101.68(c) (provisional ballots), were standardless and therefore offensive to the Equal Protection Clause.

> For a vote-by-mail ballot to be counted, the envelope of that ballot must include the voter's signature. [Fla. Stat. § 101.65.] Once the vote-by-mail ballots are received, county canvassing boards review those ballots to verify the signature requirement has been met. *Id.* § 101.68(c). In addition to confirming the envelope is signed, the county canvassing boards confirm the signature on the envelope matches the signature on file for a voter. These county canvassing boards are staffed by *laypersons that are not required to undergo formal handwriting-analysis education or training*. Moreover, Florida has *no formalized statewide procedure* for canvassing boards to evaluate whether the signature on a vote-by-mail ballot matches the signature on file with the elections office.

*Democratic Exec. Comm.*, 2018 WL 5986766, at *2 (emphases added) (footnote omitted). In addition to these shortcomings, "counties have *discretion to apply their own standards and procedures*. . . . The only way such a scheme can be reasonable is if there are mechanisms in place to protect against arbitrary and unreasonable decisions by canvassing boards to reject ballots based on signature mismatches." *Id.* at *7 (emphasis added).

The same was true for the provisional ballots, which were cast by the voter in person. The ballot could not be counted if the signatures did not match:

> Provisional ballots are placed in a secrecy envelope and sealed. The person casting a provisional ballot has until 5 p.m. on the second day following an election to present written evidence supporting his or her

54

> eligibility to vote. . . .  A provisional ballot shall be cast unless the
> canvassing board finds by a preponderance of the evidence the person
> was not entitled to vote.  After making the initial eligibility
> determination, the county canvassing board must further compare the
> signature on the provisional ballot voter's certificate with the
> signature on the voter's registration.  If the signatures match, the vote
> is counted.

*Id.* at *3 (citations omitted).  In sum, the District Court found that the Code's

standardless signature-matching scheme arbitrarily deprived VBM and provisional

voters of the right to vote in the 2018 general election in violation of the Equal

Protection Clause.  *Id.* at *8.

2.

Next, the District Court analyzed the Code's provision for curing a

signature-rejected ballot in Fla. Stat. §§ 101.68(4)(a)–(b).  It found that the "cure

period" it provided "was intended to solve the inherent problems in signature

matching" but did not.  *Democratic Exec. Comm.*, 2018 WL 5986766, at *7.  In the

Court's mind, "the opportunity to cure ha[d] proven illusory.  Vote-by-mail voters,

in this election, were not notified of a signature mismatch problem until it was too

late to cure."  *Id.*  As for the provisional voters, the Code provided "no opportunity

to cure under the law.  Without this Court's intervention, these potential voters

55

have no remedy.  Rather, they are simply out of luck and deprived of the right to

vote," in violation of the Equal Protection Clause.  *Id.*[21]

3.

The District Court found nothing in the Code that gave VBM and

provisional voters the right to challenge a signature mismatch, whether

administratively or in court.  "Florida law provides no opportunity for [VBM]

voters to challenge the determination of the canvassing board that their signatures

do not match, and their votes do not count."  *Id.* at *2.[22]  And "[t]here is no

mechanism for a [provisional] voter to challenge the canvassing board's

determination that the voter was or was not eligible to vote."  *Democratic Exec.*

*Comm.*, 2018 WL 5986766, at *3.[23]

---

[21] As it turned out, the Court did nothing for voters who cast provisional ballots; the preliminary injunction it entered did not apply to them by its terms.  But the Court essentially intervened on behalf of VBM voters, though it limited its intervention to a subset of VBM voters, to those who were "belatedly notified [that] they ha[d] submitted a mismatched-signature ballot." *Id.* at *9.

[22] This statement is correct in part.  Once a signature mismatch determination is made (and, for VBM ballots, the cure period is over), there is no administrative remedy, and normal statutory processes will not revive any ballots so rejected.  But judicial review of signature-mismatch determinations for VBM ballots is available in the Florida Circuit Court in any circumstance where the number of challenged votes might change the outcome of the election, albeit on a limited record and with a deferential standard of review.  Fla. Stat. §§ 102.168(1), (3), (8).  Rejection of valid provisional ballots may also be challenged in the Florida Circuit Court, and the evidentiary and standard-of-review limitations of subsection (8) do not apply.  *See id.* §§ 102.168(3)(c), (8) (providing for a cause of action based on "rejection of a number of legal votes sufficient to change . . . the result," with limitations that apply only to VBM-ballot signature-mismatch challenges).

[23] At some point in its analysis of whether the Code's signature-matching provisions violated the Equal Protection Clause, the District Court apparently concluded that it did not

56

4.

Once it recognized that the Code's standardless signature-matching provisions operated to deprive VBM and provisional voters of the right to vote, the District Court had to decide whether it could redress the deprivation with a preliminary injunction.  If it could not, Plaintiffs could not satisfy the first factor for obtaining a preliminary injunction, a substantial likelihood of success on the merits.

Plaintiffs' proposal was an order requiring the Secretary to direct the county supervisors of elections to accept the VBM and provisional ballots that had been, or might be, rejected due to signature mismatch and to toll the deadline for the county canvassing boards' submission of the unofficial election results to the Department of State until all these rejected ballots had been counted.  If the Court

---

matter whether the Code provided VBM and provisional voters with effective procedures for curing or challenging the rejection of their ballots.  The Court did so for two reasons.

First, in framing their equal protection claim, Plaintiffs did not challenge the constitutionality of the Code's procedures for curing or challenging the rejection of VBM and provisional ballots.  From their point of view, the cure provisions were adequate.  Rather, the injury for which Plaintiffs sought injunctive relief was the arbitrary rejection of VBM and provisional ballots, and thus the deprivation of the voters' right to vote, in the application of the standardless signature-matching provisions.  "[T]he asserted injury," as the Court was quick to recognize, was "the deprivation of the right to vote based on a standardless determination made by laypeople that the signature on a voters' vote-by-mail or provisional ballot does not match the signature on file with the supervisor of elections."  *Id.* at *7.  This was the injury Plaintiffs wanted the Court to redress.

Second, since the signature-matching provisions were unconstitutional, the VBM and provisional voters didn't need a procedure for curing or challenging the rejection of their ballots.  An injunction requiring that their ballots be counted would provide them with all the relief they needed.

could not issue such an order, Plaintiffs could not show likelihood of success on the merits; nor could they establish the second, third, and fourth factors, since those factors depend on the issuance of an injunction redressing the constitutional violation the Court found.

The Court declined to issue the proposed injunction. It could not ameliorate the deprivation of the right to vote, because, as the Court concluded, that deprivation "cannot be undone." *See id.* at *8. But instead of dismissing Plaintiffs' constitutional claim, the Court moved to the second, third, and fourth factors, to determine whether they had been established. In doing so, it implied that Plaintiffs satisfied the first factor, the likelihood of success on the merits.[24]

### B.

The District Court had no difficulty concluding that Plaintiffs had established the second factor, irreparable injury. "Potentially thousands of voters have been deprived of the right to cast a legal vote—and have that vote counted— by an untrained canvassing board member based on an arbitrary determination that their respective signatures did not match." *Id.* at *8. This deprivation, according

---

[24] As I explain in Part III, the District Court was correct not to grant this relief.

to the Court, would be irreparable if the injunction Plaintiffs proposed did not issue.[25]

C.

The District Court had no difficulty concluding that Plaintiffs had established the third factor as well. The threatened injury to the VBM and provisional voters outweighed whatever damage the proposed injunction caused the Secretary. As the Court put it, "The burden on the right to vote, in this case, outweighs the state's reasons for the practice. Thus, . . . this scheme unconstitutionally burdens the fundamental right of Florida citizens to vote and have their votes counted." *Id.* at *7.[26]

D.

The District Court found the fourth factor was satisfied because the injunction Plaintiffs sought was

> in the public interest. The right of voters to cast their ballots and have them counted is guaranteed in the Constitution. Once again, Florida's statutory scheme threatens that right by rejecting votes based on signature mismatch without an opportunity to challenge that determination.

*Id.* at *9 (citation omitted).

---

[25] Of course, the District Court knew it wasn't going to grant the injunction Plaintiffs asked for. Instead, the District Court was going to grant the injunction that would remedy its *reframed* claim. This discussion of the second factor was just window dressing.

[26] The scheme may burden the citizens' right to vote, but the District Court—by refusing to grant the injunction Plaintiffs asked for—did nothing to lift the burden and instead maintained the status quo. This discussion was more window dressing.

*    *    *

The District Court spent a lot of time analyzing the four factors.  But at bottom, it was all window dressing—pretext to issue an injunction unmoored from Plaintiffs' complained-of injury.  This analysis had nothing whatsoever to do with the injunction the Court finally issued—to give VBM voters who were "belatedly notified" that their ballots were rejected a chance to cure the rejection.

### III.

Finding that Plaintiffs had satisfied the requirements for obtaining a preliminary injunction, the District Court "granted" their motion for that relief.  *Id.* at *9.  But the word "granted" was empty.  The Court did nothing to vindicate the right to vote for the VBM and provisional voters whose ballots had allegedly been arbitrarily rejected.  "Approximately 5,000" VBM and provisional voters had been disenfranchised in violation of the Equal Protection Clause by the operation of the Code's standardless signature-matching provisions, but they received no relief.  The Court gave them no relief because the disenfranchisement could not be "undone."  *Id.* at *8.

The right of suffrage is "a fundamental political right," *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 1071 (1886), protected by the Equal Protection Clause of the Fourteenth Amendment.  *Bush*, 531 U.S. at 104–05, 121 S. Ct. at 529–30.  "[T]he right of suffrage can be denied by a debasement or dilution of the

60

weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S. Ct. 1362, 1378 (1964); *accord Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995) (per curiam). "One source of [the right's] fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush*, 531 U.S. at 104, 121 S. Ct. at 529.

If, as Plaintiffs alleged, accepting or rejecting a VBM ballot is arbitrary due to the lack of a uniform signature-matching standard, then it is nearly certain that the ballots of some unregistered voters were improperly accepted and counted, and the ballots of some registered voters were improperly rejected and not counted.

With these two issues in mind, if Plaintiffs' allegations are true and the signature-matching decision is arbitrary, the Code would violate the Constitution in two ways. First, arbitrarily accepting the ballots of unregistered voters, because the signatures seemed to match, and counting their votes would dilute the votes of registered voters. And since this constitutes "arbitrary and disparate treatment, valu[ing] one person's vote over that of another," this vote dilution would violate the Equal Protection Clause. *Id.* at 104–05, 121 S. Ct. at 530. Second, arbitrarily rejecting the ballots of registered voters, because the signatures seemed not to

match, would deprive those voters of the right to vote, in violation of the Equal Protection Clause.[27]

But even if Plaintiffs were right—and the signature-matching decisions were no better than flipping a coin—the District Court could not grant Plaintiffs' requested relief for two reasons.

First, Plaintiffs' requested relief would have changed the rules that dictate whether a ballot is valid, and it would have done so in the middle of the vote count. Our precedent prohibits this sort of midstream change. *See Roe*, 43 F.3d at 581. Such changes are fundamentally unfair, since they inevitably dilute the votes of everyone who complied with the pre-rule-change requirements. These are not the rules under which the campaigns and election were conducted, so imposing them at this stage violates fundamental fairness.

The obvious constitutional remedy—the remedy that would cure any problems flowing from the arbitrary signature-matching decisions—would be to knock out *all* VBM ballots, except the rejected ballots that had been cured (since those voters had proven their identity with adequate identification). But the

---

[27] Similarly, some provisional voters found eligible to vote in the precinct where they voted were arbitrarily deprived of the right to vote because the signatures seemed not to match. *See* Fla. Stat. § 101.048(2)(b)(1).

obvious remedy was out of the question; it would render the outcomes of the 2018 general election politically, if not constitutionally, unacceptable.[28]

Second, Plaintiffs' requested relief was inconsistent with the nature of their claim, which is a facial challenge. Plaintiffs' claim is a facial challenge because, accepting their theory, the Code cannot be applied in a constitutional way—the arbitrary signature-matching decision will always be a constitutional violation. Indeed, the Code was applied exactly as written in this case, yet Plaintiffs still allege that the signature-matching decision is unconstitutional. Nor is the Code applied constitutionally when the supervisor of elections gets the signature-matching decision right. Under Plaintiffs' theory, the decision itself is still arbitrary because it is made without a standard. Any correct decisions are still random, and the whole ballot pool is tainted by the arbitrary filter.

If, as the District Court concluded, the signature-matching process is arbitrary—and thus unconstitutional—only one remedy would cure the harm: preventing the Secretary from enforcing the entire VBM and provisional voting schemes.[29] *See United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000) ("The remedy if the facial challenge is successful is the striking down of the

---

[28] Because the District Court could not remedy Plaintiffs alleged injury, it should have found that Plaintiffs were unable to succeed on the merits on their claim.

[29] The Court was right not to grant this remedy, but it should have concluded that, because the only remedy for Plaintiffs' alleged injury was unworkable, Plaintiffs were unlikely to succeed on the merits on their claim. The Court then should have stopped there.

regulation . . . ." (citing *Stromberg v. California*, 283 U.S. 359, 369–70, 51 S. Ct. 532, 536 (1931))).

IV.

Instead of dismissing Plaintiffs' claim because it couldn't grant the relief they sought, the District Court pivoted and held this: "Florida's statutory scheme as it relates to curing mismatched-signature ballots has been applied unconstitutionally."[30]  *Democratic Exec. Comm.*, 2018 WL 5986766, at *9.  The Court remedied the manufactured constitutional error by ordering the Secretary to allow voters who were "*belatedly notified* they ha[d] submitted a mismatched-signature ballot to cure their ballots by November 17, 2018, at 5:00 p.m."  *Id.* (emphasis added).[31]  In addition to granting relief unrelated to Plaintiffs' claim— and different from the relief Plaintiffs actually asked for—the District Court also misread the Election Code.

---

[30] The relevant provisions are Fla. Stat. §§ 101.68(1), 2(a), 2(c)(1), and (4).  As the ensuing discussion in the text indicates, the District Court overlooked § 101.68(1) and its relationship to § 101.68(4)(a) and focused instead on §§ 101.68(2)(a) and (2)(c)(1).  The injunctive order did not expressly identify the provisions the supervisors of elections unconstitutionally applied.  The order is silent as to the constitutional right(s) the supervisors of elections or the canvassing boards violated in applying "Florida's statutory scheme as it relates to curing mismatched-signature ballots."

[31] Despite the District Court's statements about the injury to provisional-ballot voters, its order does not apply to provisional ballots at all: only "voters who have been belatedly notified" can avail themselves of the relief.  *Id.* at *9.  Provisional ballot voters whose ballots were rejected were not "belatedly notified" since there was no requirement to notify them at all.  Even if they had been notified that their ballots were rejected, such notice would not be "belated" since there was no opportunity to cure provisional ballots regardless.

I divide this Part into three sections.  First, I explain how the Code operates.  Second, I show how the District Court misread and misapplied the Code.  Third, I highlight how the District Court abused its discretion and violated the Constitution in the process.

## A.

To show what the District Court misunderstood, let's start with the proper understanding of how these VBM provisions operate.  A VBM ballot, once filled out, is placed within a mailing envelope.  The voter then signs the voter's certificate on the back of the envelope and sends the envelope to the county supervisor of elections, who must receive it by 7 p.m. on election day.  Fla. Stat. §§ 101.65, 101.67(2).  Instructions, provided with every ballot, warn the voter that if his signature on the voter's certificate does not match the signature on the voter's registration entry, the ballot "will be considered illegal and not be counted."  *Id.* § 101.65.

Immediately after the county supervisor of elections receives the ballot, the supervisor must compare the signature on the voter's certificate with the signature on the voter's registration entry.[32]  On finding that a voter's certificate is missing a

---

[32] The statute reads, in relevant part:

The supervisor of the county where the absent elector resides shall receive the voted ballot, *at which time* the supervisor shall compare the signature of the

65

signature, or that the signature on the certificate does not match the one in the

registration entry, the supervisor of elections must immediately notify the voter, *id.*

§ 101.68(4)(a), and allow him to cure the defect.[33]  The voter will have until 5 p.m.

the day before the election to present the supervisor of elections a signed affidavit

that includes a copy of an appropriate form of identification and a sworn statement

verifying that the ballot is his.  *Id.* §§ 101.68(4)(a)–(b).  This submission can be

made via mail, fax, or email.  *Id.* §§ 101.68(4)(c)(4)–(5).

The ballot, and any cure affidavit received, are eventually canvassed.  The

canvassing board[34] "must, if the supervisor has not already done so, compare the

signature" on the voter's certificate or cure affidavit with the one in the registration

---

elector on the voter's certificate with the signature of the elector in the registration
books or the precinct register . . . .

*Id.* § 101.68(1) (emphasis added).  The use of "shall compare" and "at which time" indicate that
this duty is mandatory and must be performed when the ballot is received.

[33] The majority mistakenly concludes that election officials may sit on a VBM ballot and
do nothing with it until it's canvassed by the canvassing board.  To draw this conclusion, the
majority assumes that the canvassing board compares the signatures all on its own.  *See* Maj. Op.
at 14–15 ("And even more problematically, the law did not require canvassing boards to even
begin the canvassing of vote-by-mail ballots and check for signature match before noon on the
day after the election[, even though signature cures must be submitted by 5 p.m. the day before
the election]."); *id.* at 22 (noting that submitting a VBM ballot well before the deadline "*still*
would not guarantee that [a voter] would be notified of any signature mismatch until it was too
late to do anything to remedy the problem").  Doing so, the majority overlooks the parts of the
Code that require the supervisor (1) to immediately compare the signatures after receiving a
ballot and (2) to immediately notify a voter that his ballot has been rejected based on a problem
with the signatures.

[34] By statute, each county canvassing board consists of the supervisor of elections, a
county court judge, and the chair of the board of county commissioners.  *Id.* § 102.141(1).

books "to determine the legality of that vote-by-mail ballot."[35]  *Id.* §

101.68(2)(c)(1).  Canvassing need not occur immediately on receiving a ballot or

cure affidavit: it can begin any time from 15 days before the election to noon of the

day after.  *Id.* § 101.68(2)(a).  If a ballot is rejected for a signature mismatch and is

not cured under the procedure specified in § 101.68(4)(b), it is marked "rejected as

illegal" and is not tabulated, although the ballot itself is preserved.  *Id.* §§

101.68(2)(c)(1), (5).

## B.

The District Court reached its decision that the Code provisions relating to

"curing" signature-rejected ballots were applied unconstitutionally because it failed

to comprehend how the statutes operated to notify VBM voters that their ballots

had been rejected, *id.* §§ 101.62(1)(a)–(b), and to inform voters of their right to

cure the rejection, *id.* § 101.68(4)(b).

With all of that clearly laid out in the Code, here is how the District Court

described the statutory process:

> The opportunity to cure is the last chance a vote-by-mail voter has to
> save their vote from being rejected and not counted.  Florida law
> provides no opportunity for voters to challenge the determination of
> the canvassing board that their signatures do not match, and their
> votes do not count. . . .  Even more striking is the fact that under
> Florida law, canvassing boards may begin canvassing of vote-by-mail

---

[35] Presumably, this would happen only if the canvassing board received a VBM ballot
after canvassing had already begun.  Otherwise, the supervisor would have compared the
signatures immediately after receiving the ballot, as he or she is required to do.  *Id.* § 101.68(1).

ballots at 7 a.m. on the 15th day before the election, but no later than noon on the day following the election.  Fla. Stat. § 101.68(2)(a).  Thus, a vote-by-mail voter could mail their ballot in weeks early, but the canvassing board could also wait, canvass the ballot the day after the election, determine there is a mismatched signature, and toss the vote.  The voter therefore gets no chance to cure, since curing must be done by 5 p.m. the day before the election.

*Democratic Exec. Comm.*, 2018 WL 5986766, at *2.

The District Court reached the conclusion that the signature-matching exercise was carried out by the canvassing boards entirely on its own.[36]  Nothing in the allegations of Plaintiffs' Complaint or the briefing on Plaintiffs' motion for a preliminary injunction warranted this conclusion.  Nothing in the Complaint or the parties' submissions indicated that VBM voters were "belatedly notified" that the signature on their ballots did not match the signature in their registration entry.  The county supervisors of elections are presumed to have processed VBM ballots and voters' cure affidavits in keeping with both the letter and the spirit of the law.[37]  Nothing in the complaint or the parties' submissions rebutted that presumption.

A VBM voter waiting until the eleventh hour to submit his ballot ran the risk that his ballot might be rejected.  VBM voters were on notice that a chain of events had to happen before they successfully cured a rejected ballot: (1) they had to

---

[36] The majority adopts and endorses this erroneous reading.  *See* Maj. Op. at 14–15, 22.

[37] "Ordinarily, we presume that public officials have properly discharged their official duties."  *Banks v. Dretke*, 540 U.S. 668, 696, 124 S. Ct. 1256, 1275 (2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 909, 117 S. Ct. 1793, 1799 (1997)).

receive a rejection notice in the mail, (2) they had to prepare a cure affidavit, and (3) they had to present the affidavit to the supervisor of elections by 5 p.m. the day before the election.  Obviously, these things would take some time, so a VBM voter knew that it was risky to submit a VBM ballot near the deadline.  A VBM voter thus had no one to blame but himself if the time ran out for curing a rejected ballot.  *See Rosario v. Rockefeller*, 410 U.S. 752, 757–58, 93 S. Ct. 1245, 1249–50 (1973) (noting that petitioners could have met the 30-day deadline for enrolling in political party, "but chose not to.  Hence, if their plight can be characterized as disenfranchisement at all, it was not caused by [the deadline], but by their own failure to take timely steps to effect their enrollment").

*    *    *

In one breath, the District Court held that the signature-matching provision is arbitrary and thus violated the Equal Protection Clause.  *See Democratic Exec. Comm.*, 2018 WL 5986766, at *8.  But in the next breath, the Court found that the signature-matching provision *did not* in fact violate the Equal Protection Clause. Indeed, implicit in its granting relief to the "belatedly notified" VBM voters is the conclusion that implementing the signature-matching provisions does not violate the Equal Protection Clause.  Thus, it is constitutionally permissible for the supervisors of elections or the canvassing boards to reject a VBM ballot on a finding that the signatures on the ballot or cure affidavit and the voter's registration

entry did not match.[38]  What was constitutionally impermissible was to belatedly

notify a VBM voter of the rejection.

C.

The District Court abused its discretion in ordering that the county

supervisors of elections allow belatedly notified voters time to cure their ballots.

"A district court abuses its discretion if it . . . applies the law in an unreasonable or

incorrect manner . . . ."  *Glock v. Glock, Inc.*, 797 F.3d 1002, 1006 (11th Cir. 2015)

(quoting *FTC v. AbbVie Prods. LLC*, 713 F.3d 54, 61 (11th Cir. 2013)).  The abuse

occurred here because the District Court based its injunctive order on an incorrect

reading of the Election Code, thus applying an incorrect legal standard.[39]  And this

Court, in wrongly assuming that the District Court had a solid legal foundation for

its injunctive order, was wrong to deny the RNSC's motion to stay the order.

The District Court not only relied on a mistaken reading of the Code, it also

committed several constitutional violations in reaching its ultimate decision.

---

[38] In fact, the Court endorsed the further use of signature-matching directly within its order: if any voter seeking to avail himself of the remedy submits a cure affidavit with Tier 2 identification, he is just as subject to the chance of rejection for signature mismatch as a voter in the first instance.  If one coin flip is unconstitutional, surely adding another doesn't solve the problem.

[39] As I explained in footnote 16, *supra*, when analyzing the motion to stay, we must evaluate the likelihood that Defendants will succeed on the merits of their appeal.  In this appeal, the issue will be whether the District Court abused its discretion by granting the preliminary injunction.  Thus, the abuse of discretion is relevant when deciding whether Defendants are likely to prevail on the merits of their appeal.

First, in issuing the injunctive order against the Secretary *sua sponte* without giving them notice and an opportunity to be heard on whether the order should issue, the Court denied them due process of law.

Second, in issuing its injunctive order after the polls had closed, the Court changed the rules under which the general election had been conducted, effectively rewriting the VBM provisions of the Code. This operated to virtually disenfranchise some VBM voters—those who would have cured but for the deadline and were now unable to submit a cure by the new deadline—and, at the same time, to dilute votes cast at the polls, in violation of the Due Process and Equal Protection Clauses.

Third, in failing to define "belatedly notified," the Court created its own standardless determination for identifying those eligible to vote, in violation of the Equal Protection Clause.

Fourth, in rewriting the VBM provisions of the Code to eliminate its purportedly unconstitutional application, the Court dishonored Florida's separation of powers doctrine, which prevents courts from rewriting statutes, and thereby violated the doctrine of federalism, which precludes federal courts from taking action that would breach a state's separation of powers.

I expand on these constitutional errors in turn.

1.

A reader of the District Court's injunctive order would assume that Plaintiffs had claimed that in belatedly notifying VBM voters that their ballots had been rejected, the supervisors of elections had infringed a right the voters enjoyed under the Fourteenth Amendment, a right they declined to identify. The assumption would be false because Plaintiffs made no such claim. The Court invented the claim by reframing what Plaintiffs actually alleged, and it did so without informing the parties of what was lying in store. Plaintiffs were only attacking the Code's signature-matching scheme; they had no quarrel with the Code's provisions for notifying VBM voters that their ballots had been rejected and explaining how a rejection could be cured.

Saddling a defendant with a judgment on a claim the plaintiff did not assert, a claim based on a legal theory the plaintiff would have rejected,[40] and doing so without notice to the defendant and affording it an opportunity to be heard violates the Due Process Clause of the Fourteenth Amendment. That's what happened here. The Court entered its injunctive order in derogation of the Secretary's and the RNSC's right to due process.

2.

---

[40] To accept the Court's position that the signature-matching provisions were valid, Plaintiffs would have to abandon their position that the provisions violated the Equal Protection Clause.

The District Court changed the rules of the election after the polls had closed, an impermissible remedy under our decision in *Roe v. Alabama*. 43 F.3d at 581.[41]  Changing the rules of an election after the voting is over and the ballots are being counted is an impermissible remedy because it violates rights guaranteed by the Fourteenth Amendment in three ways.  First, the new rules enfranchise those who failed to comply with the rules in existence before the voting began and therefore could not legally vote.  Second, counting the votes of the newly enfranchised dilutes the votes submitted in compliance with the existing rules.  Third, changing the rules virtually disenfranchises some who did not vote.  Time constraints, for example, may have rendered these non-voters unable to comply with the existing rules, but they would have voted or cured had they known of the new rules.

The first consequence of the District Court's order, counting votes that would not have been cast prior to the rule changes, would amount to "stuff[ing] the ballot box," *id.*, and would jeopardize the integrity of the election.  The second consequence, diluting compliant votes under the old rules, would disregard the Court's "obligation to avoid arbitrary and disparate treatment of the members of

---

[41] *Roe* involved an Alabama state law that appeared to require absentee ballots to be either notarized or signed by two witnesses.  It was the past practice in Alabama not to count ballots that did not meet this requirement.  *Id.*  After a closely contested election, a state circuit court ordered the Secretary of State to count non-notarized and insufficiently witnessed ballots.  The District Court issued a conflicting injunction, requiring the Secretary not to comply with the state court order, and we affirmed the order in relevant part.  *Id.* at 583.

[the] electorate" and would violate the Equal Protection Clause. *Bush*, 531 U.S. at 105, 121 S. Ct. at 530. The third consequence, virtually disenfranchising those who would have voted (or cured) but for the inconvenience imposed by the preexisting rules, would deprive those would-be voters of the equal protection of the laws. *Roe*, 43 F.3d at 581.

3.

Now, onto the problems with belated notice. The District Court's injunctive order fails to define "belatedly notified." What constitutes belated notice, and how were the supervisors of elections supposed to determine who was belatedly notified?

Start with the substantive standard of belated notice. This must mean "later than would in fact allow the voter to cure," rather than "later than the supervisor of elections was allowed to wait by statute": the voter must have received notice at an hour actually too late to cure, or with an unreasonably low amount of turn-around time available, if the order is to include him. Interpreting the order otherwise, to rule that only persons who were notified later than required by the statute received belated notice, would not remedy any constitutional problem with the statute. So the most natural reading of the order is that belated notice is a fact-intensive inquiry turning on the voter's individual circumstances. When was the voter notified? What was he told about the cure procedure—was he sent a cure affidavit,

directed to its location on the county elections website, simply informed that it was required, or none of the above?  What sort of means and capacity—a computer or fax machine, a few minutes of free time—did he have available to respond quickly, if necessary?  The determination would be easy with respect to some voters—those whose ballots originally came in after the 5 p.m. cure affidavit deadline—but harder for others.

The supervisors of elections were not required to retain any of the information that would help resolve the hard cases of belated notice.  Much of it would be inherently outside a supervisor's purview—e.g., when the voter checked his mail—so the supervisor would have no idea which voters were actually belatedly notified.  Likely, many of these possibly belatedly notified voters sent in (late) cure affidavits.  So, supervisors must, for each late cure affidavit already received, determine whether the affiant was actually belatedly notified, in addition to making this determination for every cure affiant who submitted his affidavit between the issuance of the injunction and its deadline two days later.  The injunctive order gave supervisors no guidance or standards to apply when making these determinations.

This relief is impermissible under *Bush v. Gore*, in which the Supreme Court reversed the Florida Supreme Court's order requiring a hand recount that lacked uniform standards across counties for determining the intent of the voter.  531 U.S.

at 111, 121 S. Ct. at 533.  The Court explained that "[w]hen a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied."  *Id.* at 109, 121 S. Ct. at 532.  Here, non-uniform standards for belated notice, and how it is to be determined, are practically inevitable.  Some counties may set a cutoff date and time to cure.  Other counties may ask each voter whether he or she had enough time.  Still others may assume that the submission of every cure after the deadline was due to belated notice rather than dilatory voter behavior and therefore count them all.  The Court's failure to dictate a uniform standard for deciding those who were or were not belatedly notified is destined, almost assuredly, to result in voters in identical circumstances being treated differently.  Under *Bush*, it must not.

4.

The District Court's injunction functionally writes a new provision into Florida's Election Code as it relates to curing a ballot rejected for want of matching signatures.  It was not needed; the statutory provisions the Court overlooked informed VBM voters of everything they needed to know to cast a ballot and have it counted.  If the provisions are inadequate, it is the responsibility of the Florida legislature to refine them.

The Florida Supreme Court would not usurp the legislative prerogative and rewrite a significant part of the Election Code as the District Court has done.  The

76

separation of powers doctrine would preclude it from doing so. *See, e.g.*, *Fla. Dep't of Revenue v. Fla. Mun. Power Agency*, 789 So. 2d 320, 324 (Fla. 2001) ("Under fundamental principles of separation of powers, courts cannot judicially alter the wording of statutes where the Legislature clearly has not done so."); *Hawkins v. Ford Motor Co.*, 748 So. 2d 993, 1000 (Fla. 1999) ("[T]his Court may not rewrite statutes contrary to their plain language.").

Under our Constitution, federal courts must respect the doctrine of federalism; it requires the federal courts to respect Florida's decision to fashion a government with three coequal branches, legislative, executive, and judicial. As a sister circuit has said, "Even the narrowest notion of federalism requires us to recognize a state's interest in preserving the separation of powers within its own government as a compelling interest." *Republican Party of Minn. v. White*, 416 F.3d 738, 773 (8th Cir. 2005). The court explained that a "state's choice of how to organize its government is 'a decision of the most fundamental sort for a sovereign entity.'" *Id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S. Ct. 2395, 2400 (1991)).

If the District Court believed the Code's provisions relating to curing VBM ballots for lack of a signature match violated the Constitution as applied, what could it do? The power the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, allows federal courts to review state statutes, but federal courts are limited to

refusing to apply the provisions they find unconstitutional.  *See Frandsen*, 212 F.3d at 1235 ("The remedy if the facial challenge is successful is the striking down of the regulation . . . ." (citing *Stromberg*, 283 U.S. at 369–70, 51 S. Ct. at 536)); *see also* Henry M. Hart, Jr. & Albert M. Sacks, *The Legal Process* 154 (1994) ("American courts have no general power of control over legislatures.  Their power, *tout simple*, is to treat as null an otherwise relevant statute which they believe to be beyond the powers of the legislature . . . .").  That power does not extend—as the District Court clearly believed—to prescribing *new* rules of decision on the state's behalf.  *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397, 108 S. Ct. 636, 645 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements.").[42]

The District Court could impose no remedy other than an injunction prohibiting the State's enforcement of the provisions it found offensive to the U.S. Constitution.  The Court couldn't impose that remedy, though, because it might leave out in the cold the VBM voters the Court wanted to protect—those belatedly

---

[42] Remarkably, courts cannot rewrite statutes even by *striking down* language, rather than by adding it.  Take severability clauses—which the statutes at issue here noticeably lack.  In *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), *as revised* (June 27, 2016), for example, the state defendant argued for a "narrowly tailored judicial remedy," not facial invalidation, by pointing to a severability clause in Texas's abortion statute.  *Id.* at 2318−19.  But the Supreme Court responded that a "severability clause is not grounds for a court to 'devise a judicial remedy that entails quintessentially legislative work.'"  *Id.* at 2319 (alterations omitted) (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329, 126 S. Ct. 961, 968 (2006)).

notified.  The Court didn't identify the provisions "relat[ing] to curing mismatched-signature ballots" that were unconstitutionally applied.  Those provisions are intertwined with other VBM provisions, so the vindication of the rights of the voters belatedly notified might require the Court to enter an order that would bring down the VBM scheme altogether, a result neither Plaintiffs nor the belatedly notified voters could accept.

At the end of the day, the District Court should have been restrained by federalism: the Court should not have taken it upon itself to monitor the operation of Florida's Election Code, fine-tuning its provisions here and there.  *See Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986) ("Although federal courts closely scrutinize state laws whose very design infringes on the rights of voters, federal courts will not intervene to examine the validity of individual ballots or supervise the administrative details of a local election.").

## V.

This case highlights the many problems that arise when a federal court oversteps its Article III authority.  Here, the District Court overstepped by reframing Plaintiffs' claim *sua sponte* and without notice to the parties.  It also overstepped by granting relief on the reframed claim, relief that Plaintiffs never requested.  And finally, the District Court overstepped by effectively rewriting the Election Code.

# EXHIBIT 1

Case: 18-14758   Date Filed: 11/15/2018   Page: 1 of 3

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14758

_____

D.C. Docket No. 4:18-cv-00520-MW-MJF

KEN DETZNER, in his official capacity as Florida Secretary of State,

Defendant-Appellant,

NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

Intervenor-Defendant-Appellant,

versus

DEMOCRATIC EXECUTIVE COMMITTEE OF FLORIDA,
BILL NELSON FOR US SENATE,

Plaintiffs-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

Before TJOFLAT, MARTIN, and ROSENBAUM, Circuit Judges.

BY THE COURT:

Before the Court is Appellant National Republican Senatorial Committee's

Emergency Motion for a Stay and Motion to Expedite.  Appellant's request for a

stay pending appeal is DENIED because Appellant has not made the requisite showing. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

Appellant's alternative request to expedite appeal is DENIED.

One judge dissents; opinions will follow.

As for Appellant's concerns about the administrative difficulties of fulfilling the district court's order, it follows logically from the district court's order that any voter who voted by mail and received actual notice after 5 p.m. on Thursday, November 1, 2018, that his or her vote was rejected due to a signature mismatch is a voter who received belated notice of the defect.[1]  Therefore, anyone who voted by mail can cure in the manner provided by the district court's order if he or she signs an affidavit or declaration, to be provided by the Secretary of State of the State of Florida or the county voting authorities, affirming under penalty of perjury that he or she did not receive actual notice of the signature defect until after 5 p.m. on Thursday, November 1, 2018.

As there was no cure mechanism for provisional voters whose votes were rejected for mismatched signatures, any provisional voter whose vote was rejected due to a signature mismatch is eligible to cure his or her vote in the manner

---

[1] The district court's order gave 48 hours to cure, demonstrating that the district court found 48 hours to be a reasonable period to give individuals to cure their vote.  Under the statute, the latest someone who voted by mail could cure was 5 p.m. on Monday, November 5, 2018, so 48 hours prior, excluding Saturday and Sunday, was Thursday, November 1, 2018, by 5 p.m.  Similarly, the district court's reliance on the declaration of Fallon Williams, among others, demonstrates that its order was concerned with actual notice of the signature mismatch.

provided by the district court's order, regardless of when he or she discovered the defect.